UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------X
ANNE BRYANT, ELLEN BERNFELD, AND GLORYVISION, LTD.,

Plaintiffs,

-against-

EUROPADISK, LTD., MEDIA RIGHT PRODUCTIONS, INC., VERY COOL MEDIA, INC., DOUGLAS MAXWELL, THE ORCHARD ENTERPRISES, INC., and RUSSELL J. PALLADINO,

Defendants.

-------------------------------------------X

Tuesday
January 29, 2008
10:15 a.m.

EXAMINATION BEFORE TRIAL of the Defendant, MEDIA RIGHT PRODUCTIONS, INC., by and through its witness, DOUGLAS BERLENT, taken pursuant to Notice, held at the offices of Rockland & Orange Reporting, 445 Hamilton Avenue, White Plains, New York, on the 29th day of January 2008, before a Notary Public of the State of New York.

ROCKLAND & ORANGE REPORTING
20 South Main Street
New City, New York 10956
(845) 634-4200



APPEARANCES:

MONAGHAN, MONAGHAN, LAMB & MARCHISIO, ESQS.
Attorneys for Plaintiffs
28 West Grand Avenue
Montvale, New Jersey 07645
BY: PATRICK J. MONAGHAN, JR., ESQ.
MICHAEL KORIK, ESQ.

SHELOWITZ BRODER, LLP
Attorneys for Defendants
11 Penn Plaza, 5th Floor
New York, New York 10001
BY: MITCHELL C. SHELOWITZ, ESQ.



STIPULATIONS

IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties hereto that the sealing and filing of the within deposition be waived; that such deposition may be signed and sworn to before any officer authorized to administer an oath with the same force and effect as if signed and sworn to before a Justice of this Court.

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to form, are reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED that the within examination and any corrections thereto may be signed before any Notary Public with the same force and effect as if signed and sworn to before this Court.



Douglas Berlent

DOUGLAS BERLENT, the Witness herein, on behalf of the Defendant, MEDIA RIGHT PRODUCTIONS, INC., having first been duly sworn by Kathryn Lebeau, a Notary Public of the State of New York, was examined and testified as follows:

THE COURT REPORTER: Please state your name for the record.
THE WITNESS: Douglas Berlent.
THE COURT REPORTER: Will you state your present address.
THE WITNESS: 324 West 23rd Street, Number 3B, New York, New York 10011.

EXAMINATION BY
MR. MONAGHAN:

Q. Good morning. I'm sorry. Did you say your name was Douglas Berlent, B-E-R-L-E-N-T?
A. Yes.
Q. Okay. And do you, also, use the name Maxwell?
A. Yes.





Douglas Berlent

Q. Okay. And in what context do you use that name?

MR. SHELOWITZ: Objection to the form.

MR. MONAGHAN: What's the objection?

Q. Why do you use another name?

A. For personal reasons relevant to my blindness, I changed my name for myself, approximately, 10 years ago to reflect maximum wellness and that became the name I use, professionally, since that time.

Q. I see. Okay. Do you have any licenses or any official documents that bear the name Maxwell?

In other words, what is your official name? What do you sign contracts with? What do you sign documents with? What name?

A. I, usually, Doug - Doug Berlent Maxwell, accounting for both.

Q. Okay. You haven't had any official name change by a court; is that what you're saying?

A. No, I have not.

Q. Okay. That's fine.



Douglas Berlent

Are you suffering from any physical or mental disability, today, that would disable you from understanding my questions or reviewing any documents that I might show to you?

A. No. In terms of mental disability, potentially, seeing the documents, I might not be able to read the print depending on the size of the print. So, I may need you to read them.

Q. Okay. Can you give me an idea of the parameters of the vision that you are able to use, effectively?

MR. SHELOWITZ: Objection to the form.

MR. MONAGHAN: You can answer, please.

Q. I mean what size type are you able to read?

A. Comfortably, 18-point type.

Q. From what distance?

A. Close.

Q. Okay. The address you gave to the reporter -- Would you prefer I called you "Mr. Maxwell"?

A. That would be fine.



Douglas Berlent

Q. Okay. The address you gave to the reporter, Mr. Maxwell, is that home or business address?

A. Home.

Q. Okay. And are you, currently, employed, sir?

A. Yes.

Q. And by what company?

A. Media Right Productions, Inc.

Q. And is that a New York corporation?

A. Yes, it is.

Q. And where are its offices?

A. 40 West 27th Street, 4th Floor, Room 400, New York, New York 10001.

Q. And do you have any other business associations at the present time, that is, with respect to which you're either an employee, officer or a director?

A. Yes.

Q. What would those be?

A. I am the Executive Director of the Visionary Media Group, which is a non-for-profit agency assisting blind people.

Q. Any others?



Douglas Berlent

A. No.

Q. Okay. And you said Media Right Productions is a New York corporation and you are, currently, employed. And what position are you, currently, employed by that company?

A. I am the President.

Q. And do you own the company?

A. Yes.

Q. 100 percent? You own the company, 100 percent of the shares?

A. I do not believe so.

Q. Who else is a principal or owner of the company?

A. I believe my wife has a small percentage.

Q. And your wife's first name?

A. Liz.

Q. Okay. Any other shareholders?

A. No.

Q. And who are the other officers? You're President. Who else is an officer?

A. My wife.

Q. What position does she hold?

A. I believe, Vice President.

[9]

Douglas Berlent

Q. And any other individuals?
A. No.
Q. Okay. And has this status that you've just described been true from, at least, 1999 to the present, that is, the shareholding officerships?
A. No.
Q. Okay. Going backwards, who were the officers of the company in 1999?
A. I was the sole officer.
Q. And sole owner?
A. Yes.
Q. Okay. And how would you describe the business of Media Right Productions? What do they do?
A. It's a vehicle for my skills as a composer and producer.
Q. To do what?
A. To use my skills to try to earn a living in the music business.
Q. Okay. And do you, also, provide services to third parties?
A. Yes.
Q. Okay. What type of services would

[10]

Douglas Berlent

those be?
A. Recording services, production services and, on occasion, marketing.
Q. And you are the person who's responsible for those various functions?
A. Yes.
Q. And are you a member of any societies, musical performing right societies?
A. Yes.
Q. Other societies?
MR. SHELOWITZ: Just let him finish the question, okay, Doug?
MR. MONAGHAN: Yeah.
Q. Let me give you a couple of guidelines here. The attorney, probably, has already told you some of them.
Wait until I finish my question, please.
If you don't understand my question, tell me and I'll try and correct it or rephrase it.
If you answer a question of mine, we will assume that you understood it. Is that fair?
A. That is fair.

[11]

Douglas Berlent

Q. Okay. Have you ever testified before?
A. Yes.
Q. In a deposition or a trial?
A. In a deposition.
Q. Okay. How many such times?
A. Once.
Q. Okay. What was the nature of the case?
A. Copyright.
Q. Copyright infringement?
A. Yes.
Q. Were you a plaintiff or a defendant or a witness?
A. I don't understand the question. If you could explain?
Q. I'll try.
A. The difference, I know which one I was, but I don't know plaintiff or defendant.
Q. Which side were you on? The top or the bottom in the caption?
A. We were the plaintiff.
Q. Okay. Where was that case?
A. The State of New York.
Q. And was it on your behalf, individually, or on behalf of Media Right

[12]

Douglas Berlent

Productions?
A. I don't recall.
Q. How long ago was the case?
A. Within the past two years.
Q. Is the case still, ongoing?
A. No, it's not.
Q. Okay. And who was the defendant?
A. I believe it was Focus Films, but I cannot, completely, recall that.
Q. And was Mr. Shelowitz your attorney in that case?
A. No, he was not.
Q. Who was your attorney?
A. Paul Millman.
Q. Who, for a time, was in this case, as well; am I right?
A. Yes.
Q. And what was the resolution of the case?
A. It was settled.
Q. So, may I take it from that that you have some basic familiarity with copyright law having been involved in a piece of litigation as a plaintiff?

[13]

Douglas Berlent
A. Yes.
Q. Do you own any copyrights, yourself?
A. Yes.
Q. And are these compositions of yours?
A. Yes.
Q. And how many such compositions have you recorded copyright -- Let me rephrase that.
You've recorded copyrights in Washington; have you not?
A. Yes.
Q. Okay. How many copyrights do you hold? Roughly? You don't have to be precise.
A. No less than 50, I would think.
Q. Okay. And were you the person who, primarily, accomplished the filing of the copyright registration forms?
MR. SHELOWITZ: Objection to the form. If you could be more specific with what you mean by accomplished the filing?
MR. MONAGHAN: Took care of, actually, filling out the forms and sending them in?

[14]

Douglas Berlent
THE WITNESS: Yes.
Q. Were you able to do this, unaided, that is, without any vision-enhancement device?
A. I use special adaptive devices that allow me to read.
Q. What are those? Just magnify -- I shouldn't say. I have no idea. I just ask the question.
A. They're microscopic lenses and --
Q. Microscopic lenses, you insert in your eyes?
A. They're glasses.
Q. Glasses. Okay.
And, getting back to your knowledge of the music business, in general, are you familiar with the term "music publishings"?
A. Yes.
Q. What is music publishing?
A. My understanding of it is it's an entity that attempts to generate income from a musical work.
Q. Exploit the musical composition, not exploit in a negative sense, but exploit it for commercial use?

[15]

Douglas Berlent
MR. SHELOWITZ: He's already answered the question. That's what is his understanding of what a music publisher is.
Q. Do you agree with what I just said or disagree?
MR. SHELOWITZ: Objection to the form.
MR. MONAGHAN: You can answer.
THE WITNESS: I'm sorry. Was that a question?
MR. MONAGHAN: Yeah.
The WITNESS: Could you --
Q. I went, further, and said do you agree with the concept that music publisher exploits musical composition --
A. I'm sorry.
Q. -- in a positive way?
A. I've seen that term in publishing documents, yes.
Q. Okay. And, in some instances, the music publisher might, also, be the composer; is that right? Is that your understanding from your

[16]

Douglas Berlent
knowledge of copyright law?
A. Yes.
Q. Okay. And are you familiar with the concept of copyright assignments?
A. Not in detail.
Q. Well, generally speaking, have you ever had occasion to assign a copyright that you own to a third party?
A. No.
Q. You've kept all your own copyrights, is what you're saying?
A. For a brief time, I did have a publishing agreement, but I didn't know the word "assign" was used in that context. So, I'm not clear on what the definition is of assign.
Q. Transfer?
A. Yes, I have signed. I have been party to agreements that have publishing agreements.
Q. Do you know that, in order to transfer a copyright, you must do it by a written document? Do you have that understanding?
A. Yes.
Q. And you've had that understanding since, at least, 1999?

[17]

Douglas Berlent
A. Yes.
Q. Okay. Getting back to the question pertaining to what organizations and societies in the music business, have you been involved with or a member of -- are you a member of a performing rights society?
A. Yes.
Q. Which one?
A. A.S.C.A.P.
Q. Any others? Any foreign musical performing rights societies?
A. The only other one is the Harry Fox Agency.
Q. Okay. And what is your understanding of what Harry Fox does?
A. They collect mechanical royalties on behalf of publishers and record companies and artists.
Q. Okay. And any other organizations which you are a member -- in which you are a member?
A. Currently?
Q. Yeah.
A. May I ask, so I understand the

[18]

Douglas Berlent
question, you said are there any other organizations of which I am, currently, a member. Do you mean in the music --
Q. I do.
A. -- industry?
Q. Yeah.
A. To my present recollection, no.
Q. Okay. And how about if I asked you if you can recall going back to 1999-2000, would your answer have been, essentially, the same, that is, you were a member of A.S.C.A.P. and you, also, dealt with Harry Fox?
A. Yes.
Q. Okay. Have you had occasion to obtain copyrights from other persons in the course of your business dealings, musical copyrights?
MR. SHELOWITZ: Objection to the form.
Q. Did you understand my question, Mr. Maxwell?
A. No, I did not.
Q. Did somebody ever transfer a copyright to you or your company?
A. No.

[19]

Douglas Berlent
Q. And what is your understanding of the rights of a copyright holder? You have said that you have no less than 50. What do you understand that you're holding those 50 copyrights, more or less, entitle you to as far as your rights, if you have any?
A. I'm not an attorney, so.
Q. I'm only asking for your understanding as a layperson whose been involved in Media Right Productions and, as indicated, has no less than 50 copyrights?
A. Well, as far as I've seen in my experience, it's the first step in affording protection to your creation of a work and acknowledging date of creation and entitling you to certain rights that go along with copyright that I'm not educated to know, specifically, what they are. I have just been taught that it's good practice as a composer that when you create a work to begin by copyrighting it.
Q. It's protection for the composer?
A. Yes.
Q. Okay. Now, you used the term before "mechanical royalties." Do you remember when you

[20]

Douglas Berlent
mentioned that?
A. Yes.
Q. Okay. What are mechanical royalties?
A. That is an amount that's set, I guess, I believe by Congress that's paid to the composer of a work based on CDs sold.
Q. Are you limiting to CDs or you mean records, any other type of physical reproduction composers do?
A. Again, I'm not familiar with the law, but I know that, certainly, would apply to CDs and cassette tape.
Q. Okay. Are you familiar with the term "digital downloading"?
A. Yes.
Q. What is that?
A. It's the delivery of, I guess, applying it or applying it to music in a nonmaterial form, it's transmitted, electronically, via the Internet.
Q. And do you know whether composers who are in the music business, composers receive royalties with respect to digital downloading of their music?
A. I just know that there's a lot of

[21]

Douglas Berlent

controversy on that subject now and I don't know what the status is.

Q. Have you ever been paid any royalties with respect to digital downloading of your music?

A. Yes.

Q. And where? From what source were those funds received?

A. The Orchard.

Q. The Orchard, the Defendant in this action?

A. Yes.

Q. You're being represented by Mr. Shelowitz, who's sitting to your left; am I correct?

A. Yes.

Q. And he's, also, representing the other Defendants in this action?

MR. SHELOWITZ: That's a legal question you can ask me. I will be happy to tell you.

MR. MONAGHAN: No. I just want his understanding. I understand. I know you will tell me.

[22]

Douglas Berlent

Q. He's representing the other Defendants in this action, correct, to your knowledge?

A. To my knowledge, yes.

Q. Okay. And Media Right Productions, that is, the Defendant in this case, that's the company we've been talking about so far?

A. Yes.

Q. Okay. Are there other Media Right Production companies that you are involved with that bear that name?

A. Media Right Productions?

Q. That have the name "Media Right" in it, in the name of the company?

A. We did file a d/b/a to use the name "Media Right Music."

Q. Is that a New York corporation?

A. It's not a separate corporation. It was a d/b/a. Media Right Productions d/b/a Media Right Music.

Q. Well, I want to move this along.

So, I don't want to err you, but we did a search of New York State Department of State to see how many Media Right companies there were and -- okay, I had it marked, okay -- we found a

[23]

Douglas Berlent

company known as "Media Right Holding, LLC." Does that have any connection to you?

A. No, it's not.

Q. And then we found "Mediaright," one word, "Productions, Inc.," incorporated on February 27, 1986 in Nassau County; is that your company?

MR. SHELOWITZ: Do you have like the printout that we can look at?

MR. MONAGHAN: Yeah. Sure, sure.

MR. SHELOWITZ: Thank you.

MR. MONAGHAN: If you don't remember, that's okay.

MR. SHELOWITZ: Just take a look at this and we can go, outside, and chat for a minute. Can we take a quick break just to check if he recalls this and just give us five minutes; okay? You want him to answer truthfully and honestly, so.

MR. MONAGHAN: Yeah. Okay.

[24]

Douglas Berlent

MR. SHELOWITZ: Okay. Thanks.

MR. MONAGHAN: Let the record reflect so forth.

(Recess taken.)

MR. SHELOWITZ: You can ask the question again if you would like.

MR. MONAGHAN: Kathryn, could you please read that back.

(Last question read.)

THE WITNESS: Yes, it is.

Q. Okay. Now, I asked about you getting paid for any of your compositions for digital downloading and you said you have been paid by The Orchard, Inc.; am I correct?

A. Yes.

Q. Okay. Just for the record, for the uninitiated of which I include myself, what is The Orchard? What does that company do?

A. From my understanding of it, they represent independent artists and distribute their music and attempt to collect revenue on their behalf for that distribution.

Q. They distribute the music, the artist's music to Internet retailers of that music?

Douglas Berlent

A. I believe that that is one of the functions that they do.

Q. Well, can you give me -- Are we talking about something like iTunes?

A. Yes, I do believe they distribute to iTunes.

Q. Okay. How about is there another company, eMusic; are you familiar with that company?

A. I, personally, haven't had any dealings with eMusic.

Q. Okay. You said that's one of their functions. What are some of the other functions, your understanding?

MR. SHELOWITZ: Are you referring to functions of The Orchard?

MR. MONAGHAN: Orchard, yeah.

MR. SHELOWITZ: If you know, of course, you can answer.

MR. MONAGHAN: If you know?



Douglas Berlent

THE WITNESS: Yeah. They were a very entrepreneurial company that was involved with many diverse aspects of trying to assist independent artists make money with their music.

Q. Now, you've collected royalties through The Orchard, and from what ultimate source were the payments that came to you from?

Take out the last part.

In other words, it was from iTunes? Was it from some other source?

A. I don't have the statement in front of me to know, but I know that there's been a diversity of sources.

Q. Are you saying came from several sources through The Orchard and then to you?

A. Yes.

Q. Can you remember any of the other sources?

A. No, I don't recall.

Q. Okay. Do you have statements somewhere in your possession or at your offices that would give you that information?



Douglas Berlent

A. Yes.

MR. MONAGHAN: Okay. I'm going to ask for production of, at least, a sampling of those.

MR. SHELOWITZ: Can you be a little more specific with your request?

MR. MONAGHAN: Well, sure.

Q. Have you received payments for digital downloads of your compositions within the last year?

A. Yes, I believe so.

Q. Okay. Have you received payments, by the way, from A.S.C.A.P. for any downloading of tunes that would have generated a performing rights royalty?

A. Not that I'm aware of.

Q. Are you familiar with the term "ring tones"?

A. Yes.

Q. Have any of your songs ever been used as ring tones?

A. Not that I know of.

* MR. MONAGHAN: Okay. All



Douglas Berlent

right.

Now, I am calling for the production of Mr. Maxwell's statements that would reflect payments he's received through The Orchard for digital downloading for the last year.

MR. SHELOWITZ: And just on the question of relevance --

MR. MONAGHAN: Doesn't have to be relevant, has to lead to relevant information.

MR. SHELOWITZ: Well, our objection on relevance on that request, this is a case about alleged infringement relating to Cats and Dogs.

MR. MONAGHAN: Yup.

MR. SHELOWITZ: We'll be happy to produce and produced all the records that either of the Defendants have regarding Cats and Dogs and your clients, but any downloads or any

Douglas Berlent

royalties that a musician has received for the last year that are unrelated to this lawsuit, we would object to.

MR. MONAGHAN: I understand, but we have a question of what is a willful infringement and if Mr. Maxwell is aware of how the system works, that may well go to the issue of whether or not the infringement was willful.

MR. SHELOWITZ: With regard to your clients.

MR. MONAGHAN: Correct.

MR. SHELOWITZ: Things unrelated to your clients, a musician makes a living from getting royalties from his own musical works.

Again, we'll repeat our objection. You can continue with the questions, but we, certainly, want to make that clear for the record.



Douglas Berlent

MR. MONAGHAN: Would you agree the state of mind of willful infringement is an issue that's relevant?

MR. SHELOWITZ: Yes, at the time of infringement.

MR. MONAGHAN: Okay. Okay.

MR. SHELOWITZ: It's related to, again, the particular works that are alleged to have been infringed.

MR. MONAGHAN: Well, I disagree with that cutoff, but you maintain your objection --

MR. SHELOWITZ: Okay.

MR. MONAGHAN: -- we'll take it up with the Court in the appropriate fashion if you persist.

My suggestion is that we conclude the deposition, we see what has been requested and what has been objected to, you go back to your office, I go back to mine and then we, first, try and work it out as the Court has admonished



Douglas Berlent

all to do and then we decide whether or not we have to go to war about it.

MR. SHELOWITZ: No need for going to war about anything in a civil matter.

MR. MONAGHAN: Okay.

MR. SHELOWITZ: Okay.

Q. Now, for how long a period have you, Mr. Maxwell, received payments for digital downloading of any music of yours? Is it more than five years? Less than five years?

A. I don't know.

Q. Okay. Would you be able to go back without a great deal of trouble -- Do you keep records of payments you've received?

A. Any check that I receive --

Q. Yeah.

A. -- I would enter into my ledger, yeah.

Q. Okay, yeah.

Now, do you enter it into the ledger of your company or do you enter it into some personal ledger? And I'm not interested in your private personal affairs other than those that may relate



Douglas Berlent

to this deposition.

A. My company.

Q. Okay. So that if you did get a payment for a digital download, you're saying that, even though you were the composer, it would have gone into Media Right Productions?

A. Correct.

* MR. MONAGHAN: Okay.

So, I am going to ask for production of any records that would show payments that were received by the company with respect to digital downloads from the year 1999 on. That's my request; all right?

MR. SHELOWITZ: We'll take it under advisement.

Q. Okay. Now, how did you prepare for this deposition? And I'm not looking for any conversations you might have had with your Counsel. Did you -- I will give you an example of what I'm interested in. Did you look at any particular documents or files?

A. Yes.

[33]

Douglas Berlent

Q. Okay. And what files were those?
A. It was a file that we sent to you, this morning.
Q. This Excel, generally, stated -- What is on this Excel spreadsheet?
A. That's -- It's a backup that was on my - that I located on our computer of all, to the best of my knowledge, the marketing that we had done for Cats and Dogs.
Q. Okay. Now, I want to come back to your business with The Orchard because I want something on the record, at least, of your understanding of how this works. Did you have to fill out a form of some type with The Orchard to have your compositions sold through The Orchard?
A. I don't recall the form.
Q. Do you recall whether there was a form?
A. I'm sure that there was a form.
Q. Do you recall whether or not you had to make a representation to The Orchard about copyright ownership of the composition that you were asking them to market?
A. I don't recall.
Q. When you provide your music to The

[34]

Douglas Berlent

Orchard, you expected that The Orchard would not do anything to infringe on your copyrights; am I right? You weren't -- Let me rephrase. You weren't giving The Orchard your copyrights; were you?
A. No, I was not giving The Orchard copyrights.
Q. You were interested in preserving and protecting the songs that you had composed?
A. Yes.
Q. In fact, probably, like most artists, you guard that, fairly, zealously; don't you?
A. Yes.
Q. How about Napster, would that have been one of the ultimate sellers of your music through The Orchard?
A. I would not know.
Q. Okay. Now, how long have you dealt with The Orchard?
A. To the best of my recollection, I believe I started contact with them in 1999.
Q. Was it in any way connected with Cats and Dogs?
A. Initially, no.

[35]

Douglas Berlent

Q. With whom did you deal at The Orchard?
A. I don't recall.
Q. Have you had occasion to deal with The Orchard on behalf of someone other than yourself listing music for sale through The Orchard where you were not the copyright owner?
A. Yes.
Q. Okay. And is that true from 1999 forward?
A. Yes.
Q. Okay. And can you give me a general idea of the circumstances under which you would be dealing with The Orchard with respect to somebody else's compositions?
MR. SHELOWITZ: Objection to the form.
MR. MONAGHAN: Okay.
Q. How would this come up? Somebody comes to you and says I've written a great song, I want to sell it on the Internet and you say what?
A. My best friend approached me to ask if I would help out a client of his and that client was Ellen Bernfeld.
Q. What's your best friend's name?

[36]

Douglas Berlent

A. Russ Palladino.
Q. How long have you known Russ?
A. Since we're, approximately, Age 13.
Q. Did you grow up, together, on Long Island?
A. Yes.
Q. Where, on Long Island?
A. Oceanside.
Q. I used to play them in soccer. I grew up in Levittown.
A. Really?
Q. Used to get beaten by them, actually, fairly, often.
Okay. So, he came to you, and Mr. Palladino said would you represent a client of his; is that right?
A. He introduced the two of us because he felt that we could help each other. More specifically, I could be of assistance to his client.
Q. Okay. But, before we ask about that, you had said, initially, your dealings with The Orchard were not with respect to Cats and Dogs. So, there was some other deal?

Douglas Berlent

MR. SHELOWITZ: Objection. He didn't testify to that. He said it was not with respect to other copyright holders, I believe. I don't think he mentioned Cats and Dogs.

MR. MONAGHAN: No. I took it down. Let me just rephrase on that.

Q. Were your first dealings with The Orchard related in any way to Ellen Bernfeld or Cats and Dogs?

A. No.

Q. Okay. So, what were they?

A. It was part of the activities that I was undertaking to market my own compositions.

Q. Okay. And this was in 1999?

A. To the best of my recollection in response to your question: When did I begin contact with The Orchard?

Q. Okay. Now, is it possible -- Well, let me just ask it, straight away, that when you came and I will ask more questions, I'm just jumping a little bit ahead and I'll come back. I apologize.



Douglas Berlent

If it's a problem, let me know.

Is it possible because of the time element 1999 that when you were, also, dealing with and helping your best friend Russ Palladino and his client Ellen Bernfeld and dealing on your own behalf with The Orchard that you represented to The Orchard that you were the copyright owner of Cats and Dogs?

A. It is not possible.

Q. Okay. Well, let me come back to the conversation you had with your best friend Russ. What was Russ's business at that time?

A. He was, I believe, a sales representative working for Europadisk.

Q. What is that? What company? What do they do?

A. It's a CD or was a CD and cassette manufacturing facility.

Q. Where was it located?

A. I believe Varick Street in New York.

Q. A replication company?

A. Yes.

Q. Now, I noticed on your website screen shot there was an indication that that, also, is



Douglas Berlent

something that Media Right Productions is engaged in, replication; am I correct about that?

A. We do not manufacture any - any product. We refer people to, obviously, my best friend, Russ, to assist them with any replication needs.

Q. So, I have in my hand, I'm going to --

MR. MONAGHAN: What's the second page of this, Mike? Is the second page the narrative of that? Media Right Productions?

MR. KORIK: It might be.

Q. While Mike is trying to find the second page, we obtained a printout from the website, www.mediarightproductions.com, mediarightproductions being all one word. Is that your website?

A. Yes.

Q. Okay. And that's been your website for a period of time?

A. Yes.

Q. How long?

A. I don't recall.

Q. Well, this one is printed out in August



Douglas Berlent

of '05. So, certainly, at least, since then. Was it for a number of years prior to that?

A. I don't recall.

Q. Okay. And it describes - I will show it to you and I represent it is -- We'll ask the reporter to mark it.

MR. SHELOWITZ: Do you have a copy for me, please?

(Plaintiffs' Exhibit Maxwell-1, one-page document entitled "Recording a 'demo' CD," marked for identification.)

Q. Mr. Maxwell, have you had a chance to take a look at what the reporter has marked as Maxwell-1? If you need a moment, take it.

A. I will, probably, need some assistance in reading the smaller print.

Q. I'm happy to have Mr. Shelowitz --

MR. SHELOWITZ: Well, maybe, there's something specific you want to direct his attention to?

MR. MONAGHAN: Yeah, there is.

Q. What I'm going to do, I'll read some

Douglas Berlent

sections of this, you and your Counsel can take a look at it, make sure I read it, accurately.

A. Okay.

Q. And then I will ask some questions, if that's okay. Do you need a minute for a break, a bathroom break or something? I'm happy to accommodate.

A. I'm okay.

MR. SHELOWITZ: We'll go for 10 more minutes, then take a break.

MR. MONAGHAN: That's fine.

Q. Mr. Maxwell, Maxwell-1 for ID is a printout. It says "Page 1 of 2" and from that website I've just described, mediarightproductions.com; and that is your website?

A. Yes, it is.

Q. Okay. And it describes some service that Media Right Productions offers, including starting with recording a demo CD.

So, reading from the top, "Recording a 'demo' CD.

"We can help you record and produce a



Douglas Berlent

'demo' CD of your original music or an existing song.

"We offer productions as simple as piano and vocal, or as intricate as a full live orchestra.

"To insure an accurate recording of your voice, we have one of New York's best microphone collections.

"Our recording studios are stocked with vintage, as well as state of the art recording equipment.

"Our engineers and producers have many years of experience working with major artists as well as those just starring on their journey into the music industry: Our goal is to help you achieve your musical and professional goals in a relaxed, nurturing and enjoyable manner.

"We invite you to schedule an appointment to visit our studios, listen to our work, and discuss your project.

"Some of our other services include:

"Bullet point, Producing albums for commercial distribution

"Bullet point, Setting lyrics to



Douglas Berlent

music/Harmonizing melodies, refining song structure.

"Bullet point, Orchestrating music for any type of instrumentation

"Bullet point, Contracting musicians for recording sessions and live performances

"Bullet point, Printing sheet music.

"Bullet point, Replicating music/multi media on CD, DVD or cassette."

And then there's a description of some clients that you've indicated you have done work for through Media Right Productions, including the famous Mr. Spector.

So, up until that point, are you familiar with the content I just read?

A. Yes, I am.

Q. Did you, actually, draft that content?

A. Yes, I did.

Q. And the last bullet point I read about "Replicating music/multi media on CD, DVD or cassette," is that something you farmed out to your best friend Russ?

A. Yes.

Q. And is that accurate, these comments



Douglas Berlent

and statements on the website?

MR. SHELOWITZ: As of 2005?

MR. MONAGHAN: I'm sorry. Yes. As of 2005?

THE WITNESS: To the best of my knowledge.

MR. MONAGHAN: Yeah.

Q. Have there been changes since 2005 on the website?

A. Yes.

MR. MONAGHAN: All right. I'm looking at -- Let's mark this as Exhibit 2. This one, I'll make a comment on the record is a two-page -- Do you call it a screen shot? A screen shot from mediarightproductions.com. This one is printed out on August 10, 2006, bears the name "Media Right Productions," and it has a bunch of buttons up top indicating "Music Production, Recording Studios, Mastering, Music For Advertising, Music For

[45]

Douglas Berlent

Film/TV" and so forth, lists an address of 40 West 27th Street, 4th Floor, Suite 400, New York, New York 10001.

I will ask Kathryn to mark that as Maxwell-2.

MR. SHELOWITZ: Do you have a copy for me, please?

MR. MONAGHAN: Yeah. You can use this. I will ask from a different copy.

(Plaintiffs' Exhibit Maxwell-2, two-page document entitled "Media Right Productions," marked for identification.)

Q. Okay. Your Counsel has, in his hand, Maxwell-2 for ID and have you had a chance to take a look at that?

A. Except for reading the text.

Q. Okay. Well, all I would like you to do is satisfy yourself that this is, in fact, a printout of a screen shot from your company's web page as of August 10th, 2006?

[46]

Douglas Berlent

A. Yes.

Q. Now, in the services that you're offering here, you indicate -- and, by my reading it, I'm not intending to suggest there is anything different or inconsistent. So, I'm just reading this. You indicate, "Our Services Include:

"Recording 'Demo' CDs for musicians, and vocalists.

"Producing albums for commercial distribution.

"Setting lyrics to music/Harmonizing melodies, refining song structure.

"Orchestrating music for any type of instrumentation

"Contracting musicians for recording sessions and live performances

"CD mastering

"Replicating CDs, and DVDs."

Does that sound correct?

A. It does sound correct.

Q. A replication, again, is something that is done through Mr. Palladino?

A. Yes.

Q. Okay. Now, are you familiar with the

[47]

Douglas Berlent

term "product representation"?

A. No. I would have to say, in a legal context, no. I speak English. So, I know what the word "product representation" means, but --

Q. Okay. Have you ever heard of a term "manufacturer's rep"?

A. Yes.

Q. What does that term mean to you?

A. Again, from a layman's --

Q. That's all I'm asking.

A. -- point of view, it's someone who represents the manufacturer.

Q. Promotes the manufacturer's product?

MR. SHELOWITZ: Objection. He didn't say that.

MR. MONAGHAN: No. I'm asking.

Q. Does that square with your understanding?

A. I would have to think that would be the case - case-specific responsibility.

Q. Well, have you used the term "product representation" in your business? Because I didn't see it on either of these printouts, 1 or 2,

[48]

Douglas Berlent

Exhibit 1 or 2.

A. If you're asking me, in the entire history of my business, have I used the two words "product representation," together -- Is that the question or --

Q. I will try that one. I will take that one?

A. -- or are you asking it's a service that we offer?

Q. Both questions.

A. I can't recall.

MR. SHELOWITZ: Why don't you ask him the questions? He'll be happy to answer.

MR. MONAGHAN: He did a good job of framing the question.

THE WITNESS: Okay.

MR. MONAGHAN: Go right ahead. I like your question.

THE WITNESS: I, honestly, can't recall. I may have used it, I may not have used it in the course of history of my

[49]

Douglas Berlent

business. Um, I do believe that we use that because I have seen the agreement that we had with Ellen Bernfeld.

MR. MONAGHAN: The Plaintiffs?

THE WITNESS: The Plaintiffs. I believe it did say product representation agreement in some way. That is not a service that we offer. That was an accommodation to my, again, my friend Russ to help out his client Ellen.

Q. After all this, is he still your friend?

A. He is.

MR. SHELOWITZ: Maybe, now is a good time to take a break.

MR. MONAGHAN: All right, but we're still in the middle of questioning --

MR. SHELOWITZ: So --

MR. MONAGHAN: -- about the

[50]

Douglas Berlent

topic we just started to touch upon. I would ask --

MR. SHELOWITZ: We're going to take a break and we're allowed to talk about whatever we want to talk about, as you're entitled to do with your clients. He has been prepped. The facts are the facts. Its been an hour of questioning and it's a good time for a break.

MR. MONAGHAN: It is, but I want to pursue a few more questions before the break.

MR. SHELOWITZ: Certainly.

Q. You're saying product representation is something not your company has done other than with respect to the Plaintiffs; is that right?

A. There was one other instance where I believe where we, formally, represented another product that we didn't write, and I say, formally, because I try to help people, informally, whenever I can, so.

Q. And so what was your general understanding of the two instances that you just

[51]

Douglas Berlent

talked about would be the role by Media Right Productions as a product representative?

A. I'm sorry. Could you ask the question again for me?

Q. What were you going to do as a product representative in these two instances?

A. I was going to try to use my contacts and all the abilities that I had might help generate income for the artist whose product it was and, as a result, be compensated in an agreed-upon fashion with a percentage of those proceeds.

Q. Okay. What was the other product that you represented?

A. It was, also, another referral from Russ. A product called "Smokin' Sounds."

Q. Smokin' Sounds?

A. It was a cigar CD.

Q. And who was the principal of that company?

A. I don't recall.

Q. Can I call -- Do you have a copy of the Product Representation Agreement?

A. I do not believe so.

Q. Can I leave a space in the record and

[52]

Douglas Berlent

ask the reporter to leave a space and, when you get a copy of the transcript, would you please answer the question whether, after you've looked in your files, whether you have a copy and would ask for production of it.

*

Q. And when was that Cigar Sounds or Smokin' Sounds product representation?

A. I believe it was around the time of early 2000s.

Q. Same time, roughly?

A. I don't recall. Yeah.

MR. MONAGHAN: Okay. If you want to take a break, that's fine.

(Recess taken.)

(Plaintiffs' Exhibit Maxwell-3, two-page document entitled "Product Representation Agreement," marked for identification; Plaintiffs' Exhibit Maxwell-4, one-page letter dated February 1, 2000, marked for identification;

Douglas Berlent

Plaintiffs' Exhibit Maxwell-5, two-page document which states at the top "From: The Orchard," marked for identification;
Plaintiffs' Exhibit Maxwell-6, Excel spreadsheet, marked for identification.)

(Last two questions and answers read.)

Q. Okay. Mr. Maxwell, you had mentioned, earlier, how it was that you met Ellen Bernfeld through your good friend Mr. Palladino. Can you recall, generally - I can't hold you to a specific conversation that occurred, years ago, but can you recall, generally, what the subject of the discussion was between you and Mr. Palladino about Ms. Bernfeld?

A. Yes.

Q. Okay. Please tell us what that was.

A. Russ and I spoke, frequently, and Russ knew that, after many years of struggling as a composer and not finding great success through the established music industry channels, I decided to try to promote my music by myself and the music



Douglas Berlent

that I had created was very specific to topics and Russ had manufactured the Cats and Dogs CDs and called me and thought that it might be an interesting match for us to be introduced and if I could help his client market their music.

Q. And was a meeting arranged which you and Ms. Bernfeld and Mr. Palladino were in attendance?

A. No.

Q. Okay. What happened next, generally?
After Russ makes this -- Is this a telephone call or face-to-face?

MR. SHELOWITZ: Objection. Several questions in there. If you can help us to help him?

Q. Was it a telephone call or was it face-to-face? Pick one.

A. I would say we, usually, had a telephone call prior to face-to-face.

Q. Okay.

A. But it's hard to recall that many years ago, but I would defer to telephone.

Q. Okay. And what did he tell you about Ms. Bernfeld and her background, if anything?



Douglas Berlent

A. Nothing about her background that I recall.

Q. Did he tell you she was a composer?

A. I don't recall.

Q. Did the name "Gloryvision" come up in that initial conversation?

A. I don't recall.

Q. Did the name "Anne Bryant" come up in this initial conversation?

A. I don't recall.

Q. Did there come a time after that conversation when you heard those names, "Bryant" and "Gloryvision"?

A. Yes.

Q. And when was that?

A. I don't recall the exact date, but I would say it was around 1999 or 2000 when we began our association.

Q. Okay. And, before you began your association, was there a meeting with Ellen Bernfeld? Did you ever meet her?

A. No, I did not.

Q. You never met Anne Bryant, either?

A. I never met Anne Bryant.



Douglas Berlent

Q. Okay.

A. I'm sorry. May I amend that to say I did meet Anne Bryant, once, recently, at our mediation --

Q. Oh, yes.

A. -- attempt, but, prior to that, I had not met Anne Bryant.

Q. Now, what did Russ tell you he was doing for Ellen Bernfeld?

A. I don't recall the specifics that he told me, but I know that Russ's function at the time was a sales rep at Europadisk and he assisted clients in manufacturing their CDs and cassettes.

Q. Okay. But you assumed that that's what he was doing for them?

A. Yes.

Q. For Ellen?
Yeah. Okay.
When did the term "Cats and Dogs" or the name of the CDs first come into your knowledge?

A. I would assume that it was on that first conversation when Russ told me about those CDs.

Q. Now, I think you used the phrase "topic

Douglas Berlent

specific" or something along those lines, that you're interested in music regarding topics? I'm not holding you to that, but you used the word "topic"; do you remember?

A. Yes.

Q. Okay. What did you mean when you said that?

A. The albums that I've created, I have created an album on golf, for example. So, it is music on the topic of golf.

Q. Uh-huh. So, is it fair to say that the topic being Cats and/or Dogs was something that interested you, music regarding those topics?

A. Yes.

Q. Okay. Do you have any other affinity for music or products related to cats or dogs?

A. I don't understand the question.

Q. Are you a dog fancier, yourself?

A. Yes.

Q. See, you did understand.

What is the nature of your involvement with dogs?

A. I, currently, own one.

Q. Okay. Well, do you raise dogs?



Douglas Berlent

A. No.

Q. You just like dogs and you have a dog that you like?

A. Yes.

Q. And, beyond that, is there anything? Have you ever shown a dog?

A. Do you mean in a --

Q. -- dog show?

A. No.

Q. Well, help me out here then. It's gratuitous, but I mean is there anything else, I don't know, just owning a dog that endears, anything else about dogs to you?

A. I think they're better than people.

Q. How about cats?

A. Are you asking for my personal opinion about cats?

Q. I'm asking if cats are in the same category as dogs in your mind's eye?

A. I tend to prefer dogs.

Q. Okay. I can't editorialize.

Okay. So, was this something of interest to you because this music related to dogs when Russ raised it with you?



Douglas Berlent

A. That was one of the ingredients.

Q. What were the others?

A. That I felt that it fit in with a niche-oriented or topic-oriented music product that was like all of the records that I had composed, such as golf.

Q. That golf music, that was yours?

A. Yes.

Q. What are some of the other topical musical compositions that you composed?

MR. MONAGHAN: Make it topic musical compositions.

MR. SHELOWITZ: Maybe, she can reread the question for us?

MR. MONAGHAN: Sure.

(Last question read.)

THE WITNESS: You said compositions. Do you mean albums?

MR. MONAGHAN: No. Songs? Music?

THE WITNESS: The title of the songs?



Douglas Berlent

Q. Have you composed any songs other than the music you composed related to golf or any other --

A. Yes.

Q. -- any other niche?

A. Yes.

Q. What would they be?

A. Romance. Records were entitled "Music for Lovemaking."

Q. Okay. Any others?

A. Yes.

Q. What were they?

A. "Sounds of the Womb."

Q. Sounds of the Womb?

A. Womb, W-O-M-B.

Q. Okay. I got it.

Others?

A. Relaxation.

Q. All right. Did you have any discussions with -- You testified, earlier, you hadn't met Anne Bryant or Ellen Bernfeld and hadn't met Ms. Bryant until the mediation.

So, the question is: Prior to August of 1999, did you have any telephone conversations

Douglas Berlent

with either of them, either Ellen or Anne?

A. To the best of my recollection, I only spoke with Ellen.

Q. Okay. And I'm talking about prior to August of 1999, how many times did you speak to Ellen?

A. I don't recall.

Q. More than one?

A. You said prior to August 1999?

Q. Yeah. I picked that date only - I will tell you why - because that's the first date mentioned in the Product Representation Agreement. It says, "This agreement is made on the 8th day of August 1999." So, that's just a marker.

A. Right. I would say we, definitely, had more than one telephone conversation, yes.

Q. Can you remember the gist of those conversations?

A. To the best of my recollection, our first conversation was very friendly and mutually affirming.

Q. Okay. Well, that's what we call a characterization. Do you remember what was discussed?



Douglas Berlent

A. I told her about what I do as a composer and that I was marketing and having some successes in marketing my topic-oriented or niche records and that was why Russ felt that we should speak.

Q. Okay.

A. And we told each other, from what I recall, about what we did and we tried to see if there was a way that we felt we would be a good match to see if I could help them sell their music and if their music would fit into what I was trying to do and we agreed that it was a good fit.

Q. Yeah. Okay. And, prior to August of 1999, had Ellen given you any materials or documents or anything tangible?

A. I would have to assume yes because you had just told me that the Agreement was dated the 8th of August 1999 and, clearly, I must have heard the CD.

Q. Well, let me just - that's the date in the first paragraph, but the signatures on it are quite a bit later. I'm going to show you the Agreement in a moment, but the signatures are in February of 2000. Do you remember there being some



Douglas Berlent

-- I will come back to the question about the materials, but do you remember there being some gap in discussions, negotiations?

A. I really can't recall.

Q. It's okay. All right. Let me show you now Plaintiffs' Exhibit - I'm sorry - Maxwell Exhibit 3 for identification.

MR. SHELOWITZ: We have a copy.

MR. MONAGHAN: Okay. You got a copy. All right.

Q. I know the print on this is not -- Are you familiar with this document?

A. Yes, I am.

Q. Does it bear your signature on the second page?

A. Yes, it does.

Q. That is your signature and that is your writing, including the date?

A. Yes.

Q. Were you, physically, present with Ellen Bernfeld when signing occurred?

A. No, I was not.

Q. So, this was done through the mail?



Douglas Berlent

A. Yes, I believe so, or fax.

Q. Is this Agreement in your files?

A. Now, I have a copy of it.

Q. As a result of the litigation?

A. Yes.

Q. And, prior to the litigation being filed, you would say that you did not have a copy of this Agreement in your files?

A. I did not have a copy of that in my files.

Q. Okay. Did you have a file on this matter at all, on Cats and Dogs?

A. Yes, I did.

Q. In what form was that file?

A. Paper.

Q. In a red weld? Do you know what a red weld is?

A. No.

Q. In a manila folder, someplace?

I will just ask you: How were these files kept?

A. They were kept in folders that were stored in boxes in my parents' basement.

Q. Okay. What did the folder say? How

did you distinguish one folder from another?
A. I don't recall what the specific folder said that the Agreement was in, but you would make an assumption that it was something that would reference agreements.
Q. No, I'm not asking for an assumption.
Did you have occasion to go to your parents' basement and retrieve a file folder?
A. No.
Q. Where is that file folder now?
A. It's been destroyed.
Q. When? When did that happen?
A. Through a series of floods in their basement.
Q. I know. When?
A. I don't recall the exact date of the flood in their basement. It was either stored in their basement where it was destroyed or in the basement of my home where it was destroyed, also, by a broken pipe.
Q. Is this supposition on your part?
A. The only supposition is where it was stored. It was either at my parents' house or it got transferred to my house.





Q. But, in either case, it was destroyed by a flood?
A. Yes.
Q. And did you, actually, go, after this case began, did you, actually, go and endeavor to try and locate any files pertaining to the matter?
A. No, I did not.
Q. Well, how are you sure you didn't have any such file?
A. Because I know that all that was stored was lost.
Q. Were the files, physically, located at your offices at one point? Your business offices?
A. You mean my current office?
Q. Any business office?
A. They were located in my address on 23rd Street.
Q. Until when?
A. I'm not sure of the exact date when they were moved.
Q. Can you give us a year?
A. I don't recall.
Q. What other files were lost?
A. I don't recall the specifics, but,





generally, living in New York, we don't have much space. So, it was time-related as opposed to content-specific. So, I believe that the earlier files were moved out to my parents' house.
Q. Earlier files being the files generated in what years?
A. I don't recall.
Q. What was your criteria - criterion for moving files from the business office to your parents' or your home?
A. Space.
Q. Okay. Is it safe to say this happened more than five years ago?
A. Our basement in our home was flooded, I believe, around three years ago and my parents' basement, I can't recall the exact dates.
Q. Okay. Now, you produced some documents in the case pursuant to a request and, also, what we call Rule 26, and I would like to show you and mark those, collectively, and Bates-stamped.
MR. SHELOWITZ: Thank you.
MR. MONAGHAN: And if I can ask Kathryn to mark that as the next exhibit, whatever that is.





(Plaintiffs' Exhibit Maxwell-7, a document entitled "Songs for Cats/Songs for Dogs" and Bates-stamped 1 through 32, marked for identification; Plaintiffs' Exhibit 8, a CD entitled "Songs for Dogs (and the people who love them)," marked for identification; Plaintiffs' Exhibit 9, a CD entitled "Songs for Cats (and the people who love them)," marked for identification; Plaintiffs' Exhibit 10, a CD entitled "Songs for Dogs (and the people who love them)," 10 original songs on CD and a fully illustrated book, marked for identification.)
Q. Mr. Maxwell, have you had a chance to look at the document production which is Maxwell-7?
A. Yes, I have.
Q. And are these the documents that you produced in connection with the case?

Douglas Berlent

A. My attorney would have to confirm that.

MR. SHELOWITZ: They're a combination. Those are Defendants' Response including what The Orchard provided.

So, those are what we produced in response to the document request on behalf of all the Defendants that are active.

Q. Okay. Well, how can we tell from the joint production which document came from which source?

MR. SHELOWITZ: You can ask me. I will tell you.

MR. MONAGHAN: Okay. Let me ask Mr. Maxwell, first.

Q. Since you've indicated you don't have any files, they were destroyed, it's fair to say that none of the documents in this production came from you, that you being Media Right, I should say; is that right?

A. That is not true.

Q. Okay. Well, let's go, if you have it in front of you, let's see if we can narrow it



Douglas Berlent

down.

The top page, which is Bates-stamped Number 1, where did that come from?

A. That came from --

MR. SHELOWITZ: You want to identify it for the record?

MR. MONAGHAN: Yeah. Well, it's Bates 1 of Exhibit 7.

MR. SHELOWITZ: That's the one.

THE WITNESS: That came from a backup hard drive that had the cell sheets that Russ Palladino created for our CDs.

Q. Actually, I'm a little bit lost with that. What's a cell sheet?

A. It's a description of the record that would give somebody who's not exposed to the record an idea of what it's about without, necessarily, having to listen to it.

Q. In what form was this maintained?

You said it came from Russ Palladino's backup hard drive?

A. It came from my backup hard drive.



Douglas Berlent

Q. Your backup hard drive. Where is that backup hard drive?

A. It's now part of my computer hard drive.

Q. So, this, what I'm looking at, Bates 1, this printout in an electronic form reposes on your hard drive?

A. Hopefully, still, yes. We did have a major hard-drive crash, two weeks ago, but I believe, somewhere, it would still reside.

Q. Okay. And how was it designated on your hard drive? What's the file name on your hard drive?

A. To the best of my recollection, it says "Cell Sheets."

Q. And does it have cell sheets for other products?

A. Yes.

Q. Are these Russ Palladino's related products?

A. They're my albums and cell sheets were created by Russ Palladino for me.

Q. And who was it that went and looked on your hard drive to find this document or find this



Douglas Berlent

media? Was that you?

A. I believe that Russ sent it to me.

Q. Recently? After the suit was filed?

A. I'm sorry?

Q. After the lawsuit was filed?

A. I don't recall the date.

Q. Okay. You don't have to recall the date. Was it after the suit? Is that what prompted him to send it to you?

A. I don't recall because I may have needed the cell sheets for some of my other albums and asked him for it.

Q. Are there hard copies of this cell sheet existing anywhere besides this printout here?

A. I do not believe so.

Q. And the cell sheet would have been in color similar to the covers of the CDs that you see before you now which are Exhibits 8 and 9; am I correct?

A. Yes.

Q. Okay. And who wrote the copy for the cell sheet?

A. Russ Palladino.

Q. And where was it used, to your

[73]

Douglas Berlent

knowledge?

A. It was used to send out to potential customers for the CDs, tapes, music recordings.

Q. To potential customers, is that what you said?

A. Yes.

Q. That would be some sort of a mail list?

A. Could you clarify mail list?

Q. What was the criterion for determining to whom the cell sheets would be sent to those potential customers?

A. My knowledge and determination of who would be relevant.

Q. And, when you went through that exercise of using your knowledge and determination of who would be relevant, what did you come up with?

A. Well, certainly, active at that time was The Orchard and I do, vividly, recall my excitement over The Orchard and discussing that with Ellen. That was a new relationship that had taken me some months to develop, and, in addition, I had other contacts that were interested in promoting my music that I sent the cell sheet to.

[74]

Douglas Berlent

Q. Well, when was it?

Let's go back to the -- Let's use that Agreement, which is the Product Representation Agreement, Exhibit 3, which you have a copy of. That's it, right there.

MR. SHELOWITZ: Yeah, this one right here.

Q. So, the copy that you have in your hand which your Counsel produced to us is one that, actually, came from our files; is that right? We gave it to you, you gave it back to us?

A. I did not produce the document.

Q. Well, I see that it has an (845) number up top. That's, probably, my client's number.

MR. MONAGHAN: Is that correct, Mr. Shelowitz?

MR. SHELOWITZ: Off the record.

(Discussion held off the record.)

Q. Now, Mr. Maxwell, your Counsel has just indicated he's not, exactly, sure where this Agreement came from in the production we got from the Defendants, a joint production, and I'm

[75]

Douglas Berlent

directing your attention to Maxwell-3 and ask you who prepared this Agreement?

A. From the best of my recollection, the initial draft was prepared by me --

Q. Uh-huh.

A. -- and then modified by Ellen.

Q. And you dealt only with Ellen in connection with this Agreement?

A. To the best of my recollection, yes.

Q. And you said it was modified by Ellen. Are you talking about the handwritten modification on the second page down at the bottom under the signatures or are you talking about --

A. Could you tell me what it says?

MR. SHELOWITZ: I'm going to read it out for the record at his request.

It looks like letters "EB."

"Each negotiation and deal may be different and may require a review of percentages previously agreed to," in script.

THE WITNESS: I did not write that, and, to my recollection,

[76]

Douglas Berlent

through our telephone conversations, we had gone through the Agreement, together, and had to reflect our mutual understanding.

Q. No. I understand what you're saying now, but I'm asking you: Earlier, you said there was some modifications. I asked you then, after that, was that handwritten modification the modification you were talking about, and that's the question on the table now, and then I will ask you if there were modifications to the typed portion?

A. That handwritten modification, to the best of my recollection, would be one of those, but, honestly, I don't recall the specific modification or we didn't initial it, so. I didn't produce the document. So, I don't know.

Q. All right. You're unable to, sitting here today, to tell me whether any of the typewritten content represents some modifications from your initial draft that you gave Ellen; is that right?

A. Could you repeat the question? I'm not sure I understand it.

Q. You're unable to tell us, today,

[77]

Douglas Berlent

whether the typewritten material in this two-page Agreement includes modifications made by Ellen; is that right?

A. I believe I am able to tell you that from the best of my recollection --

Q. Uh-huh.

A. -- if this is the original Agreement that Ellen and I worked on, together, we both had a hand in drafting it.

MR. SHELOWITZ: I think he's answered your question very clearly, actually.

MR. MONAGHAN: Well, perhaps.

Q. Is this the Agreement that was, eventually, worked out between you and Gloryvision, Ellen Bernfeld, Exhibit 3?

A. To the best of my recollection, yes.

Q. Okay. Now, you and only you and she conducted these negotiations; correct?

A. To the best of my recollection, yes.

Q. Who else works for -- in this time frame, who else worked for Media Right Productions?

A. No one.

[78]

Douglas Berlent

Q. And are you, also, an engineer? You know, studio engineer?

A. Yes, I have that skill.

Q. Okay. Now, without looking at the Agreement, what was your understanding of what Media Right Productions was supposed to do for Gloryvision and Ellen with respect to Cats and Dogs?

A. I was going to use any means at my disposal to generate income from the sale of the recordings and to be compensated a percentage of the income that I generated as a result.

Q. Did you discuss these means with Ellen, the means at your disposal that you just described?

A. Yes, I did.

Q. And what means did you tell her you were going to use to generate this income?

A. I, as I said, at the time was very excited about The Orchard, what it was able to do and was going to do. I, also, told her about the successes that I was having with catalogue marketing and other types of specialized markets that these topical or niche recordings were relevant for.

[79]

Douglas Berlent

Q. Did you have these discussions about The Orchard before this Agreement was signed?

A. Yes.

Q. How much before?

A. It was a great basis of, from what I would recall, our first conversation and, probably, one of the reasons why Russ felt it would be also very interesting to Ellen.

Q. Well, how else were you going to -- At the same time that you were dealing with Ellen, did you, also, provide a service to composers of promoting their music through an agreement that was not called a Product Representation Agreement?

A. I'm not sure I understand the question.

Q. You told us, earlier, that this Agreement, this type of Agreement of a Product Representation Agreement was only used in two instances, the Cigar Smokin' Sounds instance and the Cats and Dogs instance; did I get that right?

A. Yes.

Q. Okay. But you're, also, representing artists, promoting their music in some other fashion or manner at the same time; aren't you?

A. Not to my knowledge.

[80]

Douglas Berlent

Q. Okay. Had you done that before, represented artists in promoting their music and selling their music?

A. Only myself.

Q. Only yourself. Okay.

Well, why was this Agreement characterized as a Product Representation Agreement rather than a Music Representation Agreement?

A. I would, actually, attribute it to a very personal reason.

Q. Whose personal reason?

A. My personal reason.

A friend of mine was the -- is a salesperson for Synclavier, a synthesizer company, and we used to make fun of him how he referred to, instead of music, he called it "product," and we sort of adopted it because it allowed us to have a distance from the music and sort of as an inside concept to us.

Q. All right. I understand what you're saying.

By the time this Agreement was signed, had you received copies of Exhibits 8, 9 and 10?

A. Yes.

Douglas Berlent

Q. And had you gotten those from Russ or from the Plaintiffs?
A. To the best of my recollection, I got it from Plaintiffs.
Q. Okay. Did they give you a supply of these?
A. To the best of my recollection, after our Agreement was signed.
Q. Uh-huh. You got a supply?
A. You want to define supply?
Q. A quantity? Some quantity?
A. Yes.
Q. Okay. And so, before the Agreement is signed, they gave you what, one of each or several of each?
A. To the best of my recollection, one of each.
Q. Okay.
A. And, perhaps, a cassette tape, but I am not positive.
Q. Okay.
MR. SHELOWITZ: Just so the record is clear, you're lumping. There are three



Douglas Berlent

products with three exhibits. You're lumping, together.
So, if you can ask him, separately, because I think there may be different answers depending on which exhibit you're referring to.
Q. Okay. Does that sound correct, Mr. Maxwell?
There's Songs For Dogs is Exhibit 8, which is a wrapped CD case with a CD in it, Songs For Cats is wrapped with the CD in it and then Songs For Dogs, 10 songs, is a gift-box set. What are these?
MR. KORIK: You want to mark these, as well?
MR. MONAGHAN: Yeah. Let's mark these.
Why don't we make them A and B of the CDs?
MR. KORIK: Okay. Dogs is 8A. Cats is 9A.
(Plaintiffs' Exhibit Maxwell-8A, cassette entitled



Douglas Berlent

"Songs For Dogs," marked for identification; Plaintiffs' Exhibit Maxwell-9A, cassette entitled "Songs For Cats," marked for identification.)
Q. Okay. Mr. Maxwell, coming back to the question about what you were given before the Agreement was signed in February of 2000, the Product Representation Agreement, Maxwell-3 for identification, you received, you thought, perhaps, one of each. Is that one of each of the five exhibits represented by the tapes and the CD cassettes that I have in front of you here?
A. To the best of my recollection, I believe I only received the CD, two CDs, Songs for Cats and Songs for Dogs and the book. I, actually, don't know if I ever received the cassette.
Q. Okay. I just picked up on your answer before. That's fine.
Did you have occasion to listen to the material?
A. Yes, I did.
Q. Okay. And did you find it interesting and something that you were interested in



Douglas Berlent

promoting?
A. I found that it was something I was interested in promoting.
Q. Okay. And, when you received this material from the Plaintiffs, did you understand that they had commissioned the artwork, prepared the copy, had caused the CDs to be recorded, paid for musicians and, in fact, put everything that you see before you in these two CDs that you mentioned you had got? Did you understand they had done all that work?
A. I had no knowledge of what their contributions had been.
Q. Well, you knew someone had paid for all that work; correct?
A. Yes.
Q. Okay. And did you understand there was artwork involved?
A. Yes.
Q. Okay. And that was artwork not only on the covers but in the booklets that accompanied the CDs; correct?
A. Correct.
Q. Okay. And did you understand that

Douglas Berlent

there had been recording sessions involved?
A. I would make that assumption.
Q. Right. And did you understand that there were musicians and singers involved in those recording sessions?
A. I did not know if there was musicians, plural, musicians, singular. I knew nothing about the specifics of the making of the recordings.
Q. Well, did you examine the CDs, themselves, with the names of the songs and who the composers were?
A. I examined the names of the songs and I listened to the songs.
Q. Okay. How did you satisfy yourself, if you did, that the Plaintiffs had the rights to do anything with respect to these compositions?
A. Well, again, going back to Russ, I knew that since he, also, manufactured all of my recordings that there was a very stringent form that you had to sign that you had to declare that you were the owner of the copyright, that you had the right to manufacture the CD and gave Europadisk permission to do that.
So, I knew that any music product that



Douglas Berlent

Russ would refer to me that he manufactured that the owners of that copyright had to have sworn that they own the music and it wasn't being pirated, illegally.
Q. Well, did you, actually, see an agreement between Europadisk and any of the Plaintiffs?
A. No. I did not.
Q. You just assumed that to be the case because of your relationship with your friend and the way he conducted business, as far as you understand it?
A. Yes.
Q. Okay. And do you have such an agreement with Europadisk, at any time?
A. Yes. I have signed that agreement.
Q. Okay. And so, as far as you're concerned, once it passed Europadisk, that was good enough for you in terms of the copyrights; is that what you're telling us?
A. In terms of the authority --
Q. Right.
A. -- to manufacture the CD?
Q. Right.



Douglas Berlent

A. Specifically, my best friend Russ. I would not extend that to Europadisk. But something Russ told me to be true, I would affirm his truth.
Q. And what did Russ tell you about the copyrights on these?
A. We never discussed it.
MR. MONAGHAN: Okay. I'm sorry. Could you go back and give me the answer when I asked him about whether he had seen an agreement between Europadisk and Plaintiffs?
Q. Let me ask that again. You said you hadn't; correct?
A. I had not.
Q. So, you hadn't seen an agreement between Europadisk and Plaintiffs and you didn't discuss it with Russ.
So, essentially, you had no knowledge of the copyrights inherent in these musical compositions; is that right?
A. No, I did not.
Q. When you say no, you did not, you had no knowledge of the copyrights as far as these



Douglas Berlent

products were concerned?
A. I made an assumption that they belonged to Ellen Bernfeld.
Q. Okay. Now, have you discussed this case with Russ Palladino?
A. Yes.
Q. Okay. And when was that?
A. When he was a party to the suit.
Q. And did you ask him about the copyrights, at any time?
A. No, I did not.
Q. Did you ask him about authority to make copies of these CDs? In other words, you said to Russ, Russ, what authority did you have to make any copies of these CDs and cassettes?
A. No, I did not ask him that question.
Q. Okay. If I can direct your attention to the Product Representation Agreement, Plaintiffs' Exhibit -- I'm sorry -- Maxwell Exhibit 3. You said you drafted this, essentially. Although, it may, also, represent the combination of your points and Ellen's points; correct?
MR. SHELOWITZ: He said it did reflect a combination

Douglas Berlent

of his points.

MR. MONAGHAN: It did. I don't disagree with that.

Q. Can you tell me which parts of this were drafted by you, exclusively, and which parts of it represent contributions by Ellen?

A. No, I cannot.

Q. And when did you first hear the name "Gloryvision"?

A. It was, probably, in connection with the writing of this Agreement.

Q. Okay. And I'm now reading you the second paragraph, "Media Right Productions is hereby granted the authority to act as agent and representative, on a non-exclusive basis, for the CDs and tapes entitled 'Songs For Dogs' and 'Songs for Cats,' and 'Songs for Dogs CD and Book.'"

Did I read that, accurately?

MR. SHELOWITZ: I think this is a question that he's having trouble seeing; okay?

So, the contract speaks for itself. If that's what the contract says, that's what



Douglas Berlent

the contract says. I don't know how he can be of any assistance based on his difficulty in reading this.

Q. Does that sound like what you've heard was the subject matter of the agency between you and Media Right Productions and the Plaintiffs?

MR. SHELOWITZ: Again, I'm going to object to that. The contract is written and speaks for itself.

MR. MONAGHAN: I tried it, the easy way, which is: Did I read it, correctly? You're Counsel. You have it in front of you.

MR. SHELOWITZ: You want to ask him his understanding of what the Agreement says?

If you're reading it and you're a lawyer and telling the truth, that's what it says, he'll believe that's what it says if you're reading it.



Douglas Berlent

MR. MONAGHAN: No. I'm asking if Mr. Maxwell is unable to read it -- I noticed he was able.

Q. You're able to read this if you place it close to your eye; are you not?

A. Very closely.

Q. All right. Would you take a moment, since this is an important point? I won't trouble you with everything we've got to look at.

A. Which?

Q. The second paragraph.

MR. SHELOWITZ: Come on. This is not fair.

If you want to read what it says, read what it says. I will tell you if it's an accurate reading of the contract, but the contract is in the record. Its been produced. Nobody disputes this is the contract.

MR. MONAGHAN: Okay.

MR. SHELOWITZ: I'm not



Douglas Berlent

sure what your line of questioning is. It's torture here for him. It's not fair.

MR. MONAGHAN: No. I disagree. I think you're just fencing, unnecessarily.

MR. SHELOWITZ: I'm not. It's a contract that's written. If you want to read it again, I will confirm that's what the contract says and you can ask what he thinks it means, but not whether it's a correct reading of the contract.

MR. MONAGHAN: All right. I'll pursue additional questions.

Q. What did you understand the phrase "granted authority" -- What did you understand the phrase "Media Right Productions is hereby granted the authority to act as agent and representative, on a non-exclusive basis, for the CDs and tapes entitled 'Songs For Dogs' and 'Songs For Cats,' and 'Songs For Dogs CD and Book'" to mean?

A. That we were not the only people

Douglas Berlent

allowed to sell it.

Q. What did you understand you had authority to sell?

A. The music for Dogs and music for Cats.

Q. Where, in the sentence I just read you, does it say that?

A. It's sort of implied on what a CD and cassette contains.

Q. Where does it say that you're authorized to do anything other than sell the CDs and tapes that we've marked as exhibits?

MR. SHELOWITZ: Is that where in this sentence or where in the Agreement?

MR. MONAGHAN: In the sentence I just read?

And I would appreciate it if you didn't make any sort of speaking suggestions, Mr. Shelowitz. They're contraindicated by the Rules. The Courts have been very clear about that.

THE WITNESS: It's implied



Douglas Berlent

in the discussion and I know Ellen and I had as to what the intent was with this music.

Q. You would agree with me then that, literally read, there is nothing in that sentence, that second paragraph, that gives Media Right Productions authority to do anything other than sell these CDs and tapes; would you not?

A. Literally read, yes.

Q. And, at the time you negotiated with Ellen, she had already employed the services of your friend Russ Palladino to, actually, make copies for sale of the CDs and tapes; hadn't she?

A. I believe yes.

Q. And then I asked you, earlier, whether she had given you a supply of these. You asked me to define supply and I said quantity, and you said you believe there was a quantity of these CDs and tapes supplied after the contract; correct?

A. Correct.

MR. SHELOWITZ: And are you referring, also, to the book and tapes that when you lump the CDs and tapes,



Douglas Berlent

together? Because, remember, there are three separate exhibits.

MR. MONAGHAN: Yes.

THE WITNESS: To clarify, I do not recall receiving a supply of the book. I do recall receiving, I believe, one box of each of the CDs for Cats and the CD for Dogs, and, at that time, I believe the standard Europadisk boxing was 20 or 25 units.

Q. Do you have any idea how many you got?

A. I believe it to be 20 or 25 of each.

Q. And they came, excuse me, from the Plaintiffs?

A. I believe that to be yes.

Q. Okay. And they came prepackaged as in the form they are in now on the table here, wrapped in cellophane?

A. Yes.

Q. And these had already -- the supply that you got, the 20 or 25 from the Plaintiffs,



Douglas Berlent

those had already been obtained from Mr. Maxwell -- not Mr. Maxwell, you're Mr. Maxwell -- from Mr. Palladino and delivered to the Plaintiffs and then in some portion of the quantity delivered to you?

A. Is that a question?

Q. It is.

A. I don't know the --

Q. You don't know the route?

A. The route.

Q. Okay. Fine.

How did you, actually, get the copies? Were they hand-delivered by Ellen?

A. I believe they were sent to me. They were not hand-delivered. I never met Ellen.

Q. Okay.

MR. SHELOWITZ: How about taking a lunch break?

MR. MONAGHAN: Oh, yes. No. Let me go about 5 or 10 minutes and then break; all right.

Q. Didn't you understand at the time you negotiated this Agreement with Ellen that if you

Douglas Berlent

needed additional copies to sell, you would tell Ellen I need some more product and that Ellen would then procure the product and deliver it to you? Didn't you have that understanding with her?

A. I would assume so. That would be my only way of obtaining the product.

Q. Well, Russ had the ability to make copies of the CDs and tapes; didn't he?

A. Russ worked for Europadisk who had that ability.

Q. Right.

How about the artwork and the booklet? Was Russ's company, Europadisk, able to reproduce that, to your knowledge?

A. I do not know. For your information, to the best of my recollection --

Q. Right.

A. -- I believe that they did not do printing.

Q. Okay. Now, where, in the paragraph that I read to you, earlier, which has been the subject of this last line of inquiry, is there any authority for you, Media Right Productions, to make any copies of any of these CDs?



Douglas Berlent

A. Well, I will assume since you read it to me and that was not specified, then I would say that it does not, literally, specify that.

Q. And you have familiarity with the copyright laws being a composer, yourself, and you understood, didn't you, at the time, that you couldn't just make copies without permission of the composers? Didn't you know that?

A. Yes, I knew that.

Q. In fact, you said you thought Russ was very stringent in making sure, before he made copies, he got that authorization; didn't I hear you say that, earlier?

A. Yes, you did.

Q. So, you're not relying upon anything in the four squares of this Agreement to give you authority to have made copies of these CDs or tapes; is that right?

MR. SHELOWITZ: Objection to the form. You've asked him that, a single sentence, and now you're talking about four corners of the entire document. You can ask him what's inside



Douglas Berlent

the four corners of the document.

MR. MONAGHAN: Okay. I'll take that.

MR. SHELOWITZ: What is his understanding of?

Q. Let's, first, start with the language.

Is there anything in the four corners of the Agreement that you're aware of, with several months after this litigation, is there anything in the four squares of this Agreement that gives Media Right Productions the right to make copies of our clients', the Plaintiffs', CDs and tapes?

A. Yes.

Q. Okay. And what is the language that gives you that authority?

A. I would have to ask my Counsel to direct me to help me read that portion of the Agreement that Ellen and I intended to cover that eventuality.

Q. All right. That's fine. Go ahead.

A. May I ask my Counsel to read it?

MR. MONAGHAN: Sure.

MR. SHELOWITZ: I think the contract speaks for itself,



Douglas Berlent

but Paragraph 3 of this Agreement says, "Media Right Productions will use its best efforts to market and promote these recordings to catalogues, shopping networks, internet sites, retailers, and wholesalers. Media Right Productions will pay all marketing expenses for this purpose including postage, telephone, printing, advertising, trade shows, time, and travel." And then, you know, it's a two-page contract and it's filled with provisions.

Again, you can ask the Plaintiff what his understanding is of his rights under the Agreement.

MR. MONAGHAN: I'm reasonably confident --

MR. SHELOWITZ: Defendant, excuse me.

Q. What language that your Counsel just

[101]

Douglas Berlent

read, in your view, Mr. Maxwell, gave you the right to have copies made which were not supplied by the Plaintiffs?

MR. SHELOWITZ: This is a basic assumption here. I don't recall you asking him whether he ever made copies. You have assumed, throughout, that he's made copies without asking him that question.

MR. MONAGHAN: Well, you know, again, this is I think a speaking suggestion, which I don't think is appropriate.

Q. So, did you understand the question now that you have that backdrop with your Counsel's suggestion?

A. I don't recall what the question is.

Q. Do you agree with me that a digital copy is a copy?

A. Yes.

Q. Okay. So, where did you have -- Coming back to my original question, which I thought you had answered, obliquely, before, which is: By what

[102]

Douglas Berlent

authority could copies be made of this product, copies that didn't come from my clients, directly? Your Counsel read Paragraph 3 and I wanted to know which words there said that?

A. The reference to recordings and Internet sites, that, even at that time of this Agreement, there was no other way to participate in that domain.

Q. Well, what is amazon.com? Isn't that an Internet site?

A. It is an Internet site.

Q. Wasn't that the Internet site that was being referred to in Paragraph 3?

A. I'm not even sure I recall if Amazon existed then, but I didn't refer to Amazon, specifically.

Q. Well, you didn't refer to any. The phrase is "internet sites." What Internet sites did you have in mind at the time?

A. Well, that references back to the discussions that Ellen and I had in our conversation and basis for the excitement that we shared. Specifically, The Orchard, was the basis for that.

[103]

Douglas Berlent

Q. But what does the phrase "these recordings" mean? How is that term defined in the Agreement, if it is?

A. Well, as you can see and as I've attested to you, Ellen -- Well, I don't know if Ellen had an attorney look at it, but, to the best of my understanding, I did not have an attorney draft the Agreement. I drafted it with Ellen to reflect our understanding and we're not lawyers. So, we didn't define anything, legally.

In terms of the definition of what a recording is, we were two composers that had a mutual understanding of wanting to help each other and that's why this Agreement is the way it is.

Q. Why didn't it just say, as I asked you, earlier, Music Representation Agreement? If you believe you were granted authority to sell the music through the Internet sites, why not just say so?

MR. SHELOWITZ: Objection. Asked and answered.

MR. MONAGHAN: Okay. I'm still going to ask you the question again.

[104]

Douglas Berlent

THE WITNESS: I told you that it was, at that time, a relevant topic of humor and meaning that we adopted. Ellen didn't object to it and I used it.

Q. Okay. Then why does the second paragraph use the phrase "CDs and tapes"? What does that add, to your understanding?

A. I do not recall the specific intent of Ellen and myself as we drafted the Agreement as we defined it, but, certainly, I think that would include the obvious incarnation here of the exhibits that you've presented.

Q. And where does the authority in this Agreement repose that gives anybody the right to sell individual songs from these CDs and tapes entitled "Songs For Dogs, Songs For Cats, Songs For Dogs CD and Book"?

A. Again, from my understanding and what I believe to be Ellen's understanding, the reference to recordings accounted for that eventuality.

Q. And you don't think that "these recordings" refer to the entire compilation and

Douglas Berlent

Songs For Dogs and Songs For Cats and Songs for Dogs CD and Book; is that what you're saying?

A. I believe the way you just asked the question, there are two questions. If you could read back the question and I will answer it.

Q. I will ask it again.

There is no point in you and I arguing about this. We, obviously --

A. I'm not arguing. I would be happy to answer your question.

Q. We have a different interpretation. But would you agree with me the phrase "CD and tapes" is extraneous to the Agreement in your interpretation?

A. I don't understand what you mean by the word "extraneous."

Q. Unnecessary?

A. I don't think I understand the question.

Q. Well, the second paragraph says "Media Right Productions is granted authority to act as agent and representative, on a non-exclusive basis, for the CDs and tapes entitled 'Songs For Dogs' and 'Songs For Cats,'" and I'm saying, under your



Douglas Berlent

interpretation, we really don't need that phrase "CDs and tapes" because you're telling us that you are entitled to sell the music and promote the music?

A. I believe that we do need that, as did Ellen, because I believe that we were talking about two different eventualities. It's very obvious we're talking about one element of the Agreement which is to sell CDs and tapes and there's another eventuality that Ellen and I discussed and both understood that knew that there were other potentials that we needed to account for.

Q. Well, let's take the third paragraph then where it says, "Media Right Productions will use its best efforts to market and promote these recordings." Let's take, first, catalogues. Those catalogue sales would have been of the intact CDs and the intact cassettes; wouldn't they?

A. In all likelihood, yes.

Q. Okay. And, on the shopping networks, that would have been the same, that is, they would have been sold, intact?

A. When you say "intact" --

Q. Without individual songs being sold,



Douglas Berlent

separately?

A. We don't -- We wouldn't know that. I didn't have the opportunity to have success with any of the shopping networks, but I can tell you, from my experience, that I do believe that we did have success with a shopping network and/or when they discussed with us doing business that the possibility of doing a custom compilation or new ordering or fewer songs is always possible.

Q. But, on the Internet sites, iTunes and such, you can buy a song at a time; isn't that right?

A. That is correct.

Q. Okay. And you can, digitally, download it; correct?

A. That is correct.

Q. And digital download rights are a whole set of different rights, aren't they, in the music business?

A. I only have a layman's understanding of what that would be, but I understand they would be a different set of rights.

Q. Okay. And, in fact, composers license the right to do digital downloads; don't they,



Douglas Berlent

specifically?

A. I don't know what composers do, in general.

Q. Are you aware of anything going on in the music industry regarding digital download rights?

MR. SHELOWITZ: Objection to the form.

MR. MONAGHAN: Any controversies over those?

THE WITNESS: Yes, I am.

Q. Okay. What's the extent of your knowledge of the controversy?

A. That they have not settled in with the de facto way dealing with it.

Q. And are you aware that agreements, licensing agreements, publishing agreements that are - that predate that technology, that there's a dispute over whether or not those license agreements include the right to sell digital downloading?

A. Could you ask that question again, please?

Q. Among the controversy or included in

Douglas Berlent

controversy is the issue of whether or not these older music publishing agreements included the right to sell digital downloading?

A. I wouldn't know about that.

MR. MONAGHAN: Okay. All right. You want to break? It's 10 of 1. What time would you like to come back?

MR. SHELOWITZ: Take a half hour?

MR. MONAGHAN: Half hour. Be back at 20 after?

MR. SHELOWITZ: Sure.

MR. MONAGHAN: There's a cafeteria in the building.

MR. SHELOWITZ: Thanks.

(Recess taken.)

(Plaintiffs' Exhibit Maxwell-10, two-page amazon.com screen shot, marked for identification; Plaintiffs' Exhibit Maxwell-11, three-page rhapsody.com screen shot, marked for identification; Plaintiffs'



Douglas Berlent

Exhibit Maxwell-12, two-page amazon.com screen shot, marked for identification; Plaintiffs' Exhibit Maxwell-13, multipage document entitled "The Orchard, Digital and CD Distribution," marked for identification.)

Q. Very Cool Media, do you know that company?

A. Yes, I do.

Q. Is that one of Russ's?

A. Yes.

Q. And what is his business?

A. I believe it's in the business of replicating CDs.

Q. This would be the business that Russ picked up when he left Europadisk?

A. I should say brokering the replication of CDs. He doesn't own any physical equipment to do that.

Q. Okay. And where does it operate from, if you know?

A. I do not know.

Q. Okay. Is Russ the principal of the



Douglas Berlent

company?

A. I do not know.

Q. What dealings have you had with Very Cool Media, you being Media Right Productions?

A. I have contracted with him to replicate CDs for me of my music.

Q. Okay. What is Elias? Are you familiar with that?

A. Elias?

Q. Right.

A. No, I'm not. Or I'm not familiar with the context that you're --

Q. Well, I don't even want to waste time marking it, but I'm going to show you something which is referencing Elias' Links and it mentions Doug Maxwell, Producer, and Very Cool Media, CD manufacturing. Does this mean anything to you?

A. I've never seen that.

Q. Okay.

A. Oh, wait. Yes. I recorded some of his music.

Q. Elias being the artist?

A. Elias. Elias being the artist, yes.

Q. And Russ made CDs for him or brokered



Douglas Berlent

them?

A. I believe so.

MR. MONAGHAN: Okay. Well, now that I talked about it, I guess, we'll have to mark it.

Make that the next number, Kathryn.

(Plaintiffs' Exhibit Maxwell-14, two-page document entitled "Elias' Links & Acknowledgements," marked for identification.)

Q. How did you intend to promote the Plaintiffs' products? How were you going to do that? Your Product Representation Agreement mentioned catalogue sales. Did you contact any of the cataloguers?

A. Yes.

Q. Which ones?

A. Um, I did show you the database that we produced to you and I remember --

Q. The production, today?

A. Yes.

Q. Okay. All right. You're talking about

Douglas Berlent

Exhibit --

MR. KORIK: 6.

MR. MONAGHAN: Yup.

Q. Okay. I'm showing you now Exhibit 6. Is this what you're referring to as a database?

MR. SHELOWITZ: Yeah, I have, if you want to work with that?

MR. MONAGHAN: Yes.

Q. Okay. Tell us what Exhibit 6 is.

A. That's a database of the people that I contacted in an attempt to market songs, music for dogs, music for cats.

Q. What do the references on the top line represent?

A. This is going back a long ways, but I believe that they were various categories that I referenced on how to track the record.

Are you asking me to go through each one?

Q. No, we don't have time for that.

Am I correct that this is not only related to the songs at issue in this suit, but, also, other of your clients or customers?



Douglas Berlent

A. It's all my music, all my albums that we've talked about.

Q. Cause I see the reference to Cigar next to Dog and Cat?

A. Right.

Q. That was the one you talked about, earlier?

A. Uh-huh.

Q. That's the other Product Representation Agreement?

A. Yeah.

Q. Okay. The top line on the first page, what does that refer to?

A. The first active --

MR. SHELOWITZ: Want me to read it for you? I will tell you what it says.

THE WITNESS: Active.

MR. SHELOWITZ: Active baseline.

THE WITNESS: Active would mean if I put a check mark in the box and it would allow me to find out what was active or



Douglas Berlent

if I need to do something, immediately, taking action.

Q. Okay. Baseline?

A. I don't recall.

Q. Are those products or music?

A. No. I don't remember what that is.

Q. Agency, what is that?

A. This is going back, a long time, and I'm not even sure what, you know, revision it is. It's just, as I said, we had a hard-drive crash. So, this was on a backup disk.

Agency was if it was, I guess, an ad agency.

Q. Okay. What is Me for You?

A. That was a rep that we had dealings with. I think his name was Mike Edelman and he was trying to sell all of our titles.

Q. PI, the next one?

A. Premium Incentive.

Q. E&J?

A. I don't recall.

Q. Boat?

A. I had a record called "H2Overtures." So, the boating industry.



Douglas Berlent

Q. And then the next column is headed "Catalogue"?

A. I would say assume catalogue.

Q. Yes, I would, too, but how does that tie into anything else on that same page?

A. Well, it would get an "X" or something in that column if it was relevant or if it was a description of that particular company.

Q. There's an "X" in the box right under Catalogue. There's no other information?

A. Okay. So, that would mean if you follow the line, horizontally, through the pages, whoever was on that line was, probably, a catalogue.

Q. Okay. So, Page 1 and Page 2 should be put, together, alongside of each other. Page 2 would be on the right of Page 1?

A. Correct.

Q. And then so I can, if I look at under Cat, there's an "X," and that is indicating that Cat was in a catalogue because there's an "X" in catalogue?

A. No. That it was in a catalogue. Again, these pages were designed to abut, one

[117]

Douglas Berlent

against the other.

Q. Right.

A. So, if you continued your formula and unstapled the pages, put them all next to each other --

Q. I got it, yeah.

A. -- each line is one related descriptive.

Q. What does the "X" in the box under Cat mean?

MR. SHELOWITZ: If you could just -- There are multiple "X"s.

MR. MONAGHAN: There's only, on that particular horizontal line --

MR. SHELOWITZ: On which page? Oh, okay.

MR. MONAGHAN: -- there's only "Cat."

MR. SHELOWITZ: It's the top line.

THE WITNESS: Is Cat next to Dog; right?

MR. SHELOWITZ: Yeah.

[118]

Douglas Berlent

THE WITNESS: Um --

MR. SHELOWITZ: And then --

THE WITNESS: So, again, to understand the way that this information is presented, you would have to put the pages next to each other so you could go, horizontally, across a field and you would see that that particular line, whatever line it's on, if it were the second line, for example, if you continue reading across the fields, everything on the second line would have a relation to that.

Q. I'm lost. You have an "X" on the second horizontal line. The only one that has an "X" on the first horizontal line, reading all the way across, is Cat. I assume that refers to Cats and Dogs, the Cats, music for cats; am I right?

A. I, honestly, can't tell you whether that was Catalogue or Cats and Dogs.

Q. It's right next to Dog?

A. Then I would say --

[119]

Douglas Berlent

Q. In between Cigar --

MR. SHELOWITZ: Why don't we make it, easier, and, actually, attach the page so there's no guessing? He can tell you, exactly.

MR. MONAGHAN: Well, I would like to move on. We don't have all day.

Q. So, my question was, earlier, a moment ago, what does the "X" under Cat mean on the first horizontal line?

A. That would mean that whatever follows in that line would have a relevance to the marketing of Cat, the Songs for Cats.

Q. Okay.

A. So, if you follow that line, it might reveal that it was a name of a company. It might be pets.com or something that would be a relevant marketing venue.

Q. I understand.

There are only two "X"s on the first horizontal line, one in the box or column labeled "Catalogue," one in the box or column labeled

[120]

Douglas Berlent

"Cat." So, I can assume from that that Cat was in a catalogue; is that right?

A. No. You can't assume that it was in a catalogue.

Q. Okay. Then I just will move on.

The second horizontal line going across the page has nothing at all on the first page, no "X"s.

MR. SHELOWITZ: If I could try to help, there's a way. There are four pages that have data on them and we can if Doug can show us.

MR. MONAGHAN: Oh, it's all four. That's where I'm going awry.

MR. SHELOWITZ: If there's a way Doug can tell us how these flow, together, we can attach them all, together, and he can follow the lines and, specifically, identify what you're asking for. That may be helpful for where you're