1

<br>

1           UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF NEW YORK
2

3  ANNE BRYANT, ELLEN BERNFELD, and
   GLORYVISION, LTD.,
4

      Plaintiffs,
5

   vs.                    CASE NO.:  07-CV3050(CLB)
6
   EUROPADISK, LTD., MEDIA RIGHT
7  PRODUCTIONS, INC., VERY COOL MEDIA,
   INC., DOUGLAS MAXWELL, THE ORCHARD
8  ENTERPRISES, INC., and RUSSELL J.
   PALLADINO,
9
      Defendants.
10

11           DEPOSITION OF ANNE BRYANT

12       Taken on Behalf of the Defendants

13

14    DATE TAKEN:  Wednesday, February 13, 2008

15    TIME:        3:50 p.m. to 5:30 p.m.

16    PLACE:       Sclafani Williams Court Reporters
                   1800 Second Street, Suite 875
17                 Sarasota, Florida  34236

18

19

20

21

22

23           Stenographically Reported By:
                    Leihla Collins
24        Registered Professional Reporter

25

2

```
 1  APPEARANCES:

 2  Counsel for Plaintiffs:

 3      PATRICK J. MONAGHAN, ESQUIRE
        Monaghan, Monaghan, Lamb & Marchisio
 4      150 West 55th Street
        New York, NY  10019
 5

 6  Counsel for Defendants:

 7      MITCHELL SHELOWITZ, ESQUIRE
        Shelowitz & Associates
 8      11 Pen Plaza, 5th Floor
        New York, NY  10001
 9      (Via telephone)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                    I N D E X

2

3  ANNE BRYANT                                    PAGE

4  Called by the Defendants:

5          DIRECT EXAMINATION BY MR. SHELOWITZ ..... 04

6  SIGNATURE INSTRUCTIONS ........................... 75

7  ERRATA SHEET .................................... 76

8  CERTIFICATE OF REPORTER OATH ..................... 77

9  REPORTER'S DEPOSITION CERTIFICATE ................ 78

10

11

12                    * * * * * *

13                    EXHIBITS

14       (Exhibits marked in previous depositions)

15

16  BERNFELD A (Request for Documents) ................ 11

17  MAXWELL 3 (Product Agreement) ..................... 51

18

19

20

21

22

23

24

25

4

1                  P R O C E E D I N G S

2          ANNE BRYANT, called as a witness by the

3  DEFENDANTS, having been first duly sworn, testified as

4  follows:

5                  DIRECT EXAMINATION

6  BY MR. SHELOWITZ:

7      Q    Ms. Bryant?

8      A    Yes.

9      Q    My name is Mitchell Shelowitz.

10     A    Yes.

11     Q    We represent the Defendants in the case

12  captioned Anne Bryant versus Europadisk.

13     A    Yes.

14     Q    And I'm going to be asking you questions

15  related to discovery and relevant information in this

16  case.  And I would ask you to answer to the best of

17  your knowledge and belief.

18          Please let me finish the question before

19  responding so that we don't make too much work for the

20  court reporter, too much extra work.  And if you don't

21  understand a question, please let me know and I'll be

22  happy to rephrase it for you.

23     A    That's fine.

24     Q    And your answers should be audible ones, a

25  yes or a no, or whatever, and a response required in

1 order to allow the court reporter to transcribe

2 everything that we're going to be addressing.

3          Do you understand those instructions,

4 Ms. Bryant?

5     A    Yes, I do.

6     Q    And is there any reason why you won't be able

7 to answer fully and honestly today?

8     A    None.

9     Q    I'm sorry, I didn't hear that.

10    A    No reason.

11    Q    And are you under any mental disability that

12 would prevent you from answering fully and honestly and

13 competently today?

14    A    No.

15    Q    And is there any physical disability that

16 would prevent that?

17    A    No.

18    Q    Okay.  With that being said, we're going to

19 go into the questions and we're going to start off with

20 some background information.  Then we're going to move

21 towards some of the facts and claims related to the

22 complaint that's been served by you and Ms. Bernfeld

23 and your company, Gloryvision.

24    A    Okay.

25    Q    Can you please state your full name for the

1  record?

2      A      Anne Bryant.

3      Q      And what is your date of birth?

4      A      September 3rd, 1950.

5      Q      And what is your current home address?

6      A      990 Bogey Lane, Longboat Key, Florida 34228.

7      Q      And how long have you lived in this address?

8      A      2004 is when I first started living there.

9      Q      And do you reside with Ms. Bernfeld at 990

10 Bogey Lane?

11     A      We share that house.

12     Q      And before 2004 when you relocated, where did

13 you reside?

14     A      Before that I resided full time at 21

15 Collaberg Road, Stony Point, New York.

16     Q      And for how long did you live there?

17     A      I lived there since 1987, still have the

18 house, and go back to it in the summertime.

19     Q      Is anyone living at that house right now?

20     A      Yes, we have a friend who stays there and

21 looks out for it during the worst part of the winter

22 for us.

23     Q      And do you own that house together with

24 Ms. Bernfeld?

25     A      Yes.  Co-own, yeah.

1    Q    And prior to the Collaberg address in Stony

2 Point, where did you reside?

3    A    41 West 73rd Street in New York City.

4    Q    And for how long did you live at that

5 address?

6    A    About ten years.  Approximately ten years.

7    Q    So about 1977?

8    A    No, no.  It was later than that then.  Let me

9 see.  I kept that -- from 1980 to 1994, I think it was,

10 I lived there.  But I also bought the house on

11 Collaberg Road, so I would -- can live in both places.

12    Q    Okay.  And do you currently have an office

13 address?

14    A    Yes.

15    Q    And where is that office located?

16    A    Office for Gloryvision is at 55 Railroad

17 Avenue in Garnerville, New York.  It's located at the

18 Garnerville Holding Company.

19    Q    And how long have you had an office in that

20 location?

21    A    Since 1994 or 1995.

22    Q    Do you have any other offices for

23 Gloryvision?

24    A    No.

25    Q    Do you have an office in Longboat Key,

1 Florida?

2    A    No.

3    Q    Do you maintain any business records at

4 Longboat Key, Florida?

5    A    On my computers I have business records,

6 sure.

7    Q    And that's in Longboat Key, Florida?

8    A    That's wherever I go.

9    Q    What kind of computer is it?

10   A    I have a Mac laptop.  I have a couple of --

11 or several of them.  And they -- some do more business

12 and some do more arts, you know, some do more music.

13 But they all -- I also have drives that I pop in from

14 one computer to another and back everything up.  So I

15 have a lot of business files on the computer.

16 Particularly from the last couple of years I've really

17 gotten very disciplined about keeping PDFs of

18 everything that I have.

19   Q    And when did that start?

20   A    I'd say when I started coming down here for

21 the most part, in the end of 2004.  I felt that I

22 needed to kind of walk around with information.

23   Q    And before that where did you keep your

24 business records related to Gloryvision?

25   A    File cabinets, boxes.

9

1    Q    Where are those file cabinets located?

2    A    In New York.

3    Q    That's in 55 Railroad Avenue?

4    A    Oh, some of them are.  Some documents are at

5 the office and others are in storage boxes, in a

6 storage space I have there in that building.  And then

7 some of it in storage, the oldest things, underneath my

8 house on Collaberg Road.  Waterproof storage, you know.

9    Q    And with regard to any information,

10 documents, files, records assigned between the time

11 1999, let's say, and 2004 related to Media Right and

12 Songs for Cats and Songs for Dogs, where would that

13 information be kept?

14    A    That would be in the waterproof files

15 underneath the house.  The basement.  I would say --

16    Q    Did you have occasion to look through those

17 files in connection with this lawsuit to respond to a

18 notice of document production that we had made on

19 behalf of the Defendants?

20    A    At some point -- a couple of different points

21 I looked through those boxes having to do with that,

22 yes.  But I -- I think I supplied whatever I was asked

23 to supply.  I'm not sure.  I hope so.

24    Q    And would you have any of the records

25 regarding any of the expenses you may have incurred in

1 connection with the production, the manufacturing of

2 the Songs for Cats CD and tapes?

3     A    Yes, I have some.  I know that in going

4 through those boxes of looking for -- I think something

5 else.  Actually I had some things mislabeled in boxes.

6 I saw a slew of stores, and I saw also like a mold

7 company that designed our gift boxes.  I saw those kind

8 of things, and something from the cassette supplier.

9     Q    When was the last time you looked through

10 those waterproof files that you recall?

11     A    I would say that -- that when I found those

12 things that I told you, I just saw them, I didn't

13 really get into them, that would have been in -- I

14 guess in the fall.  I'm just guessing.  Early fall

15 maybe or summer.  I'm not sure.

16     Q    And did you turn over any of those documents

17 to your counsel?

18     A    I wasn't asked for those documents.

19         MR. MONAGHAN:  What documents are we talking

20     about?

21         THE DEPONENT:  What documents are we talking

22     about, yeah?

23 BY MR. SHELOWITZ:

24     Q    Documents related to Songs for Dogs and Cats;

25 cost of production, records, Media Right Productions.

1 Things related to this -- underlying facts in this

2 lawsuit.

3    A    Well, I wasn't asked for any back then.  I've

4 been down here since the end of October.

5    Q    Okay.  I'm going to direct your attention, if

6 I may, to a document that we actually marked in

7 Ms. Bernfeld's prior deposition.  It's marked as

8 Bernfeld Exhibit A, which is a Defendants' First

9 Request for the Production of Documents.

10        MR. SHELOWITZ:  And I would just request,

11    Mr. Monaghan, if you can please show that to the

12    witness.

13        MR. MONAGHAN:  It's in front of the witness.

14 BY MR. SHELOWITZ:

15    Q    And, Ms. Bryant, if you would be so kind as

16 to just take a few minutes to familiarize yourself with

17 this document and just let me know after you've

18 reviewed it.

19    A    Okay.

20    Q    Just let me know after you've gone through

21 it.

22    A    Yeah, I'm looking through it.

23        It seems like you're asking for every

24 possible document that ever existed for Gloryvision, am

25 I wrong about that?  It seems very --

1     Q    Well, I can ask you a question about that.

2 Have you seen this document before?

3     A    I don't remember seeing this document before.

4 And I'm looking at the date on it.  I wouldn't have had

5 access to those documents on November 5th because I

6 wasn't where they were located.

7     Q    Okay.  And we had produced -- or we had

8 served this on your counsel requesting all documents

9 related to the claims in the lawsuit.  And if I could

10 direct your attention on page 9 of this request.

11     A    Okay.  Yes.

12     Q    You can see paragraph 24 which says, Any

13 documents or communications relating to the sale of the

14 recordings, including but not limited to invoices,

15 canceled checks, customer transactions, books and

16 ledgers and/or accountings.

17     A    Yes.

18     Q    With regard to the sale of the Songs for Dogs

19 and Songs for Cats CDs and tapes and books, do you

20 retain the records that are described in that paragraph

21 24?

22     A    I've seen many of the invoices.  There were

23 yellow invoices I remember that, you know, had our

24 company name on it.  And I had seen boxes with -- you

25 know, gobs of them, you know.  I don't know if every

1  single one is there.  But it would, you know, just be

2  stacks of them.  So I know that there are many there.

3  I don't know if every single one is there.

4      Q    And what about records regarding the expenses

5  that you may have incurred in the entire creation of

6  those works or recordings of Songs for Dogs and Songs

7  for Cats?

8      A    In terms of invoices, in looking in the file

9  and seeing that one box where things were put in the

10  wrong box, I did see certain invoices having to do with

11  creating the physical product.  Like I said, the molds

12  that -- the special molds that had to be designed for

13  the gift boxes and whatnot, I saw a number of things

14  like that.  So if I really went into this box, I might

15  be able to find more, but I didn't know I was to do

16  that, so --

17      Q    Okay.  Well, we would like to request that

18  you please review this after the deposition with your

19  counsel, and we'd ask counsel to produce all relevant

20  documents that are located either on the computers that

21  you're holding, the hard drives that you referred to,

22  the Garnerville location, in that office and anywhere

23  else, including in Stony Point, New York, that are

24  responsive since those documents are considered in your

25  possession, custody and control under the Federal

1 Rules.

2　　A　　Okay.  I will do that, but I just want to

3 make it clear that these three-year-old or less

4 computers really had to do with things that have been

5 happening in the last three years, not the kind of

6 records you're seeking, but -- so they're not on there.

7 And those computers, too bad, because those computers

8 are with me and what you're talking about is in New

9 York.

10　　Q　　Okay.

11　　A　　Okay.

12　　Q　　And also, Ms. Bryant, with regard to the

13 recordings and the CDs and cassettes and the books for

14 Songs for Cats, we know that -- we understand that

15 those were first created in 1994.

16　　A　　Dogs was created in '94.

17　　Q　　Dogs, I apologize.

18　　A　　Yeah.

19　　Q　　Can you tell me what the total sales, since

20 1994, revenues have been to Gloryvision --

21　　A　　No.

22　　Q　　-- for Dogs?

23　　A　　I can't tell you that amount.

24　　Q　　Then who would know that?  Because

25 Ms. Bernfeld said that you have all the numbers, that

1 you have all that information.

2     A    Well, I'd have to -- I can't tell you off the

3 top of my head, maybe that's a better answer, because I

4 think I would have to -- and hopefully have enough --

5 complete enough documentation.  I'd have to go through

6 all those files and try to add up all the invoices and

7 see if we can get copies of old tax returns that might

8 have -- try to piece together an answer for you.  I

9 can -- I can only make a guess.  And I -- I don't know

10 if that's a good thing to do.

11     Q    Well, have you -- let's start backwards.  In

12 the year 2007 were there any sales of any of the Songs

13 for Dogs products or recordings?

14     A    We're not actively marketing it.

15     Q    Just, you know, again, in 2007, it's really

16 just yes or no, were there any sales, it's not a

17 question of whether you're marketing, were there any

18 sales?

19     A    For charity there were, yes.

20     Q    So you received -- somebody paid you for

21 those?

22     A    We told them to pay the charity.

23     Q    Okay.  So that means that you have not

24 received any compensation or any revenue from the sales

25 of 2007 --

1    A    No.

2    Q    -- for Songs for Dogs?

3    A    No.

4    Q    What about for 2006, did you have any revenue

5 from --

6    A    I don't remember whether we did or not.  We

7 weren't selling it, so -- every now and then somebody

8 would call and ask for it.  But I don't remember if

9 that happened in 2006.

10    Q    So could you estimate what the sales were, if

11 any, in 2006 for Songs for Dogs?

12    A    I would have said -- off the top of my head

13 there were no sales.

14    Q    Okay.  And for 2005 for Songs for Dogs -- and

15 by the way, you know what, let me just go back.  For

16 2007 we said for Dogs that there were none.  What about

17 for Cats?

18    A    No, I said in 2007 there were sales that were

19 donated, gifted to charity.  But I don't know --

20    Q    You didn't receive any?

21    A    No, I didn't do it for money, I just did it

22 for homeless animals.

23    Q    Okay.  So that was for Dogs and Cats?

24    A    Yes.

25    Q    Okay.  And what about in 2006 for Cats, any

1  sales?

2      A    I don't think we sold anything in 2006.  We

3  weren't marketing it.

4      Q    And what about for 2005?

5      A    The same thing, we weren't marketing it.

6      Q    And what about for 2004?

7      A    We weren't marketing it.

8      Q    So is your answer that there were no sales in

9  2004 and five?

10      A    Right.

11      Q    Okay.  What about 2003?

12      A    Well, apparently Mr. Maxwell and The Orchard

13  had some sales.

14      Q    No, but I'm just talking about, you know,

15  either --

16      A    During that whole time.

17      Q    You personally, you know, through yourself,

18  through Ms. Bernfeld or through Gloryvision were there

19  any sales of either the Songs for Cats or Songs for

20  Dogs in 2003?

21      A    No.

22      Q    I didn't hear that.

23      A    No, there weren't.

24      Q    Okay.  And --

25      A    Through us.  There weren't through us, just

1 to be clear.

2     Q    Okay.  Of course.  That's all we're talking

3 about.

4         2002, were there any sales?

5     A    Not through us.

6     Q    And what about in 2001?

7     A    You know, Mr. Shelowitz, I'm not really sure

8 in 2001, 2002 if there were sales or not.  I don't

9 remember back then.  If there were, we weren't

10 marketing it.  Mr. Maxwell was supposed to be marketing

11 it.

12     Q    I know.  I understand.  But, again, the

13 question is we're trying to understand what the sales

14 revenue, if any, for this -- related to the sale of

15 Songs for Dogs and Songs for Cats, the CDs, tapes,

16 book, anything, what that may have been in 2002.

17     A    It would have been minimal.  After 2000 we

18 did not market it.

19     Q    Okay.

20     A    Mr. Maxwell was marketing it.

21     Q    Okay.  So Maxwell had been marketing it for

22 how long?

23     A    It started in 2000.

24     Q    Okay.

25     A    Early 2000.

1     Q     And so because of that -- is it true that you

2 and Ms. Bernfeld did not do any marketing?

3     A     We did not do any marketing after 2000 of the

4 products.

5     Q     Okay.  And likewise in 2001 -- you said they

6 were minimal.  What would you, you know, define as

7 minimal?

8     A     We may have had a store call up and ask for

9 an order of a dozen, a preexisting store, that kind of

10 rings a bell with me, but I probably shouldn't even say

11 it because I'm not sure.  It seems like that's

12 something that might have happened.

13     Q     Okay.  So if the store did that, according to

14 your recollection, and they ordered a dozen units, what

15 would be the revenue from that?

16     A     A dozen units.  We sold it at the wholesale

17 price.  The gift boxes were more than -- generally

18 wholesale is 50 percent.  So a $15 CD we would get

19 7.50.  But the gift boxes were more expensive as I

20 remember.  We got a little more.  We got 10.00 or 11.00

21 and it cost 18.95.  So we got a pretty good deal on

22 that, but we had a lot more costs, you know.

23     Q     So your best estimate if you could, again, if

24 you could, for 2001 what the sales may have been for

25 either, you know, Songs for Dogs or Songs for Cats?

20

1    A    I really can't give you an answer,

2 Mr. Shelowitz. I would if I could. I just don't -- I

3 can't remember that far back what -- whether there was

4 some layover kind of orders that came from stores that

5 we had built up over time in 2001, I can only say that

6 that might have happened in 2000 or it might have

7 happened in 2001, but more likely it would have

8 happened in 2000. I just -- I just don't know. And I

9 -- you know, I don't want to say something that's not

10 right.

11    Q    Right.

12          And when you said minimal earlier, would you

13 say that under $500 in sales would be something

14 minimal?

15    A    Yeah, I would. That's -- that would be --

16 100 copies at 7.50 would be, you know, $750; right?

17    Q    Okay. So we could agree that in each of 2001

18 and 2002 the sales were probably, to the best of your

19 recollection, under $500?

20    A    I would agree with that, yeah.

21    Q    Okay. Ms. Bryant, what is your educational

22 background, if you could tell us?

23    A    I'm a composer. I'm a trained composer.

24 Classical composition.

25    Q    Where did you train?

1    A    I started 1,000,000 years ago when I was five

2 in the Brooklyn Academy of Music, and then I also

3 throughout my school years went to the High School of

4 Music and Art, Berkeley School of Music and then

5 ultimately the Eastman School of Music for the

6 undergrad.  Then I went into the music business.

7    Q    And where is the Eastman School?  Is that up

8 in Rochester?

9    A    Yeah, University of Rochester.  And I didn't

10 go back to school for quite a while.

11         And then in my early forties I got a master

12 of fine arts in classical composition, fine arts, at

13 SUNY, the classical division, where I had a fellowship.

14 And I also taught there for three years.  And they kept

15 the meter running on my fellowship for me, which was

16 very nice after I had the MFA, so I could do all my

17 groundwork for my doctorate, all of the basic work I

18 had to do.  And then I got that in 2003.

19    Q    Okay.  And, Ms. Bryant, just going back to

20 the sales of songs and -- Songs for Dogs and Songs for

21 Cats, we talked about 2001 until 2007.  Do you recall

22 what the sales were between 1994 to, you know, 1999 of

23 Songs for Cats -- Songs for Dogs, excuse me, and then

24 we'll go to Cats.

25    A    My guesstimate, rough estimate, it has been

1 about 10,000 copies between the two products with more

2 of the Dogs being sold, because we marketed it first

3 and we marketed it longer.  And when Cats came out, we

4 had some personal tragedies that were going on and we

5 just didn't give it our -- the same amount of time.  We

6 couldn't give it as much time.  So I -- that would be a

7 combined total.  And I'd have to really work hard to

8 try to break that down with records in front of me.

9      Q     Okay.  So the 10,000 units is from '94 to '99

10 or is that total ever?

11      A     I was talking about pre-entering any

12 agreement with Maxwell.  I separated as -- when we were

13 actively marketing and trying to break the product on

14 the marketplace, and then when Mr. Maxwell was carrying

15 the ball for further -- you know, after we had already

16 broken it on the market.  Expanding our store base was

17 the idea.

18      Q     And Ms. Bernfeld testified that probably --

19 she gave us that 10,000 unit number as well and she

20 said probably 1,000 or less of that would be those --

21 you know, the gift box from the Songs for Dogs, like

22 the first type of gift box.  Does that jive with your

23 recollection?

24      A     That might be a pretty good guess.  I would

25 have said more.  But really she's guessing and I'm

23

1 guessing.  I would say at least 1,000 because we had

2 the gift boxes going to the Signals catalog, to

3 Mixaplistic (phonetic).  Can you spell that?  In the

4 high-end gift stores like Henri Bendel's, the shi-shi

5 pet places that wanted it.

6     Q    Were these on consignment or were they

7 outright purchases by these distributors?

8     A    I think everything is on consignment.

9     Q    Okay.  So let's talk --

10    A    With those kind of stores.  I think catalogs

11 are always on consignment.  I really don't remember.

12 But I think that those catalogs are -- you know, you

13 send them and they sell them, and they have returns if

14 they do, you know, and they send you a check.

15    Q    What we're trying to understand is what your

16 actual sales were, your sales at Gloryvision, for

17 products that you shipped and received payment for from

18 whoever was buying, and not the numbers that were

19 shipped but the numbers that were shipped and you

20 received payment for them.

21    A    I told you, I think it's about 10,000 copies.

22 And keep in mind that those were the dark days when we

23 had to make cassettes, cassette gift boxes, CDs, CD

24 gift boxes.  All kinds of media and sizes and shapes to

25 satisfy the media of the day.  Today everything would

1 be done, if at all, on CDs, and, you know, other forms

2 of delivery.  But that was a horror show, that you had

3 to make so many different kinds of products.

4       Q     And --

5       A     So they had different prices, too, you know.

6       Q     And if -- with regard to the number -- you

7 know, that 10,000 number, do you know approximately

8 what the average, you know, sale price would have been?

9       A     I'm trying to do that in my head as -- I was

10 anticipating you a little bit.

11       Q     Okay.

12       A     A cassette with an illustrated J-card would

13 be 9.95.  We had quite a number of cassette orders.

14 You know, dog lovers, cat lovers aren't all that hip,

15 you know.  They're not techy.  So I'd say that we

16 had -- fully half of what we sold was on cassette.

17             Now, the cassette gift box was 15.00 or

18 16.95, but the plain cassette was 9.95.  And then the

19 CD was 14.95, but the gift box was 18.95.  So it's like

20 four different prices for the varying products all

21 representing -- you know, if we put them in a pile, it

22 was part of the 10,000, you know, pieces that were

23 sold.

24       Q     Right.

25       A     I think we'd have to try to average that out.

1    Q    Well, if you could just tell us kind of, to

2 the best of your knowledge, and certainly if you have

3 records we would love to see them because that would

4 help, to the best of your knowledge what the total

5 sales revenue you received from those 10,000 units?

6    A    There's one other wrinkle that I'm trying to

7 figure in now, too, which is -- because we got so much

8 publicity, we had a lot of single ordering customers

9 from all over the country who paid retail.

10        Gosh, I don't think I'm that smart.  I don't

11 think I can figure it all out in terms of dollars, you

12 know.  You know, we felt like we kind of just paid for

13 the product and we're about to -- we're poised to

14 really expand in 2000.

15    Q    Okay.  So basically there are 10,000 units,

16 the gift boxes sold for 18.95 and there are about 1,000

17 of them, and then there was the 9.95 versions --

18    A    Of the cassettes.

19    Q    -- of the cassettes, and then the 14.95

20 versions of the CDs?

21    A    Yeah, and it was the 14.00 or 15.95 versions

22 of the cassettes in gift boxes with full books.

23    Q    Right.

24        Okay.  But that doesn't change the 10,000

25 number?

1    A    No, that's -- they're all part of the same

2 10,000 group, that's the thing.  They came in different

3 sizes and shapes.

4         You know, I really can't put a dollar figure

5 on it.  I would if I could.  We spent an awful lot of

6 money promoting getting -- just breaking it on the

7 markets, so it never felt like we made much of a profit

8 even though we made money.

9    Q    Okay.  And can you tell me, Ms. Bryant, what

10 is your position with Gloryvision?

11    A    I'm the chairman and secretary.

12    Q    And how long have you held that position?

13    A    Since 1992.

14    Q    And have you held any other position with

15 Gloryvision?

16    A    No.

17    Q    And are you an owner of Gloryvision?

18    A    Yes, I'm an equal owner with Ellen.

19    Q    What would you say your percentage ownership

20 would be in the company?

21    A    Fifty percent.

22    Q    I'm sorry, I didn't hear that.

23    A    Fifty percent.

24    Q    Okay.  With regard to that 50 percent, what

25 is the significance in terms of any distributions you

1 may have made of any profits from any Gloryvision

2 sales?

3      A    Well, we're very 50/50 about things.  I don't

4 really remember any more than that.

5      Q    Does that mean that if you have profit, that

6 you would share it?

7      A    Yes.

8      Q    Half with Ms. Bernfeld and half with

9 yourself?

10     A    Yes.

11     Q    And have you ever shared any profit from

12 Gloryvision with Ms. Bernfeld?

13     A    I don't know.

14     Q    Would anybody know if you did?

15     A    No.  I could look back and try to find out.

16 But, you know, we're talking about very old records.

17     Q    Well, have you ever received any share of any

18 profits from Gloryvision from the last five years, from

19 2002 until today?

20     A    No.

21     Q    And for the prior five years, from '97 to

22 2002, did you ever receive any share of any profits of

23 Gloryvision?

24     A    I don't remember.

25     Q    Were there any profits from Gloryvision?

1     A     I don't remember.

2     Q     And do you have any records that may support

3 that?

4     A     That's what I said.  Yeah, I have records and

5 I have to look at them and I'm not looking at them now.

6     Q     And where are those records located?

7     A     In New York.

8     Q     Okay.  We'd ask you to produce all of those

9 records.

10          MR. MONAGHAN:  We'll take that --

11 BY MR. SHELOWITZ:

12    Q     -- that are relevant again in connection with

13 sales and profits related to the Songs for Dogs and

14 Songs for Cats.

15          MR. MONAGHAN:  We'll take that under

16     advisement and respond accordingly.

17 BY MR. SHELOWITZ:

18    Q     And do you have any kind of written agreement

19 with Gloryvision?

20    A     No.

21    Q     And do you have any written agreement with

22 Ms. Bernfeld?

23    A     No.

24    Q     Are you a party to any agreement whatsoever

25 with Ms. Bernfeld?

1    A    This litigation.

2    Q    And what kind of agreement do you have with

3 her?

4    A    We just -- we filed the complaint together.

5    Q    Okay.  And have you been involved with any

6 lawsuits other than this lawsuit before?

7    A    Yes.

8    Q    And how many lawsuits have you been involved

9 with before?

10    A    Two.

11    Q    And --

12    A    I think.

13    Q    And what was the most recent lawsuit that you

14 were involved in?

15    A    I have an ongoing suit in federal court

16 having to do --

17    Q    Plaintiff or defendant?

18    A    No, I'm the plaintiff.

19    Q    And which court is that in?

20    A    New York Federal Court.

21    Q    And would that be in the Southern District of

22 New York?

23    A    Yes, that's what it's called.

24    Q    And what is the basis of that lawsuit,

25 Ms. Bryant?

1          MR. MONAGHAN:  The basis is set forth in the

2     pleadings.  You can ask her for a general

3     understanding.

4          MR. SHELOWITZ:  I'm sorry, we can't really

5     hear.

6          MR. MONAGHAN:  I said the basis is set forth

7     in the pleadings, but you can ask her her general

8     understanding.

9          MR. SHELOWITZ:  Are we talking about this

10    lawsuit or another one?

11         MR. MONAGHAN:  Another one.

12 BY MR. SHELOWITZ:

13    Q    Okay.  Yeah, if you can tell me as a

14 plaintiff in the lawsuit what your understanding of the

15 case is.

16    A    Well, I haven't been paid my royalties for

17 many years for many famous pieces of music that I wrote

18 that have been used constantly for more than 20 years

19 now.  And my royalties have been paid to others in lieu

20 of me, as far as broadcast royalties, like BMI.  And as

21 far as the synch royalties, you know, the music

22 publishing royalties, I haven't gotten them all these

23 years.  And I've been in court for many years fighting

24 this battle, but we're getting close now.

25    Q    And when was that lawsuit commenced?

1    A    Well, it seems to have two different suits

2 involved.  One started in 2002 and another started in

3 -- last year.

4    Q    And the one that started in 2000, what -- I'm

5 not sure that I'm clear on the two different parts of

6 one lawsuit.

7    A    Well, that one focused more on broadcast

8 royalties.

9    Q    Okay.

10    A    And this other case is -- which was in the

11 Supreme Court in New York State, and this case takes up

12 some of those same titles, but in a different way with

13 different parties in federal court.  Music publishing.

14    Q    And the one in the Southern District of New

15 York in which you're the plaintiff, what's the name of

16 that case?

17         MR. MONAGHAN:  It's Bryant v. Sunbow

18    Productions, et al.

19         THE DEPONENT:  I thought AB Droids.

20         MR. MONAGHAN:  Well, the first defendant is

21    AB Droids.

22         THE DEPONENT:  AB Droids, France.

23         MR. MONAGHAN:  You know, that's an ongoing

24    litigation, so I'm not going to allow any further

25    questions on that case.  That's ongoing now.

1          MR. SHELOWITZ:  Well, again, there's no

2     reason why I can't inquire.

3          MR. MONAGHAN:  Yes, there is, I'm not going

4     to let you do it.

5          MR. SHELOWITZ:  Okay.

6          MR. MONAGHAN:  It's part of an existing case.

7          MR. SHELOWITZ:  Okay.  That's fine.

8          MR. MONAGHAN:  Right.  You want to become a

9     party to that case, come on in.

10 BY MR. SHELOWITZ:

11     Q    Okay.  So this is called Bryant versus --

12 this was commenced in what year?

13     A    2007.

14     Q    And then -- so that was the first one.  And

15 then there's a second one that you mentioned that's in

16 the New York Supreme Court?

17     A    No, the first one was a New York Supreme

18 Court.

19          MR. MONAGHAN:  That's on appeal.  That's also

20     a pending case.

21          THE DEPONENT:  It's also pending.  2000 that

22     was commenced.

23 BY MR. SHELOWITZ:

24     Q    Okay.  Maybe -- let's try to get this clear

25 so we don't take unnecessary time.

1          You mentioned that there are two lawsuits,

2 and is one in federal court and one in state court; is

3 that correct?

4      A    That's correct.

5      Q    Okay.  And one in state.

6          The one that you were describing the

7 royalties that you said were owed to you from EMI and

8 other companies --

9      A    BMI, Broadcast Music.

10     Q    Okay.  And which one is that?  Is that the

11 federal court?

12     A    That's the state court.

13     Q    I'm sorry?

14     A    That's the State Supreme Court.

15     Q    Okay.  And that's the one that's called AB

16 Droids?

17     A    No, that's Anne Bryant --

18         MR. MONAGHAN:  Against Sunbow Productions.

19         THE DEPONENT:  -- against Sunbow Productions.

20 BY MR. SHELOWITZ:

21     Q    That's the state court case?

22     A    Yes.

23     Q    Okay.  Bryant versus -- how do you spell that

24 defendant's name?

25         MR. MONAGHAN:  Sunbow Productions.

 1          THE DEPONENT:  S-U-N-B-O-W.

 2 BY MR. SHELOWITZ:

 3    Q    Oh, Sunbow.  Okay.  Sunbow.

 4         Okay.  And that was commenced in what year?

 5    A    2000.

 6         MR. MONAGHAN:  Mitch, that's enough on the

 7    other case.

 8         MR. SHELOWITZ:  Listen, Mr. Monaghan --

 9         MR. MONAGHAN:  No, listen you, Mr. Shelowitz.

10    That's enough.

11         (Overlapping speech.)

12         MR. MONAGHAN:  No.  Okay.  I direct her not

13    to answer any further questions about pending

14    litigations.

15         MR. SHELOWITZ:  I'm not asking about pending

16    litigations.

17         MR. MONAGHAN:  Yes, you are.

18         MR. SHELOWITZ:  That's public record and

19    she's allowed to ask -- or allowed to answer that

20    question.  And if you continue to do that, I'm

21    going to get the Judge on the phone and she's

22    going to laugh at you for --

23         MR. MONAGHAN:  Go ahead, get the Judge.  Go

24    ahead, get the Judge.

25         (Overlapping speech.)

1        MR. SHELOWITZ:  Do you really want me to do

2    that?

3        MR. MONAGHAN:  You're not allowed to ask

4    about --

5        MR. SHELOWITZ:  I'm not asking about anything

6    other than the name and the substance.  And you're

7    not letting me -- you're giving very confused

8    answers and I'm trying to understand what the

9    cases are.

10       MR. MONAGHAN:  I'm not going to help --

11       MR. SHELOWITZ:  Listen to me, Mr. Monaghan.

12       MR. MONAGHAN:  No, I've had enough.

13       MR. SHELOWITZ:  I am allowed to ask

14    background questions, I'm allowed to ask if she's

15    been in litigation, I'm allowed to ask the name of

16    the litigation and I'm allowed to ask the subject

17    matter of the litigation.  That's what I'm doing.

18    And I'm trying to understand and you're not

19    letting me.

20       MR. MONAGHAN:  You already asked and you got

21    your answers.

22       MR. SHELOWITZ:  No, I did not get my answers

23    because I still don't understand because the

24    answers have not been clear.  You keep

25    interrupting her and objecting.  I'm not asking

1    her anything privileged.  I'm not asking about

2    your strategy.  I'm asking nothing other than the

3    names of the cases and when they were commenced.

4    If you're not going to let her answer that, I will

5    get the Magistrate on the line right now.

6        MR. MONAGHAN:  You can look at the -- it is a

7    matter of public record.

8        MR. SHELOWITZ:  I am asking -- she's a

9    plaintiff in these cases, okay, according to her

10   testimony.  I'm asking her to give me that

11   information.  Okay?

12       MR. MONAGHAN:  What information?

13       MR. SHELOWITZ:  The information about the

14   names of the cases and where they are, when they

15   were commenced and the subject matter of them.

16   And I'm allowed to ask that.

17       MR. MONAGHAN:  We'll be happy to provide that

18   and it's available --

19  BY MR. SHELOWITZ:

20    Q    Okay.  Ms. Bryant, I'm going to ask you

21  again.  The Bryant versus Sunbow Productions -- and if

22  you object to her and you instruct her not to answer,

23  we'll have it on the record and I will bring it to the

24  Court.

25       MR. MONAGHAN:  Go ahead.

1 BY MR. SHELOWITZ:

2     Q    Okay.  You said it was a state case that's

3 called Bryant versus Sunbow Productions that was

4 commenced in 2007; is that correct?

5     A    2000.

6     Q    Okay.  2000.  Thank you.

7          And what is the current procedural status of

8 that case?  Has a decision been rendered?

9     A    It's on appeal.

10    Q    And where is it on appeal?

11         MR. MONAGHAN:  In the second department.

12         MR. SHELOWITZ:  And, again, the question is

13    for Ms. Bryant, not for counsel.

14         MR. MONAGHAN:  I'm just trying to move this

15    along.

16         MR. SHELOWITZ:  No, you're not.

17         MR. MONAGHAN:  Yes, I am.

18         THE DEPONENT:  Well, I don't even know what

19    the departments are.

20 BY MR. SHELOWITZ:

21    Q    Did you appeal the decision of the Court or

22 did the other side appeal it?

23    A    We're appealing it.

24    Q    Okay.  Now, you mentioned there's a federal

25 case.

1        MR. MONAGHAN:  Get the Judge.  Get the Judge.

2    I've had enough.  Go ahead, call the Judge.

3 BY MR. SHELOWITZ:

4    Q    You mentioned there's a Federal case --

5        MR. MONAGHAN:  Get the Judge, Mitch.

6 BY MR. SHELOWITZ:

7    Q    -- Bryant versus AB Droids; is that correct?

8        MR. MONAGHAN:  Yes.

9        THE DEPONENT:  Yes.

10 BY MR. SHELOWITZ:

11    Q    And can you tell me the subject matter of

12 this case?

13    A    I did already.

14    Q    Well, I'd like to hear it again because it

15 wasn't clear to me what the difference is between

16 Bryant versus Sunbow and this one.  I'd just like to

17 understand so we can move on.

18        MR. MONAGHAN:  You can look at the pleadings,

19    they set forth the basis.

20 BY MR. SHELOWITZ:

21    Q    Tell me your understanding of the subject

22 matter of this lawsuit, Ms. Bryant.

23        MR. MONAGHAN:  Which lawsuit?  This one?

24        MR. SHELOWITZ:  Federal court, Bryant versus

25    AB Droids in the Southern District.

1        MR. MONAGHAN:  I object to having the witness

2    discuss it, another pending litigation, which

3    is --

4        MR. SHELOWITZ:  I'm asking her -- she's a

5    plaintiff and she filed the complaint.  I'm asking

6    her what her understanding for the basis of the

7    lawsuit is.

8        MR. MONAGHAN:  Can you give your general

9    understanding, please?

10       THE DEPONENT:  Yeah, I did already.  I told

11   you it had to do with music publishing royalties

12   that haven't been paid to me.

13 BY MR. SHELOWITZ:

14   Q    Okay.

15   A    And different -- the cases are different.

16   Q    Okay.  So we have two cases.

17        And then you said earlier in your testimony

18 that one was in two parts; one was broadcast royalties

19 and one was something else.  Is that just that they're

20 two separate cases?

21   A    They're two separate cases.

22   Q    Okay.  And have you given deposition

23 testimony in either of these cases?

24   A    In the state case I have.

25   Q    And when was that deposition taken?

1    A    I believe it was in 2003 or 2002.

2    Q    Are there any other lawsuits that you're

3 involved in other than those two?

4    A    No.

5    Q    Have you ever been involved in any other

6 lawsuits other than the two that you've just mentioned

7 and the current matter?

8    A    Yes, I had a lawsuit -- I almost forgot this.

9 I can't remember pain.  I had a lawsuit with my former

10 partner after we split up our business, Ford Kinder, in

11 the early '90s.

12    Q    And who commenced that lawsuit?

13    A    I did.

14    Q    And do you recall the basis of that lawsuit?

15    A    A breach of contract as I remember.

16    Q    And was that case resolved?

17    A    Yes, it was settled.

18    Q    With regard to Gloryvision, other than the

19 activities regarding recordings for Songs for Dogs and

20 Songs for Cats, is there any other activity that

21 Gloryvision is involved in?

22    A    Well, Gloryvision has other products and

23 properties.  Gloryvision when we worked with

24 Mr. Maxwell signed an agreement with Mr. Maxwell so he

25 could develop the store bases.  We continued to write.