UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
ANNE BRYANT, ELLEN BERNFELD, AND
GLORYVISION, LTD.,

Civil Action No.: 07-CV3050(CLB)

                                     Plaintiffs,

- against –

**AFFIDAVIT OF DOUGLAS MAXWELL**

EUROPADISK, LTD., MEDIA RIGHT
PRODUCTIONS, INC., VERY COOL MEDIA,
INC., DOUGLAS MAXWELL, THE ORCHARD
ENTERPRISES, INC., and RUSSELL J. PALLADINO,

                                       Defendants.
------------------------------------------------------------------------ x

Douglas Maxwell, being duly sworn, deposes and says:

1. I am the Defendant in the above-referenced action and have personal knowledge of the facts and circumstances described herein.

2. I submit this Affidavit in support of the Defendants' Motion for Summary Judgment.

## BACKGROUND

3. I am the founder, President, and sole manager of Media Right Productions ("Media Right"). I was born legally blind and have lived with my blindness my whole life.

4. Media Right is a small music production company based in New York City. Media Right provides such services as recording, production, and marketing.

5. I am also the founder and Executive Director of the Visionary Media Group, a not-for-profit agency assisting blind musicians to find gainful employment in the music industry.

## RUSSELL PALLADINO AND EUROPADISK

6. Europadisk, Ltd. ("Europadisk") was a CD and replication company that pressed music onto compact discs.

7. In 1999, my best friend, Russell Palladino ("Mr. Palladino"), was a sales representative for Europadisk.

8. Mr. Palladino knew of my many years struggling as a musician and was aware of my decision to self-promote my music. He was further aware that much of my music was created on very specific niche topics, such as golf, romance, and relaxation.

9. Mr. Palladino was hired by Gloryvision to press CDs for the recordings "Songs for Dogs" and "Songs for Cats" (the "Gloryvision Recordings.") Due to the topic-specific nature of these recordings, Mr. Palladino thought that I might be able to help Gloryvision to market the Gloryvision Recordings.

## THE GLORYVISION AGREEMENT

10. Mr. Palladino introduced me to Plaintiff Ellen Bernfeld in 1999.

11. Though Ms. Bernfeld and I never met in person, we discussed our respective interests to determine if her music would fit well with my marketing.

12. As part of our initial discussions, I expressed to Ms. Bernfeld my excitement about my developing relationship with The Orchard Enterprises, Inc. ("The Orchard"). At that time, The Orchard was a growing wholesaler of music I believed that The Orchard could provide extensive marketing exposure for our music.

13. Due, in part to our shared excitement about The Orchard, Ms. Bernfeld and I mutually agreed to work together.

14. In February of 2000, Ms. Bernfeld and I entered into a music representation agreement (the "Gloryvision Agreement"), which is included as Defendants' Exhibit 1.

15. The Gloryvision Agreement was prepared and signed by both myself and Ms. Bernfeld. Pursuant to the Gloryvision Agreement, Media Right was "granted authority to act as

agent and representative" of Gloryvision with respect to the Gloryvision Recordings. *See* § 2 of the Gloryvision Agreement.

16. The third paragraph of the Gloryvision Agreement states that:

"Media Right will use its best efforts to market and promote these recordings to catalogues, shopping networks, internet sites, retailers, and wholesalers. Media Right will pay all marketing expenses for this purpose including postage, telephones, printing, advertising, trade shows, time and travel."

17. My understanding of this provision was that Media Right was to use any means at its disposal to generate income from the sale of the recordings. *See* Maxwell Deposition at ¶10-13, p. 78. Media Right was entitled to a 20% commission on all sales, with 80% to be forwarded to Gloryvision. *See* §4 of the Gloryvision Agreement.

18. Based upon my excitement from the discussions with The Orchard, we included a specific provision in the Gloryvision Agreement expressly providing for the allocation of revenues in the event that I was able to utilize my contacts to generate sales of the Gloryvision Recordings by others.

19. According to such provision, "[i]n the event that Media Right Productions elects to use its relationships with other third party distributors for the purpose of marketing these products, Media Right Productions will be entitled to twenty percent of the gross sales after any commissions are paid to the third party." *See* § 4 of the Gloryvision Agreement.

20. Further to the Gloryvision Agreement, Plaintiffs delivered to me approximately 40-50 CDs, containing the Gloryvision Recordings, composed of approximately 20-25 CDs of "Songs for Cats" and 20-25 CDs of "Songs for Dogs." I never received an item called "Songs for Dogs CD and Book."

21. I tried direct marketing of the Gloryvision Recordings to pet-related retailers, such as Pets.com, and by preparing and posting marketing materials on my website.

22. Despite our best marketing efforts, no one was interested in the Gloryvision Recordings. In fact, we had no sales of the Gloryvision Recordings. Nonetheless, I maintained the marketing material on my website and continued my attempts to sell the Gloryvision Recordings whenever an opportunity arose.

23. I never delivered notice of termination of the Gloryvision Agreement to Plaintiffs.

24. I never received notice of termination of the Gloryvision Agreement from Plaintiffs.

25. Until receiving the Complaint in this case, I believed that the Gloryvision Agreement was in full force and effect.

## THE ORCHARD AGREEMENT

26. My relationship with The Orchard began in or around 1999 in an effort to market my own musical compositions.

27. In February of 2000, I entered into a distribution agreement with The Orchard, (the "Orchard Agreement") whereby The Orchard would distribute various recordings for Media Right. The Orchard Agreement is included as Defendants' Exhibit 2.

28. I believed that the Gloryvision Agreement provided me with full and complete authorization to market and sell the Gloryvision Recordings through The Orchard.

29. This was especially so after my discussions with Ms. Bernfeld at the time of negotiation of the Gloryvision Agreement regarding our collective excitement about the opportunity to distribute the Gloryvision Recordings through The Orchard.

30. At the time of entering into the Orchard Agreement, I believed in good faith based upon the Gloryvision Agreement that all of the representations and warranties I agreed to in the Orchard Agreement were true and accurate to the best of my knowledge and my understanding of the Gloryvision Agreement.

31. Pursuant to the Orchard Agreement, I delivered CDs containing the Gloryvision Recordings to The Orchard.

32. I also delivered CDs of each of my recordings for distribution to The Orchard, which were: "Music for Lovemaking," "Music for Lovemaking II," Sounds of the Womb," "A Celebration of Motherhood," "Golf's Greatest Hits I," "Cigar Smokin' Sounds," and "Primal Pounding (the "<u>Media Right Recordings</u>").

33. While I received royalty checks over the years from The Orchard, the royalty amounts were relatively small.

34. Because the royalty checks from The Orchard did not contain a breakdown of the recordings for which the royalties were being paid, I believed that all royalties paid by The Orchard were attributable to the Media Right Recordings.

35. I understand now that I made a mistake and that in fact a certain portion of such royalty checks were from sales of the Gloryvision Recordings.

36. According to sale records from The Orchard, I understand that approximately $331.06 of the royalties I received should have been paid to Plaintiffs.

37. Pursuant to the Orchard Agreement, I am required to provide legal counsel to The Orchard in this case, and I am bound to indemnify The Orchard for any damages they may incur.

38. I have already incurred close to $50,000 in legal fees in this case, which I believe has been brought in bad faith.

39. Other than my unsuccessful direct sales efforts and distribution of the Gloryvision Recordings through The Orchard, I took no further action to market the Gloryvision Recordings.

40. I never authorized anyone to attribute copyright ownership of the Gloryvision Recordings to Media Right.

41. I never represented to anyone that Media Right was the owner or creator of the Gloryvision Recordings.

42. I never made copies of the Gloryvision Recordings.

43. I never instructed anyone to add © or ℗ with Media Right's name on any of the Gloryvision Recordings on third-party websites. I am unaware how these designations may have occurred.

44. I never intended, nor did Media Right intend, to infringe Plaintiffs' copyrights.

45. Because I mistakenly believed that all royalties contained in these small checks were due from the Media Right Recordings, I unintentionally neglected to forward the amount received in sales revenues generated from the Gloryvision Recordings to Gloryvision.

46. I constantly wonder how my innocently forgetting to pay Plaintiffs $331.06 could result in such an outrageous situation.

47. I was not made aware of such owed money until I was served with the Complaint in this case, without any warning, request, or communication from Gloryvision. I have tried from the beginning of this lawsuit to settle this matter.

48. As soon as I was made aware that I had forgotten to disperse any monies owed to Gloryvision, my former attorney sent two (2) letters to Plaintiffs' counsel offering to repay the omitted amounts to which no response was received.

49. I hired Mr. Shelowitz specifically to aid me in settling this matter as quickly as possible. On my behalf he has tried repeatedly to negotiate a settlement of this matter. I have also tried to speak directly to Plaintiffs, first to apologize, and second to see if, as fellow musicians, we could try to resolve this matter. The Plaintiffs have refused to even speak with me.

50. Because other than unintentionally overlooking payments of $331.06, I believed that I was authorized by the Gloryvision Agreement to market and sell the Gloryvision Recordings through The Orchard.

51. Based upon the foregoing, I respectfully ask this Court grant Defendants' Motion for Summary Judgment.

DOUGLAS MAXWELL

Sworn to before me this 6th day of June, 2008

MITCHELL C. SHELOWITZ
Notary Public, State of New York
No. 02SH6156903
Qualified in Nassau County
Commission Expires December 4, 20__

Notary Public