[3]

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------X
ANNE BRYANT, ELLEN BERNFELD, AND
GLORYVISION, LTD.,

Plaintiffs,

-against-

EUROPADISK, LTD., MEDIA RIGHT
PRODUCTIONS, INC., VERY COOL MEDIA,
INC., DOUGLAS MAXWELL, THE ORCHARD
ENTERPRISES, INC., and RUSSELL J.
PALLADINO,

Defendants.

------------------------------------------------X

Tuesday
January 29, 2008
10:15 a.m.

EXAMINATION BEFORE TRIAL of the
Defendant, MEDIA RIGHT PRODUCTIONS,
INC., by and through its witness,
DOUGLAS BERLENT, taken pursuant to
Notice, held at the offices of
Rockland & Orange Reporting,
445 Hamilton Avenue, White Plains,
New York, on the 29th day of January
2008, before a Notary Public of the
State of New York.

ROCKLAND & ORANGE REPORTING
20 South Main Street
New City, New York 10956
(845) 634-4200

1            STIPULATIONS
2
3        IT IS HEREBY STIPULATED AND AGREED
4    by and between the attorneys for the respective
5    parties hereto that the sealing and filing of
6    the within deposition be waived; that such
7    deposition may be signed and sworn to before any
8    officer authorized to administer an oath with
9    the same force and effect as if signed and sworn
10   to before a Justice of this Court.
11
12       IT IS FURTHER STIPULATED AND AGREED that
13   all objections, except as to form, are reserved
14   to the time of trial.
15
16       IT IS FURTHER STIPULATED AND AGREED that
17   the within examination and any corrections
18   thereto may be signed before any Notary Public
19   with the same force and effect as if signed and
20   sworn to before this Court.
21
22
23
24
25

[2]

1   A P P E A R A N C E S :
2
3       MONAGHAN, MONAGHAN, LAMB &
4   MARCHISIO, ESQS.
5       Attorneys for Plaintiffs
6       28 West Grand Avenue
7       Montvale, New Jersey 07645
8   BY: PATRICK J. MONAGHAN, JR., ESQ.
9       MICHAEL KORIK, ESQ.
10
11
12   SHELOWITZ BRODER, LLP
13       Attorneys for Defendants
14       11 Penn Plaza, 5th Floor
15       New York, New York 10001
16   BY: MITCHELL C. SHELOWITZ, ESQ.
17
18
19
20
21
22
23
24
25

[4]

1           Douglas Berlent
2   D O U G L A S   B E R L E N T,    the Witness
3       herein, on behalf of the Defendant,
4       MEDIA RIGHT PRODUCTIONS, INC., having
5       first been duly sworn by Kathryn Lebeau,
6       a Notary Public of the State of New
7       York, was examined and testified as
8       follows:
9           THE COURT REPORTER: Please state
10      your name for the record.
11          THE WITNESS: Douglas Berlent.
12          THE COURT REPORTER: Will you
13      state your present address.
14          THE WITNESS: 324 West 23rd
15      Street, Number 3B, New York,
16      New York 10011.
17   EXAMINATION BY
18   MR. MONAGHAN:
19      Q.  Good morning. I'm sorry. Did you
20   say your name was Douglas Berlent,
21   B-E-R-L-E-N-T?
22      A.  Yes.
23      Q.  Okay. And do you, also, use the
24   name Maxwell?
25      A.  Yes.

[5]

Douglas Berlent

1                      Douglas Berlent
2    Q.  Okay.  And in what context do you use
that name?
4        MR. SHELOWITZ:  Objection
5 to the form.
6        MR. MONAGHAN:  What's the
7 objection?
8    Q.  Why do you use another name?
9    A.  For personal reasons relevant to my
10 blindness, I changed my name for myself,
11 approximately, 10 years ago to reflect maximum
12 wellness and that became the name I use,
13 professionally, since that time.
14    Q.  I see.  Okay.  Do you have any licenses
15 or any official documents that bear the name
16 Maxwell?
17        In other words, what is your official
18 name?  What do you sign contracts with?  What do
19 you sign documents with?  What name?
20    A.  I, usually, Doug - Doug Berlent
21 Maxwell, accounting for both.
22    Q.  Okay.  You haven't had any official
23 name change by a court; is that what you're saying?
24    A.  No, I have not.
25    Q.  Okay.  That's fine.

[6]

Douglas Berlent

2        Are you suffering from any physical or
3 mental disability, today, that would disable you
4 from understanding my questions or reviewing any
5 documents that I might show to you?
6    A.  No.  In terms of mental disability,
7 potentially, seeing the documents, I might not be
8 able to read the print depending on the size of the
9 print.  So, I may need you to read them.
10    Q.  Okay.  Can you give me an idea of the
11 parameters of the vision that you are able to use,
12 effectively?
13        MR. SHELOWITZ:  Objection
14 to the form.
15        MR. MONAGHAN:  You can
16 answer, please.
17    Q.  I mean what size type are you able to
18 read?
19    A.  Comfortably, 18-point type.
20    Q.  From what distance?
21    A.  Close.
22    Q.  Okay.  The address you gave to the
23 reporter -- Would you prefer I called you
24 "Mr. Maxwell"?
25    A.  That would be fine.

[7]

Douglas Berlent

2    Q.  Okay.  The address you gave to the
3 reporter, Mr. Maxwell, is that home or business
4 address?
5    A.  Home.
6    Q.  Okay.  And are you, currently,
7 employed, sir?
8    A.  Yes.
9    Q.  And by what company?
10    A.  Media Right Productions, Inc.
11    Q.  And is that a New York corporation?
12    A.  Yes, it is.
13    Q.  And where are its offices?
14    A.  40 West 27th Street, 4th Floor,
15 Room 400, New York, New York  10001.
16    Q.  And do you have any other business
17 associations at the present time, that is, with
18 respect to which you're either an employee, officer
19 or a director?
20    A.  Yes.
21    Q.  What would those be?
22    A.  I am the Executive Director of the
23 Visionary Media Group, which is a non-for-profit
24 agency assisting blind people.
25    Q.  Any others?

[8]

Douglas Berlent

1                      Douglas Berlent
2    A.  No.
3    Q.  Okay.  And you said Media Right
4 Productions is a New York corporation and you are,
5 currently, employed.  And what position are you,
6 currently, employed by that company?
7    A.  I am the President.
8    Q.  And do you own the company?
9    A.  Yes.
10    Q.  100 percent?  You own the company,
11 100 percent of the shares?
12    A.  I do not believe so.
13    Q.  Who else is a principal or owner of the
14 company?
15    A.  I believe my wife has a small
16 percentage.
17    Q.  And your wife's first name?
18    A.  Liz.
19    Q.  Okay.  Any other shareholders?
20    A.  No.
21    Q.  And who are the other officers?  You're
22 President.  Who else is an officer?
23    A.  My wife.
24    Q.  What position does she hold?
25    A.  I believe, Vice President.

[9]

Douglas Berlent

1                Douglas Berlent
2     Q. And any other individuals?
3     A. No.
4     Q. Okay. And has this status that you've
5 just described been true from, at least, 1999 to
6 the present, that is, the shareholding
7 officerships?
8     A. No.
9     Q. Okay. Going backwards, who were the
10 officers of the company in 1999?
11     A. I was the sole officer.
12     Q. And sole owner?
13     A. Yes.
14     Q. Okay. And how would you describe the
15 business of Media Right Productions? What do they
16 do?
17     A. It's a vehicle for my skills as a
18 composer and producer.
19     Q. To do what?
20     A. To use my skills to try to earn a
21 living in the music business.
22     Q. Okay. And do you, also, provide
23 services to third parties?
24     A. Yes.
25     Q. Okay. What type of services would

[10]

1                Douglas Berlent
2 those be?
3     A. Recording services, production services
4 and, on occasion, marketing.
5     Q. And you are the person who's
6 responsible for those various functions?
7     A. Yes.
8     Q. And are you a member of any societies,
9 musical performing right societies?
10     A. Yes.
11     Q. Other societies?
12     MR. SHELOWITZ: Just let
13 him finish the question, okay,
14 Doug?
15     MR. MONAGHAN: Yeah.
16     Q. Let me give you a couple of guidelines
17 here. The attorney, probably, has already told you
18 some of them.
19     Wait until I finish my question,
20 please.
21     If you don't understand my question,
22 tell me and I'll try and correct it or rephrase it.
23     If you answer a question of mine, we
24 will assume that you understood it. Is that fair?
25     A. That is fair.

[11]

1                Douglas Berlent
2     Q. Okay. Have you ever testified before?
3     A. Yes.
4     Q. In a deposition or a trial?
5     A. In a deposition.
6     Q. Okay. How many such times?
7     A. Once.
8     Q. Okay. What was the nature of the case?
9     A. Copyright.
10     Q. Copyright infringement?
11     A. Yes.
12     Q. Were you a plaintiff or a defendant or
13 a witness?
14     A. I don't understand the question. If
15 you could explain?
16     Q. I'll try.
17     A. The difference, I know which one I was,
18 but I don't know plaintiff or defendant.
19     Q. Which side were you on? The top or the
20 bottom in the caption?
21     A. We were the plaintiff.
22     Q. Okay. Where was that case?
23     A. The State of New York.
24     Q. And was it on your behalf,
25 individually, or on behalf of Media Right

[12]

1                Douglas Berlent
2 Productions?
3     A. I don't recall.
4     Q. How long ago was the case?
5     A. Within the past two years.
6     Q. Is the case still, ongoing?
7     A. No, it's not.
8     Q. Okay. And who was the defendant?
9     A. I believe it was Focus Films, but I
10 cannot, completely, recall that.
11     Q. And was Mr. Shelowitz your attorney in
12 that case?
13     A. No, he was not.
14     Q. Who was your attorney?
15     A. Paul Millman.
16     Q. Who, for a time, was in this case, as
17 well; am I right?
18     A. Yes.
19     Q. And what was the resolution of the
20 case?
21     A. It was settled.
22     Q. So, may I take it from that that you
23 have some basic familiarity with copyright law
24 having been involved in a piece of litigation as a
25 plaintiff?



[13]

Douglas Berlent

1
2      A.  Yes.
3      Q.  Do you own any copyrights, yourself?
4      A.  Yes.
5      Q.  And are these compositions of yours?
6      A.  Yes.
7      Q.  And how many such compositions have you
8  recorded copyright -- Let me rephrase that.
9          You've recorded copyrights in
10 Washington; have you not?
11     A.  Yes.
12     Q.  Okay.  How many copyrights do you hold?
13 Roughly?  You don't have to be precise.
14     A.  No less than 50, I would think.
15     Q.  Okay.  And were you the person who,
16 primarily, accomplished the filing of the copyright
17 registration forms?
18         MR. SHELOWITZ:  Objection
19     to the form.  If you could be
20     more specific with what you
21     mean by accomplished the
22     filing?
23         MR. MONAGHAN:  Took care
24     of, actually, filling out the
25     forms and sending them in?

[14]

Douglas Berlent

1
2          THE WITNESS:  Yes.
3      Q.  Were you able to do this, unaided, that
4  is, without any vision-enhancement device?
5      A.  I use special adaptive devices that
6  allow me to read.
7      Q.  What are those?  Just magnify -- I
8  shouldn't say.  I have no idea.  I just ask the
9  question.
10     A.  They're microscopic lenses and --
11     Q.  Microscopic lenses, you insert in your
12 eyes?
13     A.  They're glasses.
14     Q.  Glasses.  Okay.
15         And, getting back to your knowledge of
16 the music business, in general, are you familiar
17 with the term "music publishings"?
18     A.  Yes.
19     Q.  What is music publishing?
20     A.  My understanding of it is it's an
21 entity that attempts to generate income from a
22 musical work.
23     Q.  Exploit the musical composition, not
24 exploit in a negative sense, but exploit it for
25 commercial use?

[15]

Douglas Berlent

1
2          MR. SHELOWITZ:  He's already
3      answered the question.  That's
4      what is his understanding of what
5      a music publisher is.
6      Q.  Do you agree with what I just said or
7  disagree?
8          MR. SHELOWITZ:  Objection
9      to the form.
10         MR. MONAGHAN:  You can
11     answer.
12         THE WITNESS:  I'm sorry.
13     Was that a question?
14         MR. MONAGHAN:  Yeah.
15         The WITNESS:  Could you --
16     Q.  I went, further, and said do you agree
17 with the concept that music publisher exploits
18 musical composition --
19     A.  I'm sorry.
20     Q.  -- in a positive way?
21     A.  I've seen that term in publishing
22 documents, yes.
23     Q.  Okay.  And, in some instances, the
24 music publisher might, also, be the composer; is
25 that right?  Is that your understanding from your

[16]

Douglas Berlent

1
2  knowledge of copyright law?
3      A.  Yes.
4      Q.  Okay.  And are you familiar with the
5  concept of copyright assignments?
6      A.  Not in detail.
7      Q.  Well, generally speaking, have you ever
8  had occasion to assign a copyright that you own to
9  a third party?
10     A.  No.
11     Q.  You've kept all your own copyrights, is
12 what you're saying?
13     A.  For a brief time, I did have a
14 publishing agreement, but I didn't know the word
15 "assign" was used in that context.  So, I'm not
16 clear on what the definition is of assign.
17     Q.  Transfer?
18     A.  Yes, I have signed.  I have been party
19 to agreements that have publishing agreements.
20     Q.  Do you know that, in order to transfer
21 a copyright, you must do it by a written document?
22 Do you have that understanding?
23     A.  Yes.
24     Q.  And you've had that understanding
25 since, at least, 1999?

[17]

Douglas Berlent

1          Douglas Berlent
2    A. Yes.
3    Q. Okay. Getting back to the question
4 pertaining to what organizations and societies in
5 the music business, have you been involved with or
6 a member of -- are you a member of a performing
7 rights society?
8    A. Yes.
9    Q. Which one?
10   A. A.S.C.A.P.
11   Q. Any others? Any foreign musical
12 performing rights societies?
13   A. The only other one is the Harry Fox
14 Agency.
15   Q. Okay. And what is your understanding
16 of what Harry Fox does?
17   A. They collect mechanical royalties on
18 behalf of publishers and record companies and
19 artists.
20   Q. Okay. And any other organizations
21 which you are a member -- in which you are a
22 member?
23   A. Currently?
24   Q. Yeah.
25   A. May I ask, so I understand the

[18]

1          Douglas Berlent
2 question, you said are there any other
3 organizations of which I am, currently, a member.
4 Do you mean in the music --
5    Q. I do.
6    A. -- industry?
7    Q. Yeah.
8    A. To my present recollection, no.
9    Q. Okay. And how about if I asked you if
10 you can recall going back to 1999-2000, would your
11 answer have been, essentially, the same, that is,
12 you were a member of A.S.C.A.P. and you, also,
13 dealt with Harry Fox?
14   A. Yes.
15   Q. Okay. Have you had occasion to obtain
16 copyrights from other persons in the course of your
17 business dealings, musical copyrights?
18   MR. SHELOWITZ: Objection
19 to the form.
20   Q. Did you understand my question,
21 Mr. Maxwell?
22   A. No, I did not.
23   Q. Did somebody ever transfer a copyright
24 to you or your company?
25   A. No.

[19]

1          Douglas Berlent
2    Q. And what is your understanding of the
3 rights of a copyright holder? You have said that
4 you have no less than 50. What do you understand
5 that you're holding those 50 copyrights, more or
6 less, entitle you to as far as your rights, if you
7 have any?
8    A. I'm not an attorney, so.
9    Q. I'm only asking for your understanding
10 as a layperson whose been involved in Media Right
11 Productions and, as indicated, has no less than
12 50 copyrights?
13   A. Well, as far as I've seen in my
14 experience, it's the first step in affording
15 protection to your creation of a work and
16 acknowledging date of creation and entitling you to
17 certain rights that go along with copyright that
18 I'm not educated to know, specifically, what they
19 are. I have just been taught that it's good
20 practice as a composer that when you create a work
21 to begin by copyrighting it.
22   Q. It's protection for the composer?
23   A. Yes.
24   Q. Okay. Now, you used the term before
25 "mechanical royalties." Do you remember when you

[20]

1          Douglas Berlent
2 mentioned that?
3    A. Yes.
4    Q. Okay. What are mechanical royalties?
5    A. That is an amount that's set, I guess,
6 I believe by Congress that's paid to the composer
7 of a work based on CDs sold.
8    Q. Are you limiting to CDs or you mean
9 records, any other type of physical reproduction
10 composers do?
11   A. Again, I'm not familiar with the law,
12 but I know that, certainly, would apply to CDs and
13 cassette tape.
14   Q. Okay. Are you familiar with the term
15 "digital downloading"?
16   A. Yes.
17   Q. What is that?
18   A. It's the delivery of, I guess, applying
19 it or applying it to music in a nonmaterial form,
20 it's transmitted, electronically, via the Internet.
21   Q. And do you know whether composers who
22 are in the music business, composers receive
23 royalties with respect to digital downloading of
24 their music?
25   A. I just know that there's a lot of

[21]

Douglas Berlent
1
2  controversy on that subject now and I don't know
3  what the status is.
4      Q.  Have you ever been paid any royalties
5  with respect to digital downloading of your music?
6      A.  Yes.
7      Q.  And where?  From what source were those
8  funds received?
9      A.  The Orchard.
10     Q.  The Orchard, the Defendant in this
11 action?
12     A.  Yes.
13     Q.  You're being represented by
14 Mr. Shelowitz, who's sitting to your left; am I
15 correct?
16     A.  Yes.
17     Q.  And he's, also, representing the other
18 Defendants in this action?
19     MR. SHELOWITZ:  That's a
20 legal question you can ask me.
21 I will be happy to tell you.
22     MR. MONAGHAN:  No.  I
23 just want his understanding.
24 I understand.  I know you will
25 tell me.

[22]

Douglas Berlent
1
2      Q.  He's representing the other Defendants
3  in this action, correct, to your knowledge?
4      A.  To my knowledge, yes.
5      Q.  Okay.  And Media Right Productions,
6  that is, the Defendant in this case, that's the
7  company we've been talking about so far?
8      A.  Yes.
9      Q.  Okay.  Are there other Media Right
10 Production companies that you are involved with
11 that bear that name?
12     A.  Media Right Productions?
13     Q.  That have the name "Media Right" in it,
14 in the name of the company?
15     A.  We did file a d/b/a to use the name
16 "Media Right Music."
17     Q.  Is that a New York corporation?
18     A.  It's not a separate corporation.  It
19 was a d/b/a.  Media Right Productions d/b/a Media
20 Right Music.
21     Q.  Well, I want to move this along.
22 So, I don't want to err you, but we did
23 a search of New York State Department of State to
24 see how many Media Right companies there were
25 and -- okay, I had it marked, okay -- we found a

[23]

Douglas Berlent
1
2  company known as "Media Right Holding, LLC."  Does
3  that have any connection to you?
4      A.  No, it's not.
5      Q.  And then we found "Mediaright," one
6  word, "Productions, Inc.," incorporated on
7  February 27, 1986 in Nassau County; is that your
8  company?
9      MR. SHELOWITZ:  Do you
10 have like the printout that
11 we can look at?
12     MR. MONAGHAN:  Yeah.
13 Sure, sure.
14     MR. SHELOWITZ:  Thank you.
15     MR. MONAGHAN:  If you don't
16 remember, that's okay.
17     MR. SHELOWITZ:  Just take
18 a look at this and we can go,
19 outside, and chat for a minute.
20     Can we take a quick break
21 just to check if he recalls this
22 and just give us five minutes;
23 okay?  You want him to answer
24 truthfully and honestly, so.
25     MR. MONAGHAN:  Yeah.  Okay.

[24]

Douglas Berlent
1
2      MR. SHELOWITZ:  Okay.  Thanks.
3      MR. MONAGHAN:  Let the record
4  reflect so forth.
5      (Recess taken.)
6      MR. SHELOWITZ:  You can ask
7  the question again if you would like.
8      MR. MONAGHAN:  Kathryn, could
9  you please read that back.
10     (Last question read.)
11     THE WITNESS:  Yes, it is.
12     Q.  Okay.  Now, I asked about you getting
13 paid for any of your compositions for digital
14 downloading and you said you have been paid by The
15 Orchard, Inc.; am I correct?
16     A.  Yes.
17     Q.  Okay.  Just for the record, for the
18 uninitiated of which I include myself, what is The
19 Orchard?  What does that company do?
20     A.  From my understanding of it, they
21 represent independent artists and distribute their
22 music and attempt to collect revenue on their
23 behalf for that distribution.
24     Q.  They distribute the music, the artist's
25 music to Internet retailers of that music?

[25]

Douglas Berlent
1
2     A.  I believe that that is one of the
3 functions that they do.
4     Q.  Well, can you give me -- Are we talking
5 about something like iTunes?
6     A.  Yes, I do believe they distribute to
7 iTunes.
8     Q.  Okay.  How about is there another
9 company, eMusic; are you familiar with that
10 company?
11    A.  I, personally, haven't had any dealings
12 with eMusic.
13    Q.  Okay.  You said that's one of their
14 functions.  What are some of the other functions,
15 your understanding?
16       MR. SHELOWITZ:  Are you
17    referring to functions of
18    The Orchard?
19       MR. MONAGHAN:  Orchard,
20    yeah.
21       MR. SHELOWITZ:  If you
22    know, of course, you can
23    answer.
24       MR. MONAGHAN:  If you
25    know?

[26]

Douglas Berlent
1
2       THE WITNESS:  Yeah.  They
3    were a very entrepreneurial
4    company that was involved with
5    many diverse aspects of trying
6    to assist independent artists
7    make money with their music.
8     Q.  Now, you've collected royalties through
9 The Orchard, and from what ultimate source were the
10 payments that came to you from?
11    Take out the last part.
12    In other words, it was from iTunes?
13 Was it from some other source?
14    A.  I don't have the statement in front of
15 me to know, but I know that there's been a
16 diversity of sources.
17    Q.  Are you saying came from several
18 sources through The Orchard and then to you?
19    A.  Yes.
20    Q.  Can you remember any of the other
21 sources?
22    A.  No, I don't recall.
23    Q.  Okay.  Do you have statements somewhere
24 in your possession or at your offices that would
25 give you that information?

[27]

Douglas Berlent
1
2     A.  Yes.
3       MR. MONAGHAN:  Okay.  I'm
4    going to ask for production of,
5    at least, a sampling of those.
6       MR. SHELOWITZ:  Can you be
7    a little more specific with your
8    request?
9       MR. MONAGHAN:  Well, sure.
10    Q.  Have you received payments for digital
11 downloads of your compositions within the last
12 year?
13    A.  Yes, I believe so.
14    Q.  Okay.  Have you received payments, by
15 the way, from A.S.C.A.P. for any downloading of
16 tunes that would have generated a performing rights
17 royalty?
18    A.  Not that I'm aware of.
19    Q.  Are you familiar with the term "ring
20 tones"?
21    A.  Yes.
22    Q.  Have any of your songs ever been used
23 as ring tones?
24    A.  Not that I know of.
25 *     MR. MONAGHAN:  Okay.  All

[28]

Douglas Berlent
1
2    right.
3       Now, I am calling for the
4    production of Mr. Maxwell's
5    statements that would reflect
6    payments he's received through
7    The Orchard for digital
8    downloading for the last year.
9       MR. SHELOWITZ:  And just
10    on the question of relevance --
11       MR. MONAGHAN:  Doesn't have
12    to be relevant, has to lead to
13    relevant information.
14       MR. SHELOWITZ:  Well, our
15    objection on relevance on this
16    request, this is a case about
17    alleged infringement relating
18    to Cats and Dogs.
19       MR. MONAGHAN:  Yup.
20       MR. SHELOWITZ:  We'll be
21    happy to produce and produced
22    all the records that either of
23    the Defendants have regarding
24    Cats and Dogs and your clients,
25    but any downloads or any

[29]

Douglas Berlent

1    royalties that a musician has
2    received for the last year that
3    are unrelated to this lawsuit,
4    we would object to.
5        MR. MONAGHAN:  I understand,
6    but we have a question of what is
7    a willful infringement and if
8    Mr. Maxwell is aware of how the
9    system works, that may well go to
10   the issue of whether or not the
11   infringement was willful.
12       MR. SHELOWITZ:  With regard
13   to your clients.
14       MR. MONAGHAN:  Correct.
15       MR. SHELOWITZ:  Things
16   unrelated to your clients, a
17   musician makes a living from
18   getting royalties from his own
19   musical works.
20       Again, we'll repeat our
21   objection.  You can continue
22   with the questions, but we,
23   certainly, want to make that
24   clear for the record.

[30]

Douglas Berlent

1        MR. MONAGHAN:  Would you
2    agree the state of mind of willful
3    infringement is an issue that's
4    relevant?
5        MR. SHELOWITZ:  Yes, at the
6    time of infringement.
7        MR. MONAGHAN:  Okay.  Okay.
8        MR. SHELOWITZ:  It's related
9    to, again, the particular works that
10   are alleged to have been infringed.
11       MR. MONAGHAN:  Well, I
12   disagree with that cutoff, but you
13   maintain your objection --
14       MR. SHELOWITZ:  Okay.
15       MR. MONAGHAN:  -- we'll take
16   it up with the Court in the
17   appropriate fashion if you persist.
18       My suggestion is that we
19   conclude the deposition, we see
20   what has been requested and what
21   has been objected to, you go back
22   to your office, I go back to mine
23   and then we, first, try and work
24   it out as the Court has admonished

[31]

Douglas Berlent

1    all to do and then we decide
2    whether or not we have to go to
3    war about it.
4        MR. SHELOWITZ:  No need for
5    going to war about anything in a
6    civil matter.
7        MR. MONAGHAN:  Okay.
8        MR. SHELOWITZ:  Okay.
9    Q.  Now, for how long a period have you,
10   Mr. Maxwell, received payments for digital
11   downloading of any music of yours?  Is it more than
12   five years?  Less than five years?
13   A.  I don't know.
14   Q.  Okay.  Would you be able to go back
15   without a great deal of trouble -- Do you keep
16   records of payments you've received?
17   A.  Any check that I receive --
18   Q.  Yeah.
19   A.  -- I would enter into my ledger, yeah.
20   Q.  Okay, yeah.
21       Now, do you enter it into the ledger of
22   your company or do you enter it into some personal
23   ledger?  And I'm not interested in your private
24   personal affairs other than those that may relate

[32]

Douglas Berlent

1    to this deposition.
2    A.  My company.
3    Q.  Okay.  So that if you did get a payment
4    for a digital download, you're saying that, even
5    though you were the composer, it would have gone
6    into Media Right Productions?
7    A.  Correct.
8  *     MR. MONAGHAN:  Okay.
9        So, I am going to ask for
10   production of any records that
11   would show payments that were
12   received by the company with
13   respect to digital downloads
14   from the year 1999 on.  That's
15   my request; all right?
16       MR. SHELOWITZ:  We'll take
17   it under advisement.
18   Q.  Okay.  Now, how did you prepare for
19   this deposition?  And I'm not looking for any
20   conversations you might have had with your Counsel.
21   Did you -- I will give you an example of what I'm
22   interested in.  Did you look at any particular
23   documents or files?
24   A.  Yes.

[33]

Douglas Berlent

1  Q. Okay. And what files were those?
2
3  A. It was a file that we sent to you, this
4  morning.
5  Q. This Excel, generally, stated -- What
6  is on this Excel spreadsheet?
7  A. That's -- It's a backup that was on my
8  - that I located on our computer of all, to the
9  best of my knowledge, the marketing that we had
10  done for Cats and Dogs.
11  Q. Okay. Now, I want to come back to your
12  business with The Orchard because I want something
13  on the record, at least, of your understanding of
14  how this works. Did you have to fill out a form of
15  some type with The Orchard to have your
16  compositions sold through The Orchard?
17  A. I don't recall the form.
18  Q. Do you recall whether there was a form?
19  A. I'm sure that there was a form.
20  Q. Do you recall whether or not you had to
21  make a representation to The Orchard about
22  copyright ownership of the composition that you
23  were asking them to market?
24  A. I don't recall.
25  Q. When you provide your music to The

[34]

Douglas Berlent

1
2  Orchard, you expected that The Orchard would not do
3  anything to infringe on your copyrights; am I
4  right? You weren't -- Let me rephrase. You
5  weren't giving The Orchard your copyrights; were
6  you?
7  A. No, I was not giving The Orchard
8  copyrights.
9  Q. You were interested in preserving and
10  protecting the songs that you had composed?
11  A. Yes.
12  Q. In fact, probably, like most artists,
13  you guard that, fairly, zealously; don't you?
14  A. Yes.
15  Q. How about Napster, would that have been
16  one of the ultimate sellers of your music through
17  The Orchard?
18  A. I would not know.
19  Q. Okay. Now, how long have you dealt
20  with The Orchard?
21  A. To the best of my recollection, I
22  believe I started contact with them in 1999.
23  Q. Was it in any way connected with Cats
24  and Dogs?
25  A. Initially, no.

[35]

Douglas Berlent

1
2  Q. With whom did you deal at The Orchard?
3  A. I don't recall.
4  Q. Have you had occasion to deal with The
5  Orchard on behalf of someone other than yourself
6  listing music for sale through The Orchard where
7  you were not the copyright owner?
8  A. Yes.
9  Q. Okay. And is that true from 1999
10  forward?
11  A. Yes.
12  Q. Okay. And can you give me a general
13  idea of the circumstances under which you would be
14  dealing with The Orchard with respect to somebody
15  else's compositions?
16  MR. SHELOWITZ: Objection
17  to the form.
18  MR. MONAGHAN: Okay.
19  Q. How would this come up? Somebody comes
20  to you and says I've written a great song, I want
21  to sell it on the Internet and you say what?
22  A. My best friend approached me to ask if
23  I would help out a client of his and that client
24  was Ellen Bernfeld.
25  Q. What's your best friend's name?

[36]

Douglas Berlent

1
2  A. Russ Palladino.
3  Q. How long have you known Russ?
4  A. Since we're, approximately, Age 13.
5  Q. Did you grow up, together, on Long
6  Island?
7  A. Yes.
8  Q. Where, on Long Island?
9  A. Oceanside.
10  Q. I used to play them in soccer. I grew
11  up in Levittown.
12  A. Really?
13  Q. Used to get beaten by them, actually,
14  fairly, often.
15  Okay. So, he came to you, and
16  Mr. Palladino said would you represent a client of
17  his; is that right?
18  A. He introduced the two of us because he
19  felt that we could help each other. More
20  specifically, I could be of assistance to his
21  client.
22  Q. Okay. But, before we ask about that,
23  you had said, initially, your dealings with The
24  Orchard were not with respect to Cats and Dogs.
25  So, there was some other deal?

[37]

Douglas Berlent

1    MR. SHELOWITZ: Objection.
2  He didn't testify to that. He
3  said it was not with respect to
4  other copyright holders, I
5  believe. I don't think he
6  mentioned Cats and Dogs.
7    MR. MONAGHAN: No. I took
8  it down. Let me just rephrase
9  on that.
10    Q. Were your first dealings with The
11 Orchard related in any way to Ellen Bernfeld or
12 Cats and Dogs?
13    A. No.
14    Q. Okay. So, what were they?
15    A. It was part of the activities that I
16 was undertaking to market my own compositions.
17    Q. Okay. And this was in 1999?
18    A. To the best of my recollection in
19 response to your question: When did I begin
20 contact with The Orchard?
21    Q. Okay. Now, is it possible -- Well, let
22 me just ask it, straight away, that when you came
23 and I will ask more questions, I'm just jumping a
24 little bit ahead and I'll come back. I apologize.

[38]

Douglas Berlent

1  If it's a problem, let me know.
2    Is it possible because of the time
3  element 1999 that when you were, also, dealing with
4  and helping your best friend Russ Palladino and his
5  client Ellen Bernfeld and dealing on your own
6  behalf with The Orchard that you represented to The
7  Orchard that you were the copyright owner of Cats
8  and Dogs?
9    A. It is not possible.
10    Q. Okay. Well, let me come back to the
11 conversation you had with your best friend Russ.
12 What was Russ's business at that time?
13    A. He was, I believe, a sales
14 representative working for Europadisk.
15    Q. What is that? What company? What do
16 they do?
17    A. It's a CD or was a CD and cassette
18 manufacturing facility.
19    Q. Where was it located?
20    A. I believe Varick Street in New York.
21    Q. A replication company?
22    A. Yes.
23    Q. Now, I noticed on your website screen
24 shot there was an indication that that, also, is

[39]

Douglas Berlent

1  something that Media Right Productions is engaged
2  in, replication; am I correct about that?
3    A. We do not manufacture any - any
4  product. We refer people to, obviously, my best
5  friend, Russ, to assist them with any replication
6  needs.
7    Q. So, I have in my hand, I'm going to --
8    MR. MONAGHAN: What's the
9  second page of this, Mike? Is
10  the second page the narrative of
11  that? Media Right Productions?
12    MR. KORIK: It might be.
13    Q. While Mike is trying to find the second
14 page, we obtained a printout from the website,
15 www.mediarightproductions.com,
16 mediarightproductions being all one word. Is that
17 your website?
18    A. Yes.
19    Q. Okay. And that's been your website for
20 a period of time?
21    A. Yes.
22    Q. How long?
23    A. I don't recall.
24    Q. Well, this one is printed out in August

[40]

Douglas Berlent

1  of '05. So, certainly, at least, since then. Was
2  it for a number of years prior to that?
3    A. I don't recall.
4    Q. Okay. And it describes - I will show
5  it to you and I represent it is -- We'll ask the
6  reporter to mark it.
7    MR. SHELOWITZ: Do you
8  have a copy for me, please?
9    (Plaintiffs' Exhibit
10  Maxwell-1, one-page document
11  entitled "Recording a 'demo'
12  CD," marked for identification.)
13    Q. Mr. Maxwell, have you had a chance to
14 take a look at what the reporter has marked as
15 Maxwell-1? If you need a moment, take it.
16    A. I will, probably, need some assistance
17 in reading the smaller print.
18    Q. I'm happy to have Mr. Shelowitz --
19    MR. SHELOWITZ: Well, maybe,
20  there's something specific you
21  want to direct his attention to?
22    MR. MONAGHAN: Yeah, there
23  is.
24    Q. What I'm going to do, I'll read some

[41]

Douglas Berlent

2  sections of this, you and your Counsel can take a
3  look at it, make sure I read it, accurately.
4      A.  Okay.
5      Q.  And then I will ask some questions, if
6  that's okay.  Do you need a minute for a break, a
7  bathroom break or something?  I'm happy to
8  accommodate.
9      A.  I'm okay.
10         MR. SHELOWITZ:  We'll go
11     for 10 more minutes, then take
12     a break.
13         MR. MONAGHAN:  That's fine.
14     Q.  Mr. Maxwell, Maxwell-1 for ID is a
15  printout.  It says "Page 1 of 2" and from that
16  website I've just described,
17  mediarightproductions.com; and that is your
18  website?
19     A.  Yes, it is.
20     Q.  Okay.  And it describes some service
21  that Media Right Productions offers, including
22  starting with recording a demo CD.
23         So, reading from the top, "Recording a
24  'demo' CD.
25         "We can help you record and produce a

[42]

Douglas Berlent

2  'demo' CD of your original music or an existing
3  song.
4         "We offer productions as simple as
5  piano and vocal, or as intricate as a full live
6  orchestra.
7         "To insure an accurate recording of
8  your voice, we have one of New York's best
9  microphone collections.
10         "Our recording studios are stocked with
11  vintage, as well as state of the art recording
12  equipment.
13         "Our engineers and producers have many
14  years of experience working with major artists as
15  well as those just starring on their journey into
16  the music industry:  Our goal is to help you
17  achieve your musical and professional goals in a
18  relaxed, nurturing and enjoyable manner.
19         "We invite you to schedule an
20  appointment to visit our studios, listen to our
21  work, and discuss your project.
22         "Some of our other services include:
23         "Bullet point, Producing albums for
24  commercial distribution
25         "Bullet point, Setting lyrics to

[43]

Douglas Berlent

2  music/Harmonizing melodies, refining song
3  structure.
4         "Bullet point, Orchestrating music for
5  any type of instrumentation
6         "Bullet point, Contracting musicians for
7  recording sessions and live performances
8         "Bullet point, Printing sheet music.
9         "Bullet point, Replicating music/multi
10  media on CD, DVD or cassette."
11         And then there's a description of some
12  clients that you've indicated you have done work
13  for through Media Right Productions, including the
14  famous Mr. Spector.
15         So, up until that point, are you
16  familiar with the content I just read?
17     A.  Yes, I am.
18     Q.  Did you, actually, draft that content?
19     A.  Yes, I did.
20     Q.  And the last bullet point I read about
21  "Replicating music/multi media on CD, DVD or
22  cassette," is that something you farmed out to your
23  best friend Russ?
24     A.  Yes.
25     Q.  And is that accurate, these comments

[44]

Douglas Berlent

2  and statements on the website?
3         MR. SHELOWITZ:  As of 2005?
4         MR. MONAGHAN:  I'm sorry.
5     Yes.  As of 2005?
6         THE WITNESS:  To the best
7     of my knowledge.
8         MR. MONAGHAN:  Yeah.
9     Q.  Have there been changes since 2005 on
10  the website?
11     A.  Yes.
12         MR. MONAGHAN:  All right.
13     I'm looking at -- Let's mark
14     this as Exhibit 2.  This one,
15     I'll make a comment on the record
16     is a two-page -- Do you call it
17     a screen shot?  A screen shot
18     from mediarightproductions.com.
19     This one is printed out on
20     August 10, 2006, bears the name
21     "Media Right Productions," and it
22     has a bunch of buttons up top
23     indicating "Music Production,
24     Recording Studios, Mastering,
25     Music For Advertising, Music For

[45]

Douglas Berlent
1
2    Film/TV" and so forth, lists an
3    address of 40 West 27th Street,
4    4th Floor, Suite 400, New York,
5    New York 10001.
6        I will ask Kathryn to mark
7    that as Maxwell-2.
8        MR. SHELOWITZ: Do you have
9    a copy for me, please?
10       MR. MONAGHAN: Yeah. You
11   can use this. I will ask from
12   a different copy.
13       (Plaintiffs' Exhibit
14   Maxwell-2, two-page document
15   entitled "Media Right
16   Productions," marked for
17   identification.)
18       Q. Okay. Your Counsel has, in his hand,
19   Maxwell-2 for ID and have you had a chance to take
20   a look at that?
21       A. Except for reading the text.
22       Q. Okay. Well, all I would like you to do
23   is satisfy yourself that this is, in fact, a
24   printout of a screen shot from your company's web
25   page as of August 10th, 2006?

[46]

Douglas Berlent
1
2        A. Yes.
3        Q. Now, in the services that you're
4    offering here, you indicate -- and, by my reading
5    it, I'm not intending to suggest there is anything
6    different or inconsistent. So, I'm just reading
7    this. You indicate, "Our Services Include:
8            "Recording 'Demo' CDs for musicians, and
9    vocalists.
10           "Producing albums for commercial
11   distribution.
12           "Setting lyrics to music/Harmonizing
13   melodies, refining song structure.
14           "Orchestrating music for any type of
15   instrumentation
16           "Contracting musicians for recording
17   sessions and live performances
18           "CD mastering
19           "Replicating CDs, and DVDs."
20       Does that sound correct?
21       A. It does sound correct.
22       Q. A replication, again, is something that
23   is done through Mr. Palladino?
24       A. Yes.
25       Q. Okay. Now, are you familiar with the

[47]

Douglas Berlent
1
2    term "product representation"?
3        A. No. I would have to say, in a legal
4    context, no. I speak English. So, I know what the
5    word "product representation" means, but --
6        Q. Okay. Have you ever heard of a term
7    "manufacturer's rep"?
8        A. Yes.
9        Q. What does that term mean to you?
10       A. Again, from a layman's --
11       Q. That's all I'm asking.
12       A. -- point of view, it's someone who
13   represents the manufacturer.
14       Q. Promotes the manufacturer's product?
15       MR. SHELOWITZ: Objection.
16   He didn't say that.
17       MR. MONAGHAN: No. I'm
18   asking.
19       Q. Does that square with your
20   understanding?
21       A. I would have to think that would be the
22   case - case-specific responsibility.
23       Q. Well, have you used the term "product
24   representation" in your business? Because I didn't
25   see it on either of these printouts, 1 or 2,

[48]

Douglas Berlent
1
2    Exhibit 1 or 2.
3        A. If you're asking me, in the entire
4    history of my business, have I used the two words
5    "product representation," together -- Is that the
6    question or --
7        Q. I will try that one. I will take that
8    one?
9        A. -- or are you asking it's a service
10   that we offer?
11       Q. Both questions.
12       A. I can't recall.
13       MR. SHELOWITZ: Why don't
14   you ask him the questions?
15   He'll be happy to answer.
16       MR. MONAGHAN: He did a
17   good job of framing the
18   question.
19       THE WITNESS: Okay.
20       MR. MONAGHAN: Go right
21   ahead. I like your question.
22       THE WITNESS: I, honestly,
23   can't recall. I may have used
24   it, I may not have used it in
25   the course of history of my

[49]

Douglas Berlent

1 business. Um, I do believe that
2 we use that because I have seen
3 the agreement that we had with
4 Ellen Bernfeld.
5        MR. MONAGHAN: The
6 Plaintiffs?
7        THE WITNESS: The Plaintiffs.
8 I believe it did say product
9 representation agreement in some
10 way. That is not a service that
11 we offer. That was an
12 accommodation to my, again, my
13 friend Russ to help out his client
14 Ellen.
15     Q. After all this, is he still your
16 friend?
17    A. He is.
18        MR. SHELOWITZ: Maybe, now
19 is a good time to take a break.
20        MR. MONAGHAN: All right,
21 but we're still in the middle of
22 questioning --
23        MR. SHELOWITZ: So --
24        MR. MONAGHAN: -- about the

[50]

Douglas Berlent

1 topic we just started to touch
2 upon. I would ask --
3        MR. SHELOWITZ: We're going
4 to take a break and we're allowed
5 to talk about whatever we want to
6 talk about, as you're entitled to
7 do with your clients. He has been
8 prepped. The facts are the facts.
9 Its been an hour of questioning
10 and it's a good time for a break.
11        MR. MONAGHAN: It is, but I
12 want to pursue a few more questions
13 before the break.
14        MR. SHELOWITZ: Certainly.
15     Q. You're saying product representation is
16 something not your company has done other than with
17 respect to the Plaintiffs; is that right?
18    A. There was one other instance where I
19 believe where we, formally, represented another
20 product that we didn't write, and I say, formally,
21 because I try to help people, informally, whenever
22 I can, so.
23     Q. And so what was your general
24 understanding of the two instances that you just

[51]

Douglas Berlent

1 talked about would be the role by Media Right
2 Productions as a product representative?
3    A. I'm sorry. Could you ask the question
4 again for me?
5     Q. What were you going to do as a product
6 representative in these two instances?
7    A. I was going to try to use my contacts
8 and all the abilities that I had might help
9 generate income for the artist whose product it was
10 and, as a result, be compensated in an agreed-upon
11 fashion with a percentage of those proceeds.
12     Q. Okay. What was the other product that
13 you represented?
14    A. It was, also, another referral from
15 Russ. A product called "Smokin' Sounds."
16     Q. Smokin' Sounds?
17    A. It was a cigar CD.
18     Q. And who was the principal of that
19 company?
20    A. I don't recall.
21     Q. Can I call -- Do you have a copy of the
22 Product Representation Agreement?
23    A. I do not believe so.
24     Q. Can I leave a space in the record and

[52]

Douglas Berlent

1 ask the reporter to leave a space and, when you get
2 a copy of the transcript, would you please answer
3 the question whether, after you've looked in your
4 files, whether you have a copy and would ask for
5 production of it.
6 *
7     Q. And when was that Cigar Sounds or
8 Smokin' Sounds product representation?
9    A. I believe it was around the time of
10 early 2000s.
11     Q. Same time, roughly?
12    A. I don't recall. Yeah.
13        MR. MONAGHAN: Okay. If
14 you want to take a break, that's
15 fine.
16        (Recess taken.)
17        (Plaintiffs' Exhibit
18 Maxwell-3, two-page document
19 entitled "Product Representation
20 Agreement," marked for
21 identification; Plaintiffs'
22 Exhibit Maxwell-4, one-page
23 letter dated February 1, 2000,
24 marked for identification;

[53]

1          Douglas Berlent
2          Plaintiffs' Exhibit Maxwell-5,
3          two-page document which states
4          at the top "From: The Orchard,"
5          marked for identification;
6          Plaintiffs' Exhibit Maxwell-6,
7          Excel spreadsheet, marked for
8          identification.)
9              (Last two questions and
10         answers read.)
11         Q.  Okay.  Mr. Maxwell, you had mentioned,
12    earlier, how it was that you met Ellen Bernfeld
13    through your good friend Mr. Palladino.  Can you
14    recall, generally - I can't hold you to a specific
15    conversation that occurred, years ago, but can you
16    recall, generally, what the subject of the
17    discussion was between you and Mr. Palladino about
18    Ms. Bernfeld?
19         A.  Yes.
20         Q.  Okay.  Please tell us what that was.
21         A.  Russ and I spoke, frequently, and Russ
22    knew that, after many years of struggling as a
23    composer and not finding great success through the
24    established music industry channels, I decided to
25    try to promote my music by myself and the music

[54]

1          Douglas Berlent
2    that I had created was very specific to topics and
3    Russ had manufactured the Cats and Dogs CDs and
4    called me and thought that it might be an
5    interesting match for us to be introduced and if I
6    could help his client market their music.
7         Q.  And was a meeting arranged which you
8    and Ms. Bernfeld and Mr. Palladino were in
9    attendance?
10         A.  No.
11         Q.  Okay.  What happened next, generally?
12             After Russ makes this -- Is this a
13    telephone call or face-to-face?
14         MR. SHELOWITZ:  Objection.
15         Several questions in there.  If
16         you can help us to help him?
17         Q.  Was it a telephone call or was it
18    face-to-face?  Pick one.
19         A.  I would say we, usually, had a
20    telephone call prior to face-to-face.
21         Q.  Okay.
22         A.  But it's hard to recall that many years
23    ago, but I would defer to telephone.
24         Q.  Okay.  And what did he tell you about
25    Ms. Bernfeld and her background, if anything?

[55]

1          Douglas Berlent
2         A.  Nothing about her background that I
3    recall.
4         Q.  Did he tell you she was a composer?
5         A.  I don't recall.
6         Q.  Did the name "Gloryvision" come up in
7    that initial conversation?
8         A.  I don't recall.
9         Q.  Did the name "Anne Bryant" come up in
10    this initial conversation?
11         A.  I don't recall.
12         Q.  Did there come a time after that
13    conversation when you heard those names, "Bryant"
14    and "Gloryvision"?
15         A.  Yes.
16         Q.  And when was that?
17         A.  I don't recall the exact date, but I
18    would say it was around 1999 or 2000 when we began
19    our association.
20         Q.  Okay.  And, before you began your
21    association, was there a meeting with Ellen
22    Bernfeld?  Did you ever meet her?
23         A.  No, I did not.
24         Q.  You never met Anne Bryant, either?
25         A.  I never met Anne Bryant.

[56]

1          Douglas Berlent
2         Q.  Okay.
3         A.  I'm sorry.  May I amend that to say I
4    did meet Anne Bryant, once, recently, at our
5    mediation --
6         Q.  Oh, yes.
7         A.  -- attempt, but, prior to that, I had
8    not met Anne Bryant.
9         Q.  Now, what did Russ tell you he was
10    doing for Ellen Bernfeld?
11         A.  I don't recall the specifics that he
12    told me, but I know that Russ's function at the
13    time was a sales rep at Europadisk and he assisted
14    clients in manufacturing their CDs and cassettes.
15         Q.  Okay.  But you assumed that that's what
16    he was doing for them?
17         A.  Yes.
18         Q.  For Ellen?
19             Yeah.  Okay.
20             When did the term "Cats and Dogs" or
21    the name of the CDs first come into your knowledge?
22         A.  I would assume that it was on that
23    first conversation when Russ told me about those
24    CDs.
25         Q.  Now, I think you used the phrase "topic

[57]

Douglas Berlent

1  specific" or something along those lines, that
2  you're interested in music regarding topics?  I'm
3  not holding you to that, but you used the word
4  "topic"; do you remember?
5      A.  Yes.
6      Q.  Okay.  What did you mean when you said
7  that?
8      A.  The albums that I've created, I have
9  created an album on golf, for example.  So, it is
10  music on the topic of golf.
11     Q.  Uh-huh.  So, is it fair to say that the
12  topic being Cats and/or Dogs was something that
13  interested you, music regarding those topics?
14     A.  Yes.
15     Q.  Okay.  Do you have any other affinity
16  for music or products related to cats or dogs?
17     A.  I don't understand the question.
18     Q.  Are you a dog fancier, yourself?
19     A.  Yes.
20     Q.  See, you did understand.
21         What is the nature of your involvement
22  with dogs?
23     A.  I, currently, own one.
24     Q.  Okay.  Well, do you raise dogs?

[58]

Douglas Berlent

1      A.  No.
2      Q.  You just like dogs and you have a dog
3  that you like?
4      A.  Yes.
5      Q.  And, beyond that, is there anything?
6  Have you ever shown a dog?
7      A.  Do you mean in a --
8      Q.  -- dog show?
9      A.  No.
10     Q.  Well, help me out here then.  It's
11  gratuitous, but I mean is there anything else, I
12  don't know, just owning a dog that endears,
13  anything else about dogs to you?
14     A.  I think they're better than people.
15     Q.  How about cats?
16     A.  Are you asking for my personal opinion
17  about cats?
18     Q.  I'm asking if cats are in the same
19  category as dogs in your mind's eye?
20     A.  I tend to prefer dogs.
21     Q.  Okay.  I can't editorialize.
22         Okay.  So, was this something of
23  interest to you because this music related to dogs
24  when Russ raised it with you?

[59]

Douglas Berlent

1      A.  That was one of the ingredients.
2      Q.  What were the others?
3      A.  That I felt that it fit in with a
4  niche-oriented or topic-oriented music product that
5  was like all of the records that I had composed,
6  such as golf.
7      Q.  That golf music, that was yours?
8      A.  Yes.
9      Q.  What are some of the other topical
10  musical compositions that you composed?
11         MR. MONAGHAN:  Make it
12  topic musical compositions.
13         MR. SHELOWITZ:  Maybe,
14  she can reread the question
15  for us?
16         MR. MONAGHAN:  Sure.
17         (Last question read.)
18         THE WITNESS:  You said
19  compositions.  Do you mean
20  albums?
21         MR. MONAGHAN:  No.
22  Songs?  Music?
23         THE WITNESS:  The title
24  of the songs?

[60]

Douglas Berlent

1      Q.  Have you composed any songs other than
2  the music you composed related to golf or any
3  other --
4      A.  Yes.
5      Q.  -- any other niche?
6      A.  Yes.
7      Q.  What would they be?
8      A.  Romance.  Records were entitled "Music
9  for Lovemaking."
10     Q.  Okay.  Any others?
11     A.  Yes.
12     Q.  What were they?
13     A.  "Sounds of the Womb."
14     Q.  Sounds of the Womb?
15     A.  Womb, W-O-M-B.
16     Q.  Okay.  I got it.
17         Others?
18     A.  Relaxation.
19     Q.  All right.  Did you have any
20  discussions with -- You testified, earlier, you
21  hadn't met Anne Bryant or Ellen Bernfeld and hadn't
22  met Ms. Bryant until the mediation.
23         So, the question is:  Prior to August
24  of 1999, did you have any telephone conversations

[61]

Douglas Berlent

1  with either of them, either Ellen or Anne?
2      A.  To the best of my recollection, I only
3  spoke with Ellen.
4      Q.  Okay.  And I'm talking about prior to
5  August of 1999, how many times did you speak to
6  Ellen?
7      A.  I don't recall.
8      Q.  More than one?
9      A.  You said prior to August 1999?
10      Q.  Yeah.  I picked that date only - I will
11  tell you why - because that's the first date
12  mentioned in the Product Representation Agreement.
13  It says, "This agreement is made on the 8th day of
14  August 1999." So, that's just a marker.
15      A.  Right.  I would say we, definitely, had
16  more than one telephone conversation, yes.
17      Q.  Can you remember the gist of those
18  conversations?
19      A.  To the best of my recollection, our
20  first conversation was very friendly and mutually
21  affirming.
22      Q.  Okay.  Well, that's what we call a
23  characterization.  Do you remember what was
24  discussed?
25

[62]

Douglas Berlent

1      A.  I told her about what I do as a
2  composer and that I was marketing and having some
3  successes in marketing my topic-oriented or niche
4  records and that was why Russ felt that we should
5  speak.
6      Q.  Okay.
7      A.  And we told each other, from what I
8  recall, about what we did and we tried to see if
9  there was a way that we felt we would be a good
10  match to see if I could help them sell their music
11  and if their music would fit into what I was trying
12  to do and we agreed that it was a good fit.
13      Q.  Yeah.  Okay.  And, prior to August of
14  1999, had Ellen given you any materials or
15  documents or anything tangible?
16      A.  I would have to assume yes because you
17  had just told me that the Agreement was dated the
18  8th of August 1999 and, clearly, I must have heard
19  the CD.
20      Q.  Well, let me just - that's the date in
21  the first paragraph, but the signatures on it are
22  quite a bit later.  I'm going to show you the
23  Agreement in a moment, but the signatures are in
24  February of 2000.  Do you remember there being some
25

[63]

Douglas Berlent

1  -- I will come back to the question about the
2  materials, but do you remember there being some gap
3  in discussions, negotiations?
4      A.  I really can't recall.
5      Q.  It's okay.  All right.  Let me show you
6  now Plaintiffs' Exhibit - I'm sorry - Maxwell
7  Exhibit 3 for identification.
8          MR. SHELOWITZ:  We have
9      a copy.
10          MR. MONAGHAN:  Okay.  You
11      got a copy.  All right.
12      Q.  I know the print on this is not -- Are
13  you familiar with this document?
14      A.  Yes, I am.
15      Q.  Does it bear your signature on the
16  second page?
17      A.  Yes, it does.
18      Q.  That is your signature and that is your
19  writing, including the date?
20      A.  Yes.
21      Q.  Were you, physically, present with
22  Ellen Bernfeld when signing occurred?
23      A.  No, I was not.
24      Q.  So, this was done through the mail?
25

[64]

Douglas Berlent

1      A.  Yes, I believe so, or fax.
2      Q.  Is this Agreement in your files?
3      Q.  Now, I have a copy of it.
4      Q.  As a result of the litigation?
5      A.  Yes.
6      Q.  And, prior to the litigation being
7  filed, you would say that you did not have a copy
8  of this Agreement in your files?
9      A.  I did not have a copy of that in my
10  files.
11      Q.  Okay.  Did you have a file on this
12  matter at all, on Cats and Dogs?
13      A.  Yes, I did.
14      Q.  In what form was that file?
15      A.  Paper.
16      Q.  In a red weld?  Do you know what a red
17  weld is?
18      A.  No.
19      Q.  In a manila folder, someplace?
20      I will just ask you:  How were these
21  files kept?
22      A.  They were kept in folders that were
23  stored in boxes in my parents' basement.
24      Q.  Okay.  What did the folder say?  How
25

[65]

Douglas Berlent

1  did you distinguish one folder from another?
2  A.  I don't recall what the specific folder
3  said that the Agreement was in, but you would make
4  an assumption that it was something that would
5  reference agreements.
6  Q.  No, I'm not asking for an assumption.
7  Did you have occasion to go to your
8  parents' basement and retrieve a file folder?
9  A.  No.
10  Q.  Where is that file folder now?
11  A.  It's been destroyed.
12  Q.  When?  When did that happen?
13  A.  Through a series of floods in their
14  basement.
15  Q.  I know.  When?
16  A.  I don't recall the exact date of the
17  flood in their basement.  It was either stored in
18  their basement where it was destroyed or in the
19  basement of my home where it was destroyed, also,
20  by a broken pipe.
21  Q.  Is this supposition on your part?
22  A.  The only supposition is where it was
23  stored.  It was either at my parents' house or it
24  got transferred to my house.

[66]

Douglas Berlent

1  Q.  But, in either case, it was destroyed
2  by a flood?
3  A.  Yes.
4  Q.  And did you, actually, go, after this
5  case began, did you, actually, go and endeavor to
6  try and locate any files pertaining to the matter?
7  A.  No, I did not.
8  Q.  Well, how are you sure you didn't have
9  any such file?
10  A.  Because I know that all that was stored
11  was lost.
12  Q.  Were the files, physically, located at
13  your offices at one point?  Your business offices?
14  A.  You mean my current office?
15  Q.  Any business office?
16  A.  They were located in my address on
17  23rd Street.
18  Q.  Until when?
19  A.  I'm not sure of the exact date when
20  they were moved.
21  Q.  Can you give us a year?
22  A.  I don't recall.
23  Q.  What other files were lost?
24  A.  I don't recall the specifics, but,

[67]

Douglas Berlent

1  generally, living in New York, we don't have much
2  space.  So, it was time-related as opposed to
3  content-specific.  So, I believe that the earlier
4  files were moved out to my parents' house.
5  Q.  Earlier files being the files generated
6  in what years?
7  A.  I don't recall.
8  Q.  What was your criteria - criterion for
9  moving files from the business office to your
10  parents' or your home?
11  A.  Space.
12  Q.  Okay.  Is it safe to say this happened
13  more than five years ago?
14  A.  Our basement in our home was flooded, I
15  believe, around three years ago and my parents'
16  basement, I can't recall the exact dates.
17  Q.  Okay.  Now, you produced some documents
18  in the case pursuant to a request and, also, what
19  we call Rule 26, and I would like to show you and
20  mark those, collectively, and Bates-stamped.
21  MR. SHELOWITZ:  Thank you.
22  MR. MONAGHAN:  And if I can
23  ask Kathryn to mark that as the
24  next exhibit, whatever that is.

[68]

Douglas Berlent

1  (Plaintiffs' Exhibit
2  Maxwell-7, a document entitled
3  "Songs for Cats/Songs for Dogs"
4  and Bates-stamped 1 through 32,
5  marked for identification;
6  Plaintiffs' Exhibit 8, a CD
7  entitled "Songs for Dogs (and
8  the people who love them),"
9  marked for identification;
10  Plaintiffs' Exhibit 9, a CD
11  entitled "Songs for Cats (and
12  the people who love them),"
13  marked for identification;
14  Plaintiffs' Exhibit 10, a CD
15  entitled "Songs for Dogs (and
16  the people who love them),"
17  10 original songs on CD and a
18  fully illustrated book, marked
19  for identification.)
20  Q.  Mr. Maxwell, have you had a chance to
21  look at the document production which is Maxwell-7?
22  A.  Yes, I have.
23  Q.  And are these the documents that you
24  produced in connection with the case?

[69]

Douglas Berlent

1  A.  My attorney would have to confirm that.
2      MR. SHELOWITZ:  They're a
3  combination.  Those are Defendants'
4  Response including what The Orchard
5  provided.
6      So, those are what we produced
7  in response to the document request
8  on behalf of all the Defendants
9  that are active.
10  Q.  Okay.  Well, how can we tell from the
11  joint production which document came from which
12  source?
13      MR. SHELOWITZ:  You can
14  ask me.  I will tell you.
15      MR. MONAGHAN:  Okay.  Let
16  me ask Mr. Maxwell, first.
17  Q.  Since you've indicated you don't have
18  any files, they were destroyed, it's fair to say
19  that none of the documents in this production came
20  from you, that you being Media Right, I should say;
21  is that right?
22  A.  That is not true.
23  Q.  Okay.  Well, let's go, if you have it
24  in front of you, let's see if we can narrow it

[70]

Douglas Berlent

1  down.
2      The top page, which is Bates-stamped
3  Number 1, where did that come from?
4  A.  That came from --
5      MR. SHELOWITZ:  You want
6  to identify it for the record?
7      MR. MONAGHAN:  Yeah.  Well,
8  it's Bates 1 of Exhibit 7.
9      MR. SHELOWITZ:  That's the
10  one.
11      THE WITNESS:  That came
12  from a backup hard drive that
13  had the cell sheets that Russ
14  Palladino created for our CDs.
15  Q.  Actually, I'm a little bit lost with
16  that.  What's a cell sheet?
17  A.  It's a description of the record that
18  would give somebody who's not exposed to the record
19  an idea of what it's about without, necessarily,
20  having to listen to it.
21  Q.  In what form was this maintained?
22      You said it came from Russ Palladino's
23  backup hard drive?
24  A.  It came from my backup hard drive.

[71]

Douglas Berlent

1  Q.  Your backup hard drive.  Where is that
2  backup hard drive?
3  A.  It's now part of my computer hard
4  drive.
5  Q.  So, this, what I'm looking at, Bates 1,
6  this printout in an electronic form reposes on your
7  hard drive?
8  A.  Hopefully, still, yes.  We did have a
9  major hard-drive crash, two weeks ago, but I
10  believe, somewhere, it would still reside.
11  Q.  Okay.  And how was it designated on
12  your hard drive?  What's the file name on your hard
13  drive?
14  A.  To the best of my recollection, it says
15  "Cell Sheets."
16  Q.  And does it have cell sheets for other
17  products?
18  A.  Yes.
19  Q.  Are these Russ Palladino's related
20  products?
21  A.  They're my albums and cell sheets were
22  created by Russ Palladino for me.
23  Q.  And who was it that went and looked on
24  your hard drive to find this document or find this

[72]

Douglas Berlent

1  media?  Was that you?
2  A.  I believe that Russ sent it to me.
3  Q.  Recently?  After the suit was filed?
4  A.  I'm sorry?
5  Q.  After the lawsuit was filed?
6  A.  I don't recall the date.
7  Q.  Okay.  You don't have to recall the
8  date.  Was it after the suit?  Is that what
9  prompted him to send it to you?
10  A.  I don't recall because I may have
11  needed the cell sheets for some of my other albums
12  and asked him for it.
13  Q.  Are there hard copies of this cell
14  sheet existing anywhere besides this printout here?
15  A.  I do not believe so.
16  Q.  And the cell sheet would have been in
17  color similar to the covers of the CDs that you see
18  before you now which are Exhibits 8 and 9; am I
19  correct?
20  A.  Yes.
21  Q.  Okay.  And who wrote the copy for the
22  cell sheet?
23  A.  Russ Palladino.
24  Q.  And where was it used, to your

[73]

Douglas Berlent
1 Douglas Berlent
2 knowledge?
3     A.  It was used to send out to potential
4 customers for the CDs, tapes, music recordings.
5     Q.  To potential customers, is that what
6 you said?
7     A.  Yes.
8     Q.  That would be some sort of a mail list?
9     A.  Could you clarify mail list?
10     Q.  What was the criterion for determining
11 to whom the cell sheets would be sent to those
12 potential customers?
13     A.  My knowledge and determination of who
14 would be relevant.
15     Q.  And, when you went through that
16 exercise of using your knowledge and determination
17 of who would be relevant, what did you come up
18 with?
19     A.  Well, certainly, active at that time
20 was The Orchard and I do, vividly, recall my
21 excitement over The Orchard and discussing that
22 with Ellen.  That was a new relationship that had
23 taken me some months to develop, and, in addition,
24 I had other contacts that were interested in
25 promoting my music that I sent the cell sheet to.

[74]

1 Douglas Berlent
2     Q.  Well, when was it?
3         Let's go back to the -- Let's use that
4 Agreement, which is the Product Representation
5 Agreement, Exhibit 3, which you have a copy of.
6 That's it, right there.
7     MR. SHELOWITZ:  Yeah,
8     this one right here.
9     Q.  So, the copy that you have in your hand
10 which your Counsel produced to us is one that,
11 actually, came from our files; is that right?  We
12 gave it to you, you gave it back to us?
13     A.  I did not produce the document.
14     Q.  Well, I see that it has an (845) number
15 up top.  That's, probably, my client's number.
16     MR. MONAGHAN:  Is that
17     correct, Mr. Shelowitz?
18     MR. SHELOWITZ:  Off the
19     record.
20         (Discussion held off the
21     record.)
22     Q.  Now, Mr. Maxwell, your Counsel has just
23 indicated he's not, exactly, sure where this
24 Agreement came from in the production we got from
25 the Defendants, a joint production, and I'm

[75]

1 Douglas Berlent
2 directing your attention to Maxwell-3 and ask you
3 who prepared this Agreement?
4     A.  From the best of my recollection, the
5 initial draft was prepared by me --
6     Q.  Uh-huh.
7     A.  -- and then modified by Ellen.
8     Q.  And you dealt only with Ellen in
9 connection with this Agreement?
10     A.  To the best of my recollection, yes.
11     Q.  And you said it was modified by Ellen.
12 Are you talking about the handwritten modification
13 on the second page down at the bottom under the
14 signatures or are you talking about --
15     A.  Could you tell me what it says?
16     MR. SHELOWITZ:  I'm going
17     to read it out for the record
18     at his request.
19         It looks like letters "EB."
20     "Each negotiation and deal may
21     be different and may require
22     a review of percentages
23     previously agreed to," in script.
24     THE WITNESS:  I did not write
25     that, and, to my recollection,

[76]

1 Douglas Berlent
2 through our telephone conversations,
3 we had gone through the Agreement,
4 together, and had to reflect our
5 mutual understanding.
6     Q.  No.  I understand what you're saying
7 now, but I'm asking you:  Earlier, you said there
8 was some modifications.  I asked you then, after
9 that, was that handwritten modification the
10 modification you were talking about, and that's the
11 question on the table now, and then I will ask you
12 if there were modifications to the typed portion?
13     A.  That handwritten modification, to the
14 best of my recollection, would be one of those,
15 but, honestly, I don't recall the specific
16 modification or we didn't initial it, so.  I didn't
17 produce the document.  So, I don't know.
18     Q.  All right.  You're unable to, sitting
19 here today, to tell me whether any of the
20 typewritten content represents some modifications
21 from your initial draft that you gave Ellen; is
22 that right?
23     A.  Could you repeat the question?  I'm not
24 sure I understand it.
25     Q.  You're unable to tell us, today,

[77]

Douglas Berlent

1  whether the typewritten material in this two-page
2  Agreement includes modifications made by Ellen; is
3  that right?
4      A.  I believe I am able to tell you that
5  from the best of my recollection --
6      Q.  Uh-huh.
7      A.  -- if this is the original Agreement
8  that Ellen and I worked on, together, we both had a
9  hand in drafting it.
10      MR. SHELOWITZ:  I think
11      he's answered your question
12      very clearly, actually.
13      MR. MONAGHAN:  Well,
14      perhaps.
15      Q.  Is this the Agreement that was,
16  eventually, worked out between you and Gloryvision,
17  Ellen Bernfeld, Exhibit 3?
18      A.  To the best of my recollection, yes.
19      Q.  Okay.  Now, you and only you and she
20  conducted these negotiations; correct?
21      A.  To the best of my recollection, yes.
22      Q.  Who else works for -- in this time
23  frame, who else worked for Media Right Productions?
24      A.  No one.

[78]

Douglas Berlent

1      Q.  And are you, also, an engineer?  You
2  know, studio engineer?
3      A.  Yes, I have that skill.
4      Q.  Okay.  Now, without looking at the
5  Agreement, what was your understanding of what
6  Media Right Productions was supposed to do for
7  Gloryvision and Ellen with respect to Cats and
8  Dogs?
9      A.  I was going to use any means at my
10  disposal to generate income from the sale of the
11  recordings and to be compensated a percentage of
12  the income that I generated as a result.
13      Q.  Did you discuss these means with Ellen,
14  the means at your disposal that you just described?
15      A.  Yes, I did.
16      Q.  And what means did you tell her you
17  were going to use to generate this income?
18      A.  I, as I said, at the time was very
19  excited about The Orchard, what it was able to do
20  and was going to do.  I, also, told her about the
21  successes that I was having with catalogue
22  marketing and other types of specialized markets
23  that these topical or niche recordings were
24  relevant for.

[79]

Douglas Berlent

1      Q.  Did you have these discussions about
2  The Orchard before this Agreement was signed?
3      A.  Yes.
4      Q.  How much before?
5      A.  It was a great basis of, from what I
6  would recall, our first conversation and, probably,
7  one of the reasons why Russ felt it would be also
8  very interesting to Ellen.
9      Q.  Well, how else were you going to -- At
10  the same time that you were dealing with Ellen, did
11  you, also, provide a service to composers of
12  promoting their music through an agreement that was
13  not called a Product Representation Agreement?
14      A.  I'm not sure I understand the question.
15      Q.  You told us, earlier, that this
16  Agreement, this type of Agreement of a Product
17  Representation Agreement was only used in two
18  instances, the Cigar Smokin' Sounds instance and
19  the Cats and Dogs instance; did I get that right?
20      A.  Yes.
21      Q.  Okay.  But you're, also, representing
22  artists, promoting their music in some other
23  fashion or manner at the same time; aren't you?
24      A.  Not to my knowledge.

[80]

Douglas Berlent

1      Q.  Okay.  Had you done that before,
2  represented artists in promoting their music and
3  selling their music?
4      A.  Only myself.
5      Q.  Only yourself.  Okay.
6      Well, why was this Agreement
7  characterized as a Product Representation Agreement
8  rather than a Music Representation Agreement?
9      A.  I would, actually, attribute it to a
10  very personal reason.
11      Q.  Whose personal reason?
12      A.  My personal reason.
13      A friend of mine was the -- is a
14  salesperson for Synclavier, a synthesizer company,
15  and we used to make fun of him how he referred to,
16  instead of music, he called it "product," and we
17  sort of adopted it because it allowed us to have a
18  distance from the music and sort of as an inside
19  concept to us.
20      Q.  All right.  I understand what you're
21  saying.
22      By the time this Agreement was signed,
23  had you received copies of Exhibits 8, 9 and 10?
24      A.  Yes.



[81]

1           Douglas Berlent
2      Q.  And had you gotten those from Russ or
3  from the Plaintiffs?
4      A.  To the best of my recollection, I got
5  it from Plaintiffs.
6      Q.  Okay.  Did they give you a supply of
7  these?
8      A.  To the best of my recollection, after
9  our Agreement was signed.
10     Q.  Uh-huh.  You got a supply?
11     A.  You want to define supply?
12     Q.  A quantity?  Some quantity?
13     A.  Yes.
14     Q.  Okay.  And so, before the Agreement is
15  signed, they gave you what, one of each or several
16  of each?
17     A.  To the best of my recollection, one of
18  each.
19     Q.  Okay.
20     A.  And, perhaps, a cassette tape, but I am
21  not positive.
22     Q.  Okay.
23        MR. SHELOWITZ:  Just so
24     the record is clear, you're
25     lumping.  There are three

[82]

1           Douglas Berlent
2     products with three exhibits.
3     You're lumping, together.
4        So, if you can ask him,
5     separately, because I think
6     there may be different answers
7     depending on which exhibit
8     you're referring to.
9     Q.  Okay.  Does that sound correct,
10  Mr. Maxwell?
11        There's Songs For Dogs is Exhibit 8,
12  which is a wrapped CD case with a CD in it, Songs
13  For Cats is wrapped with the CD in it and then
14  Songs For Dogs, 10 songs, is a gift-box set.  What
15  are these?
16        MR. KORIK:  You want
17     to mark these, as well?
18        MR. MONAGHAN:  Yeah.
19     Let's mark these.
20        Why don't we make them
21     A and B of the CDs?
22        MR. KORIK:  Okay.  Dogs
23     is 8A.  Cats is 9A.
24        (Plaintiffs' Exhibit
25     Maxwell-8A, cassette entitled

[83]

1           Douglas Berlent
2     "Songs For Dogs," marked for
3     identification; Plaintiffs'
4     Exhibit Maxwell-9A, cassette
5     entitled "Songs For Cats,"
6     marked for identification.)
7      Q.  Okay.  Mr. Maxwell, coming back to the
8  question about what you were given before the
9  Agreement was signed in February of 2000, the
10  Product Representation Agreement, Maxwell-3 for
11  identification, you received, you thought, perhaps,
12  one of each.  Is that one of each of the five
13  exhibits represented by the tapes and the CD
14  cassettes that I have in front of you here?
15     A.  To the best of my recollection, I
16  believe I only received the CD, two CDs, Songs for
17  Cats and Songs for Dogs and the book.  I, actually,
18  don't know if I ever received the cassette.
19     Q.  Okay.  I just picked up on your answer
20  before.  That's fine.
21        Did you have occasion to listen to the
22  material?
23     A.  Yes, I did.
24     Q.  Okay.  And did you find it interesting
25  and something that you were interested in

[84]

1           Douglas Berlent
2  promoting?
3      A.  I found that it was something I was
4  interested in promoting.
5      Q.  Okay.  And, when you received this
6  material from the Plaintiffs, did you understand
7  that they had commissioned the artwork, prepared
8  the copy, had caused the CDs to be recorded, paid
9  for musicians and, in fact, put everything that you
10  see before you in these two CDs that you mentioned
11  you had got?  Did you understand they had done all
12  that work?
13     A.  I had no knowledge of what their
14  contributions had been.
15     Q.  Well, you knew someone had paid for all
16  that work; correct?
17     A.  Yes.
18     Q.  Okay.  And did you understand there was
19  artwork involved?
20     A.  Yes.
21     Q.  Okay.  And that was artwork not only on
22  the covers but in the booklets that accompanied the
23  CDs; correct?
24     A.  Correct.
25     Q.  Okay.  And did you understand that

[85]

Douglas Berlent

1  there had been recording sessions involved?
2      A.  I would make that assumption.
3      Q.  Right.  And did you understand that
4  there were musicians and singers involved in those
5  recording sessions?
6      A.  I did not know if there was musicians,
7  plural, musicians, singular.  I knew nothing about
8  the specifics of the making of the recordings.
9      Q.  Well, did you examine the CDs,
10 themselves, with the names of the songs and who the
11 composers were?
12     A.  I examined the names of the songs and I
13 listened to the songs.
14     Q.  Okay.  How did you satisfy yourself, if
15 you did, that the Plaintiffs had the rights to do
16 anything with respect to these compositions?
17     A.  Well, again, going back to Russ, I knew
18 that since he, also, manufactured all of my
19 recordings that there was a very stringent form
20 that you had to sign that you had to declare that
21 you were the owner of the copyright, that you had
22 the right to manufacture the CD and gave Europadisk
23 permission to do that.
24         So, I knew that any music product that

[86]

Douglas Berlent

1  Russ would refer to me that he manufactured that
2  the owners of that copyright had to have sworn that
3  they own the music and it wasn't being pirated,
4  illegally.
5      Q.  Well, did you, actually, see an
6  agreement between Europadisk and any of the
7  Plaintiffs?
8      A.  No.  I did not.
9      Q.  You just assumed that to be the case
10 because of your relationship with your friend and
11 the way he conducted business, as far as you
12 understand it?
13     A.  Yes.
14     Q.  Okay.  And do you have such an
15 agreement with Europadisk, at any time?
16     A.  Yes.  I have signed that agreement.
17     Q.  Okay.  And so, as far as you're
18 concerned, once it passed Europadisk, that was good
19 enough for you in terms of the copyrights; is that
20 what you're telling us?
21     A.  In terms of the authority --
22     Q.  Right.
23     A.  -- to manufacture the CD?
24     Q.  Right.

[87]

Douglas Berlent

1      A.  Specifically, my best friend Russ.  I
2  would not extend that to Europadisk.  But something
3  Russ told me to be true, I would affirm his truth.
4      Q.  And what did Russ tell you about the
5  copyrights on these?
6      A.  We never discussed it.
7         MR. MONAGHAN:  Okay.  I'm
8      sorry.  Could you go back and
9      give me the answer when I asked
10     him about whether he had seen
11     an agreement between Europadisk
12     and Plaintiffs?
13     Q.  Let me ask that again.  You said you
14 hadn't; correct?
15     A.  I had not.
16     Q.  So, you hadn't seen an agreement
17 between Europadisk and Plaintiffs and you didn't
18 discuss it with Russ.
19         So, essentially, you had no knowledge
20 of the copyrights inherent in these musical
21 compositions; is that right?
22     A.  No, I did not.
23     Q.  When you say no, you did not, you had
24 no knowledge of the copyrights as far as these

[88]

Douglas Berlent

1  products were concerned?
2      A.  I made an assumption that they belonged
3  to Ellen Bernfeld.
4      Q.  Okay.  Now, have you discussed this
5  case with Russ Palladino?
6      A.  Yes.
7      Q.  Okay.  And when was that?
8      A.  When he was a party to the suit.
9      Q.  And did you ask him about the
10 copyrights, at any time?
11     A.  No, I did not.
12     Q.  Did you ask him about authority to make
13 copies of these CDs?  In other words, you said to
14 Russ, Russ, what authority did you have to make any
15 copies of these CDs and cassettes?
16     A.  No, I did not ask him that question.
17     Q.  Okay.  If I can direct your attention
18 to the Product Representation Agreement,
19 Plaintiffs' Exhibit -- I'm sorry -- Maxwell
20 Exhibit 3.  You said you drafted this, essentially.
21 Although, it may, also, represent the combination
22 of your points and Ellen's points; correct?
23         MR. SHELOWITZ:  He said
24     it did reflect a combination

[89]

Douglas Berlent

1        of his points.
2        MR. MONAGHAN: It did.
3    I don't disagree with that.
4        Q.  Can you tell me which parts of this
5    were drafted by you, exclusively, and which parts
6    of it represent contributions by Ellen?
7        A.  No, I cannot.
8        Q.  And when did you first hear the name
9    "Gloryvision"?
10       A.  It was, probably, in connection with
11   the writing of this Agreement.
12       Q.  Okay.  And I'm now reading you the
13   second paragraph, "Media Right Productions is
14   hereby granted the authority to act as agent and
15   representative, on a non-exclusive basis, for the
16   CDs and tapes entitled 'Songs For Dogs' and 'Songs
17   for Cats,' and 'Songs for Dogs CD and Book.'"
18       Did I read that, accurately?
19       MR. SHELOWITZ:  I think
20   this is a question that he's
21   having trouble seeing; okay?
22       So, the contract speaks
23   for itself.  If that's what
24   the contract says, that's what

[90]

Douglas Berlent

1        the contract says.  I don't
2        know how he can be of any
3        assistance based on his
4        difficulty in reading this.
5        Q.  Does that sound like what you've heard
6    was the subject matter of the agency between you
7    and Media Right Productions and the Plaintiffs?
8        MR. SHELOWITZ:  Again, I'm
9        going to object to that.  The
10       contract is written and speaks
11       for itself.
12       MR. MONAGHAN:  I tried it,
13       the easy way, which is:  Did I
14       read it, correctly?  You're
15       Counsel.  You have it in front
16       of you.
17       MR. SHELOWITZ:  You want
18       to ask him his understanding of
19       what the Agreement says?
20       If you're reading it and
21       you're a lawyer and telling the
22       truth, that's what it says,
23       he'll believe that's what it
24       says if you're reading it.

[91]

Douglas Berlent

1        MR. MONAGHAN:  No.  I'm
2    asking if Mr. Maxwell is unable
3    to read it -- I noticed he was
4    able.
5        Q.  You're able to read this if you place
6    it close to your eye; are you not?
7        A.  Very closely.
8        Q.  All right.  Would you take a moment,
9    since this is an important point?  I won't trouble
10   you with everything we've got to look at.
11       A.  Which?
12       Q.  The second paragraph.
13       MR. SHELOWITZ:  Come on.
14   This is not fair.
15       If you want to read what
16   it says, read what it says.  I
17   will tell you if it's an
18   accurate reading of the
19   contract, but the contract is
20   in the record.  Its been
21   produced.  Nobody disputes
22   this is the contract.
23       MR. MONAGHAN:  Okay.
24       MR. SHELOWITZ:  I'm not

[92]

Douglas Berlent

1        sure what your line of
2    questioning is.  It's torture
3    here for him.  It's not fair.
4        MR. MONAGHAN:  No.  I
5    disagree.  I think you're just
6    fencing, unnecessarily.
7        MR. SHELOWITZ:  I'm not.
8    It's a contract that's written.
9    If you want to read it again, I
10   will confirm that's what the
11   contract says and you can ask
12   what he thinks it means, but not
13   whether it's a correct reading
14   of the contract.
15       MR. MONAGHAN:  All right.
16   I'll pursue additional questions.
17       Q.  What did you understand the phrase
18   "granted authority" -- What did you understand the
19   phrase "Media Right Productions is hereby granted
20   the authority to act as agent and representative,
21   on a non-exclusive basis, for the CDs and tapes
22   entitled 'Songs For Dogs' and 'Songs For Cats,' and
23   'Songs For Dogs CD and Book'" to mean?
24       A.  That we were not the only people

[93]

Douglas Berlent

1  allowed to sell it.
2     Q. What did you understand you had
3  authority to sell?
4     A. The music for Dogs and music for Cats.
5     Q. Where, in the sentence I just read you,
6  does it say that?
7     A. It's sort of implied on what a CD and
8  cassette contains.
9     Q. Where does it say that you're
10  authorized to do anything other than sell the CDs
11  and tapes that we've marked as exhibits?
12     MR. SHELOWITZ: Is that
13  where in this sentence or where
14  in the Agreement?
15     MR. MONAGHAN: In the
16  sentence I just read?
17     And I would appreciate it
18  if you didn't make any sort of
19  speaking suggestions,
20  Mr. Shelowitz. They're
21  contraindicated by the Rules.
22  The Courts have been very clear
23  about that.
24     THE WITNESS: It's implied

[94]

Douglas Berlent

1  in the discussion and I know
2  Ellen and I had as to what the
3  intent was with this music.
4     Q. You would agree with me then that,
5  literally read, there is nothing in that sentence,
6  that second paragraph, that gives Media Right
7  Productions authority to do anything other than
8  sell these CDs and tapes; would you not?
9     A. Literally read, yes.
10     Q. And, at the time you negotiated with
11  Ellen, she had already employed the services of
12  your friend Russ Palladino to, actually, make
13  copies for sale of the CDs and tapes; hadn't she?
14     A. I believe yes.
15     Q. And then I asked you, earlier, whether
16  she had given you a supply of these. You asked me
17  to define supply and I said quantity, and you said
18  you believe there was a quantity of these CDs and
19  tapes supplied after the contract; correct?
20     A. Correct.
21     MR. SHELOWITZ: And are
22  you referring, also, to the
23  book and tapes that when you
24  lump the CDs and tapes,

[95]

Douglas Berlent

1  together? Because, remember,
2  there are three separate
3  exhibits.
4     MR. MONAGHAN: Yes.
5     THE WITNESS: To clarify,
6  I do not recall receiving a
7  supply of the book. I do
8  recall receiving, I believe,
9  one box of each of the CDs for
10  Cats and the CD for Dogs, and,
11  at that time, I believe the
12  standard Europadisk boxing was
13  20 or 25 units.
14     Q. Do you have any idea how many you got?
15     A. I believe it to be 20 or 25 of each.
16     Q. And they came, excuse me, from the
17  Plaintiffs?
18     A. I believe that to be yes.
19     Q. Okay. And they came prepackaged as in
20  the form they are in now on the table here, wrapped
21  in cellophane?
22     A. Yes.
23     Q. And these had already -- the supply
24  that you got, the 20 or 25 from the Plaintiffs,

[96]

Douglas Berlent

1  those had already been obtained from Mr. Maxwell --
2  not Mr. Maxwell, you're Mr. Maxwell -- from
3  Mr. Palladino and delivered to the Plaintiffs and
4  then in some portion of the quantity delivered to
5  you?
6     A. Is that a question?
7     Q. It is.
8     A. I don't know the --
9     Q. You don't know the route?
10     A. The route.
11     Q. Okay. Fine.
12     How did you, actually, get the copies?
13  Were they hand-delivered by Ellen?
14     A. I believe they were sent to me. They
15  were not hand-delivered. I never met Ellen.
16     Q. Okay.
17     MR. SHELOWITZ: How about
18  taking a lunch break?
19     MR. MONAGHAN: Oh, yes.
20  No. Let me go about 5
21  or 10 minutes and then break;
22  all right.
23     Q. Didn't you understand at the time you
24  negotiated this Agreement with Ellen that if you

[97]

Douglas Berlent

2  needed additional copies to sell, you would tell
3  Ellen I need some more product and that Ellen would
4  then procure the product and deliver it to you?
5  Didn't you have that understanding with her?
6      A.  I would assume so.  That would be my
7  only way of obtaining the product.
8      Q.  Well, Russ had the ability to make
9  copies of the CDs and tapes; didn't he?
10     A.  Russ worked for Europadisk who had that
11 ability.
12     Q.  Right.
13         How about the artwork and the booklet?
14 Was Russ's company, Europadisk, able to reproduce
15 that, to your knowledge?
16     A.  I do not know.  For your information,
17 to the best of my recollection --
18     Q.  Right.
19     A.  -- I believe that they did not do
20 printing.
21     Q.  Okay.  Now, where, in the paragraph
22 that I read to you, earlier, which has been the
23 subject of this last line of inquiry, is there any
24 authority for you, Media Right Productions, to make
25 any copies of any of these CDs?

[98]

Douglas Berlent

2      A.  Well, I will assume since you read it
3  to me and that was not specified, then I would say
4  that it does not, literally, specify that.
5      Q.  And you have familiarity with the
6  copyright laws being a composer, yourself, and you
7  understood, didn't you, at the time, that you
8  couldn't just make copies without permission of the
9  composers?  Didn't you know that?
10     A.  Yes, I knew that.
11     Q.  In fact, you said you thought Russ was
12 very stringent in making sure, before he made
13 copies, he got that authorization; didn't I hear
14 you say that, earlier?
15     A.  Yes, you did.
16     Q.  So, you're not relying upon anything in
17 the four squares of this Agreement to give you
18 authority to have made copies of these CDs or
19 tapes; is that right?
20         MR. SHELOWITZ:  Objection
21     to the form.  You've asked him
22     that, a single sentence, and
23     now you're talking about four
24     corners of the entire document.
25     You can ask him what's inside

[99]

Douglas Berlent

2  the four corners of the document.
3         MR. MONAGHAN:  Okay.  I'll
4     take that.
5         MR. SHELOWITZ:  What is his
6     understanding of?
7      Q.  Let's, first, start with the language.
8         Is there anything in the four corners
9  of the Agreement that you're aware of, with several
10 months after this litigation, is there anything in
11 the four squares of this Agreement that gives Media
12 Right Productions the right to make copies of our
13 clients', the Plaintiffs', CDs and tapes?
14     A.  Yes.
15     Q.  Okay.  And what is the language that
16 gives you that authority?
17     A.  I would have to ask my Counsel to
18 direct me to help me read that portion of the
19 Agreement that Ellen and I intended to cover that
20 eventuality.
21     Q.  All right.  That's fine.  Go ahead.
22     A.  May I ask my Counsel to read it?
23         MR. MONAGHAN:  Sure.
24         MR. SHELOWITZ:  I think
25     the contract speaks for itself,

[100]

Douglas Berlent

2  but Paragraph 3 of this
3  Agreement says, "Media Right
4  Productions will use its best
5  efforts to market and promote
6  these recordings to catalogues,
7  shopping networks, internet
8  sites, retailers, and wholesalers.
9  Media Right Productions will pay
10 all marketing expenses for this
11 purpose including postage,
12 telephone, printing, advertising,
13 trade shows, time, and travel."
14 And then, you know, it's a
15 two-page contract and it's filled
16 with provisions.
17     Again, you can ask the
18 Plaintiff what his understanding
19 is of his rights under the
20 Agreement.
21     MR. MONAGHAN:  I'm
22 reasonably confident --
23     MR. SHELOWITZ:  Defendant,
24 excuse me.
25     Q.  What language that your Counsel just

[101]

Douglas Berlent

1  read, in your view, Mr. Maxwell, gave you the right
2  to have copies made which were not supplied by the
3  Plaintiffs?
4      MR. SHELOWITZ:  This is a
5      basic assumption here.  I don't
6      recall you asking him whether
7      he ever made copies.  You have
8      assumed, throughout, that he's
9      made copies without asking him
10     that question.
11     MR. MONAGHAN:  Well, you
12     know, again, this is I think a
13     speaking suggestion, which I
14     don't think is appropriate.
15  Q.  So, did you understand the question now
16  that you have that backdrop with your Counsel's
17  suggestion?
18     A.  I don't recall what the question is.
19  Q.  Do you agree with me that a digital
20  copy is a copy?
21     A.  Yes.
22  Q.  Okay.  So, where did you have -- Coming
23  back to my original question, which I thought you
24  had answered, obliquely, before, which is:  By what

[102]

Douglas Berlent

1  authority could copies be made of this product,
2  copies that didn't come from my clients, directly?
3  Your Counsel read Paragraph 3 and I wanted to know
4  which words there said that?
5      A.  The reference to recordings and
6  Internet sites, that, even at that time of this
7  Agreement, there was no other way to participate in
8  that domain.
9      Q.  Well, what is amazon.com?  Isn't that
10  an Internet site?
11     A.  It is an Internet site.
12  Q.  Wasn't that the Internet site that was
13  being referred to in Paragraph 3?
14     A.  I'm not even sure I recall if Amazon
15  existed then, but I didn't refer to Amazon,
16  specifically.
17  Q.  Well, you didn't refer to any.  The
18  phrase is "internet sites."  What Internet sites
19  did you have in mind at the time?
20     A.  Well, that references back to the
21  discussions that Ellen and I had in our
22  conversation and basis for the excitement that we
23  shared.  Specifically, The Orchard, was the basis
24  for that.

[103]

Douglas Berlent

1  Q.  But what does the phrase "these
2  recordings" mean?  How is that term defined in the
3  Agreement, if it is?
4      A.  Well, as you can see and as I've
5  attested to you, Ellen -- Well, I don't know if
6  Ellen had an attorney look at it, but, to the best
7  of my understanding, I did not have an attorney
8  draft the Agreement.  I drafted it with Ellen to
9  reflect our understanding and we're not lawyers.
10  So, we didn't define anything, legally.
11     In terms of the definition of what a
12  recording is, we were two composers that had a
13  mutual understanding of wanting to help each other
14  and that's why this Agreement is the way it is.
15  Q.  Why didn't it just say, as I asked you,
16  earlier, Music Representation Agreement?  If you
17  believe you were granted authority to sell the
18  music through the Internet sites, why not just say
19  so?
20     MR. SHELOWITZ:  Objection.
21     Asked and answered.
22     MR. MONAGHAN:  Okay.  I'm
23     still going to ask you the
24     question again.

[104]

Douglas Berlent

1  THE WITNESS:  I told you
2  that it was, at that time, a
3  relevant topic of humor and
4  meaning that we adopted.  Ellen
5  didn't object to it and I used
6  it.
7      Q.  Okay.  Then why does the second
8  paragraph use the phrase "CDs and tapes"?  What
9  does that add, to your understanding?
10     A.  I do not recall the specific intent of
11  Ellen and myself as we drafted the Agreement as we
12  defined it, but, certainly, I think that would
13  include the obvious incarnation here of the
14  exhibits that you've presented.
15  Q.  And where does the authority in this
16  Agreement repose that gives anybody the right to
17  sell individual songs from these CDs and tapes
18  entitled "Songs For Dogs, Songs For Cats, Songs For
19  Dogs CD and Book"?
20     A.  Again, from my understanding and what I
21  believe to be Ellen's understanding, the reference
22  to recordings accounted for that eventuality.
23  Q.  And you don't think that "these
24  recordings" refer to the entire compilation and

[105]

Douglas Berlent

1    Songs For Dogs and Songs For Cats and Songs for
2    Dogs CD and Book; is that what you're saying?
3        A.  I believe the way you just asked the
4    question, there are two questions.  If you could
5    read back the question and I will answer it.
6        Q.  I will ask it again.
7            There is no point in you and I arguing
8    about this.  We, obviously --
9        A.  I'm not arguing.  I would be happy to
10   answer your question.
11       Q.  We have a different interpretation.
12   But would you agree with me the phrase "CD and
13   tapes" is extraneous to the Agreement in your
14   interpretation?
15       A.  I don't understand what you mean by the
16   word "extraneous."
17       Q.  Unnecessary?
18       A.  I don't think I understand the
19   question.
20       Q.  Well, the second paragraph says "Media
21   Right Productions is granted authority to act as
22   agent and representative, on a non-exclusive basis,
23   for the CDs and tapes entitled 'Songs For Dogs' and
24   'Songs For Cats,'" and I'm saying, under your

[106]

Douglas Berlent

1    interpretation, we really don't need that phrase
2    "CDs and tapes" because you're telling us that you
3    are entitled to sell the music and promote the
4    music?
5        A.  I believe that we do need that, as did
6    Ellen, because I believe that we were talking about
7    two different eventualities.  It's very obvious
8    we're talking about one element of the Agreement
9    which is to sell CDs and tapes and there's another
10   eventuality that Ellen and I discussed and both
11   understood that knew that there were other
12   potentials that we needed to account for.
13       Q.  Well, let's take the third paragraph
14   then where it says, "Media Right Productions will
15   use its best efforts to market and promote these
16   recordings."  Let's take, first, catalogues.  Those
17   catalogue sales would have been of the intact CDs
18   and the intact cassettes; wouldn't they?
19       A.  In all likelihood, yes.
20       Q.  Okay.  And, on the shopping networks,
21   that would have been the same, that is, they would
22   have been sold, intact?
23       A.  When you say "intact" --
24       Q.  Without individual songs being sold,

[107]

Douglas Berlent

1    separately?
2        A.  We don't -- We wouldn't know that.  I
3    didn't have the opportunity to have success with
4    any of the shopping networks, but I can tell you,
5    from my experience, that I do believe that we did
6    have success with a shopping network and/or when
7    they discussed with us doing business that the
8    possibility of doing a custom compilation or new
9    ordering or fewer songs is always possible.
10       Q.  But, on the Internet sites, iTunes and
11   such, you can buy a song at a time; isn't that
12   right?
13       A.  That is correct.
14       Q.  Okay.  And you can, digitally, download
15   it; correct?
16       A.  That is correct.
17       Q.  And digital download rights are a whole
18   set of different rights, aren't they, in the music
19   business?
20       A.  I only have a layman's understanding of
21   what that would be, but I understand they would be
22   a different set of rights.
23       Q.  Okay.  And, in fact, composers license
24   the right to do digital downloads; don't they,

[108]

Douglas Berlent

1    specifically?
2        A.  I don't know what composers do, in
3    general.
4        Q.  Are you aware of anything going on in
5    the music industry regarding digital download
6    rights?
7            MR. SHELOWITZ:  Objection
8    to the form.
9            MR. MONAGHAN:  Any
10   controversies over those?
11           THE WITNESS:  Yes, I am.
12       Q.  Okay.  What's the extent of your
13   knowledge of the controversy?
14       A.  That they have not settled in with the
15   de facto way dealing with it.
16       Q.  And are you aware that agreements,
17   licensing agreements, publishing agreements that
18   are - that predate that technology, that there's a
19   dispute over whether or not those license
20   agreements include the right to sell digital
21   downloading?
22       A.  Could you ask that question again,
23   please?
24       Q.  Among the controversy or included in

[109]

1              Douglas Berlent
2    controversy is the issue of whether or not these
3    older music publishing agreements included the
4    right to sell digital downloading?
5         A.  I wouldn't know about that.
6         MR. MONAGHAN:  Okay.  All
7    right.  You want to break?  It's
8    10 of 1.  What time would you
9    like to come back?
10        MR. SHELOWITZ:  Take a half
11   hour?
12        MR. MONAGHAN:  Half hour.
13   Be back at 20 after?
14        MR. SHELOWITZ:  Sure.
15        MR. MONAGHAN:  There's a
16   cafeteria in the building.
17        MR. SHELOWITZ:  Thanks.
18        (Recess taken.)
19        (Plaintiffs' Exhibit
20   Maxwell-10, two-page amazon.com
21   screen shot, marked for
22   identification; Plaintiffs'
23   Exhibit Maxwell-11, three-page
24   rhapsody.com screen shot, marked
25   for identification; Plaintiffs'

[110]

1              Douglas Berlent
2    Exhibit Maxwell-12, two-page
3    amazon.com screen shot, marked
4    for identification; Plaintiffs'
5    Exhibit Maxwell-13, multipage
6    document entitled "The Orchard,
7    Digital and CD Distribution,"
8    marked for identification.)
9         Q.  Very Cool Media, do you know that
10   company?
11        A.  Yes, I do.
12        Q.  Is that one of Russ's?
13        A.  Yes.
14        Q.  And what is his business?
15        A.  I believe it's in the business of
16   replicating CDs.
17        Q.  This would be the business that Russ
18   picked up when he left Europadisk?
19        A.  I should say brokering the replication
20   of CDs.  He doesn't own any physical equipment to
21   do that.
22        Q.  Okay.  And where does it operate from,
23   if you know?
24        A.  I do not know.
25        Q.  Okay.  Is Russ the principal of the

[111]

1              Douglas Berlent
2    company?
3         A.  I do not know.
4         Q.  What dealings have you had with Very
5    Cool Media, you being Media Right Productions?
6         A.  I have contracted with him to replicate
7    CDs for me of my music.
8         Q.  Okay.  What is Elias?  Are you familiar
9    with that?
10        A.  Elias?
11        Q.  Right.
12        A.  No, I'm not.  Or I'm not familiar with
13   the context that you're --
14        Q.  Well, I don't even want to waste time
15   marking it, but I'm going to show you something
16   which is referencing Elias' Links and it mentions
17   Doug Maxwell, Producer, and Very Cool Media, CD
18   manufacturing.  Does this mean anything to you?
19        A.  I've never seen that.
20        Q.  Okay.
21        A.  Oh, wait.  Yes.  I recorded some of his
22   music.
23        Q.  Elias being the artist?
24        A.  Elias.  Elias being the artist, yes.
25        Q.  And Russ made CDs for him or brokered

[112]

1              Douglas Berlent
2    them?
3         A.  I believe so.
4         MR. MONAGHAN:  Okay.  Well,
5    now that I talked about it, I
6    guess, we'll have to mark it.
7         Make that the next number,
8    Kathryn.
9         (Plaintiffs' Exhibit
10   Maxwell-14, two-page document
11   entitled "Elias' Links &
12   Acknowledgements," marked for
13   identification.)
14        Q.  How did you intend to promote the
15   Plaintiffs' products?  How were you going to do
16   that?  Your Product Representation Agreement
17   mentioned catalogue sales.  Did you contact any of
18   the cataloguers?
19        A.  Yes.
20        Q.  Which ones?
21        A.  Um, I did show you the database that we
22   produced for you and I remember --
23        Q.  The production, today?
24        A.  Yes.
25        Q.  Okay.  All right.  You're talking about

[113]

Douglas Berlent

1  Exhibit --
2      MR. KORIK:  6.
3      MR. MONAGHAN:  Yup.
4      Q.  Okay.  I'm showing you now Exhibit 6.
5  Is this what you're referring to as a database?
6      MR. SHELOWITZ:  Yeah,
7  I have, if you want to work
8  with that?
9      MR. MONAGHAN:  Yes.
10     Q.  Okay.  Tell us what Exhibit 6 is.
11     A.  That's a database of the people that I
12 contacted in an attempt to market songs, music for
13 dogs, music for cats.
14     Q.  What do the references on the top line
15 represent?
16     A.  This is going back a long ways, but I
17 believe that they were various categories that I
18 referenced on how to track the record.
19         Are you asking me to go through each
20 one?
21     Q.  No, we don't have time for that.
22         Am I correct that this is not only
23 related to the songs at issue in this suit, but,
24 also, other of your clients or customers?

[114]

Douglas Berlent

1      A.  It's all my music, all my albums that
2  we've talked about.
3      Q.  Cause I see the reference to Cigar next
4  to Dog and Cat?
5      A.  Right.
6      Q.  That was the one you talked about,
7  earlier?
8      A.  Uh-huh.
9      Q.  That's the other Product Representation
10 Agreement?
11     A.  Yeah.
12     Q.  Okay.  The top line on the first page,
13 what does that refer to?
14     A.  The first active --
15         MR. SHELOWITZ:  Want me
16     to read it for you?  I will
17     tell you what it says.
18         THE WITNESS:  Active.
19         MR. SHELOWITZ:  Active
20     baseline.
21         THE WITNESS:  Active would
22     mean if I put a check mark in
23     the box and it would allow me
24     to find out what was active or

[115]

Douglas Berlent

1  if I need to do something,
2  immediately, taking action.
3      Q.  Okay.  Baseline?
4      A.  I don't recall.
5      Q.  Are those products or music?
6      A.  No.  I don't remember what that is.
7      Q.  Agency, what is that?
8      A.  This is going back, a long time, and
9  I'm not even sure what, you know, revision it is.
10 It's just, as I said, we had a hard-drive crash.
11 So, this was on a backup disk.
12         Agency was if it was, I guess, an ad
13 agency.
14     Q.  Okay.  What is Me for You?
15     A.  That was a rep that we had dealings
16 with.  I think his name was Mike Edelman and he was
17 trying to sell all of our titles.
18     Q.  PI, the next one?
19     A.  Premium Incentive.
20     Q.  E&J?
21     A.  I don't recall.
22     Q.  Boat?
23     A.  I had a record called "H2Overtures."
24 So, the boating industry.

[116]

Douglas Berlent

1      Q.  And then the next column is headed
2  "Catalogue"?
3      A.  I would say assume catalogue.
4      Q.  Yes, I would, too, but how does that
5  tie into anything else on that same page?
6      A.  Well, it would get an "X" or something
7  in that column if it was relevant or if it was a
8  description of that particular company.
9      Q.  There's an "X" in the box right under
10 Catalogue.  There's no other information?
11     A.  Okay.  So, that would mean if you
12 follow the line, horizontally, through the pages,
13 whoever was on that line was, probably, a
14 catalogue.
15     Q.  Okay.  So, Page 1 and Page 2 should be
16 put, together, alongside of each other.  Page 2
17 would be on the right of Page 1?
18     A.  Correct.
19     Q.  And then so I can, if I look at under
20 Cat, there's an "X," and that is indicating that
21 Cat was in a catalogue because there's an "X" in
22 catalogue?
23     A.  No.  That it was in a catalogue.
24 Again, these pages were designed to abut, one

[117]

Douglas Berlent

1  against the other.
2      Q.  Right.
3      A.  So, if you continued your formula and
4  unstapled the pages, put them all next to each
5  other --
6      Q.  I got it, yeah.
7      A.  -- each line is one related
8  descriptive.
9      Q.  What does the "X" in the box under Cat
10 mean?
11         MR. SHELOWITZ:  If you could
12     just -- There are multiple "X"s.
13         MR. MONAGHAN:  There's only,
14     on that particular horizontal
15     line --
16         MR. SHELOWITZ:  On which page?
17     Oh, okay.
18         MR. MONAGHAN:  -- there's only
19     "Cat."
20         MR. SHELOWITZ:  It's the top
21     line.
22         THE WITNESS:  Is Cat next to
23     Dog; right?
24         MR. SHELOWITZ:  Yeah.

[118]

Douglas Berlent

1         THE WITNESS:  Um --
2         MR. SHELOWITZ:  And then --
3         THE WITNESS:  So, again,
4     to understand the way that this
5     information is presented, you
6     would have to put the pages next
7     to each other so you could go,
8     horizontally, across a field and
9     you would see that that particular
10    line, whatever line it's on, if
11    it were the second line, for
12    example, if you continue reading
13    across the fields, everything on
14    the second line would have a
15    relation to that.
16     Q.  I'm lost.  You have an "X" on the
17 second horizontal line.  The only one that has an
18 "X" on the first horizontal line, reading all the
19 way across, is Cat.  I assume that refers to Cats
20 and Dogs, the Cats, music for cats; am I right?
21     A.  I, honestly, can't tell you whether
22 that was Catalogue or Cats and Dogs.
23     Q.  It's right next to Dog?
24     A.  Then I would say --

[119]

Douglas Berlent

1      Q.  In between Cigar --
2         MR. SHELOWITZ:  Why don't
3     we make it, easier, and,
4     actually, attach the page so
5     there's no guessing?  He can
6     tell you, exactly.
7         MR. MONAGHAN:  Well, I would
8     like to move on.  We don't have
9     all day.
10     Q.  So, my question was, earlier, a moment
11 ago, what does the "X" under Cat mean on the first
12 horizontal line?
13     A.  That would mean that whatever follows
14 in that line would have a relevance to the
15 marketing of Cat, the Songs for Cats.
16     Q.  Okay.
17     A.  So, if you follow that line, it might
18 reveal that it was a name of a company.  It might
19 be pets.com or something that would be a relevant
20 marketing venue.
21     Q.  I understand.
22         There are only two "X"s on the first
23 horizontal line, one in the box or column labeled
24 "Catalogue," one in the box or column labeled

[120]

Douglas Berlent

1  "Cat."  So, I can assume from that that Cat was in
2  a catalogue; is that right?
3      A.  No.  You can't assume that it was in a
4  catalogue.
5      Q.  Okay.  Then I just will move on.
6         The second horizontal line going across
7  the page has nothing at all on the first page, no
8  "X"s.
9         MR. SHELOWITZ:  If I could
10    try to help, there's a way.
11    There are four pages that have
12    data on them and we can if Doug
13    can show us.
14        MR. MONAGHAN:  Oh, it's
15    all four.  That's where I'm
16    going awry.
17        MR. SHELOWITZ:  If there's
18    a way Doug can tell us how these
19    flow, together, we can attach
20    them all, together, and he can
21    follow the lines and,
22    specifically, identify what
23    you're asking for.  That may
24    be helpful for where you're